Michael A. Kelly (CA State Bar #71460)
mkelly@walkuplawoffice.com
Matthew D. Davis (CA State Bar #141986)
mdavis@walkuplawoffice.com
Spencer J. Pahlke (CA State Bar #250914)
spahlke@walkuplawoffice.com
WALKUP, MELODIA, KELLY
& SCHOENBERGER
650 California Street, 26th Floor
San Francisco, California 94108-2615
Telephone: (415) 981-7210
Facsimile: (415) 391-6965

Daniel Shulman (MN State Bar #100651)
daniel.shulman@gpmlaw.com
Julia Dayton Klein (MN State Bar #319181)
julia.daytonklein@gpmlaw.com
GRAY, PLANT, MOOTY, MOOTY,
& BENNETT, P.A.
80 South Eighth Street, Suite 500
Minneapolis, Minnesota 55402
Telephone: (612) 632-3335
Facsimile: (612) 632-4335
*Pro Hac Vice Applications Pending*

Michael L. McGlamry (GA State Bar #492515)
mmcglamry@pmkm.com
Wade H. Tomlinson III (GA State Bar #714605)
triptomlinson@pmkm.com
Kimberly J. Johnson (GA State Bar #687678)
kimjohnson@pmkm.com
POPE MCGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, Georgia 30326
Telephone: (404) 523-7706
Facsimile: (404) 524-1648
*Pro Hac Vice Applications Pending*

Lynwood P. Evans (NC State Bar #26700)
lpe@wardandsmith.com
Edward J. Coyne III (NC State Bar #33877)
ejcoyne@wardandsmith.com
Jeremy M. Wilson (NC State Bar #43301)
jw@wardandsmith.com
WARD AND SMITH, P.A.
127 Racine Drive
Wilmington, North Carolina 28403
Telephone: (910) 794-4800
Facsimile: (910) 794-4877
*Pro Hac Vice Applications Pending*

**ATTORNEYS FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA MOORE, GRETA L. ERVIN, RAFF ARANDO, NICHOLS SMITH, RENEE EDGREN and CYNTHIA WELTON, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MARS PETCARE US, INC.; NESTLE PURINA PETCARE COMPANY; HILL'S PET NUTRITION, INC.; PETSMART, INC.; MEDICAL MANAGEMENT INTERNATIONAL, INC. D/B/A BANFIELD PET HOSPITAL; BLUEPEARL VET, LLC, <br><br> Defendants. | Case No. 3:16-cv-7001 <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiffs (collectively referred to herein as "Plaintiffs" or "Plaintiffs/Class Representatives"), individually and on behalf of others similarly situated, file this Class Action Complaint against Defendants Mars Petcare US, Inc. ("Mars"); Nestle Purina Petcare Company ("Purina"); Hill's Pet Nutrition, Inc. ("Hill's"); PetSmart, Inc. ("PetSmart"); Medical Management International, Inc. d/b/a Banfield Pet Hospital ("Banfield Pet Hospital"); and BluePearl Vet, LLC ("Blue Pearl Vet Hospital") (collectively, "Defendants"), and allege as follows:

I.    **GENERAL OVERVIEW**

1.    Defendants individually and collectively exercise significant market power in the United States market for dog and cat food ("pet food"), which is the relevant market for purposes of the federal antitrust claims asserted herein.

2.    Defendants manufacture, market, and sell one or more lines of pet food that are sold at retail by "prescription."

3.    The prescription to purchase the prescription pet food is written by a veterinarian, as would be done for a prescription drug for a dog or cat.

4.    The prescription-authorization requirement enables Defendants to market and sell prescription pet food at well above market prices that would not otherwise prevail in the absence of the prescription-authorization requirement.

5.    Other than as imposed by Defendants, however, the prescription pet food is not required to be sold by prescription.

6.    Defendants' prescription pet food contains no drug or other ingredient not also common in non-prescription pet food.

7.    Defendants' marketing, labeling, and/or sale of prescription pet food is deceptive, collusive, and in violation of federal antitrust law and California consumer-protection law.

8.    Defendants are engaged in an anticompetitive conspiracy to market and sell pet food as prescription pet food to consumers at above-market prices that would not otherwise prevail in the absence of their collusive prescription-authorization requirement.

9.    Retail consumers, including Plaintiffs, have overpaid and made purchases they otherwise would not have made on account of Defendants' abuse and manipulation of the

"prescription" requirement.  Plaintiffs bring this putative class action for violation of United States antitrust law on behalf of themselves and all those similarly situated purchasers of prescription pet food from Defendants, and seek redress in the form of damages, restitution, injunctive relief, and all other relief this Court deems just and proper.  Plaintiffs bring this putative class action for violation of California consumer-protection law on behalf of themselves and all those similarly situated purchasers of prescription pet food manufactured by Defendant manufacturers, and seek redress in the form of damages, restitution, injunctive relief, and all other relief this Court deems just and proper.

## II.     FACTUAL BACKGROUND

### A.     Defendants individually and collectively exercise significant market power in the United States market for pet food.

10.     Manufacturing, producing, marketing, advertising, distributing, and selling pet food is an approximately $24 billion per year industry in the United States.  *See* American Pet Products Association Pet Industry Market Size & Ownership Statistics, attached hereto as Exhibit A.

11.     Most of the approximately 163.6 million domestic cats and dogs in the United States derive their daily nutritional content from commercial pet food.  *See* Humane Society of the U.S. Pet Ownership Estimates, attached hereto as Exhibit B.

12.     Hill's, a Delaware corporation with a principal place of business in Kansas, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels, including, but not limited to, the "prescription only" pet food Hill's "Prescription Diet."  In 2015, Hill's was the fourth largest seller of pet food in the world, with over $1 billion in sales.  *See* petfoodindustry.com Infographic: World's Top Pet Food Companies 2015, attached hereto as Exhibit C.

13.     Purina, a Missouri corporation with a principal place of business in Missouri, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels, including, but not limited to, the "prescription only" pet food Purina "Pro Plan Veterinary Diets."  In 2015, Purina was the second largest seller of pet food in the world, with over $11 billion in sales.  *See* Exhibit C.

14.     Mars, a Delaware corporation with a principal place of business in Tennessee, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels, including, but not limited to, the "prescription only" pet foods Royal Canin "Veterinary Diet" and Iams "Veterinary Formula." In 2015, Mars was the largest seller of pet food in the world, with over $17 billion in sales. *See* Exhibit C.

15.     PetSmart, a Delaware corporation with a principal place of business in Arizona, is the largest pet goods retailer in the United States. Approximately 900 of PetSmart's approximately 1,145 nationwide stores include an onsite "Banfield Pet Hospital." Through these locations, PetSmart sells Royal Canin "Veterinary Diet," Hill's "Prescription Diet," and Purina "Pro Plan Veterinary Diets" pet foods to customers presenting a prescription from a veterinarian. PetSmart also sells other foods manufactured by each Defendant manufacturer.

16.     Banfield Pet Hospital, a Delaware corporation with a principal place of business in Oregon, is the largest veterinary chain in the United States, operating veterinary clinics at PetSmart locations, and at standalone locations, and employing approximately 3,200 veterinarians. Banfield Pet Hospitals sell Prescription Pet Food to customers presenting a prescription from a veterinarian or prescribed such foods by a Banfield Pet Hospital veterinarian.

17.     Mars owns approximately 79% of Banfield Pet Hospital, and PetSmart owns approximately 21%.

18.     Blue Pearl Vet Hospital, a Florida corporation with a principal place of business in Florida, is the largest chain of animal specialty and emergency care clinics in the United States, with approximately 50 locations and 600 veterinarians. Blue Pearl Vet Hospitals sell Prescription Pet Food to consumers prescribed such foods by a Blue Pearl Vet Hospital veterinarian.

19.     Mars owns Blue Pearl Vet Hospital.

20.     As an owner of Banfield Pet Hospital and the owner of Blue Pearl Vet Hospital, Mars employs approximately 7.5% of the companion-animal veterinarians in the United States. *See* American Veterinary Medical Association Market Research Statistics, attached hereto as Exhibit D.

**B.**     **Defendants manufacture, market, and sell one or more lines of pet food that are sold at retail by "prescription."**

21.     "Prescription only" pet food is marketed and sold across the United States.

22.     "Prescription only" pet food sales comprise approximately 5% of all pet food sales in the United States.

23.     Defendants misrepresent "prescription only" pet food in a variety of ways, further discussed below, to be: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the Food and Drug Administration ("FDA") as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

24.     Defendants Mars, Hill's, and Purina each manufacture pet food for which a prescription is required.

25.     Defendant manufacturers sell several different prescription pet foods, a demonstrative list of which is attached hereto as <u>Exhibit E</u>.  Those pet foods listed on <u>Exhibit E</u>, and all similar "prescription only" pet foods manufactured, produced, marketed, advertised, distributed, and/or sold by Defendants, are referred to collectively herein as "Prescription Pet Food," and the labels borne by the foods identified on <u>Exhibit E</u> are incorporated herein by reference.

**C.**     **The prescription to purchase Prescription Pet Food is written by a veterinarian, as would be done for a prescription drug for a dog or cat.**

26.     Most pet owners are familiar with the heartfelt concern and fear that accompanies some trips to the veterinarian, as well as the willingness to follow doctor's orders to, and sometimes beyond, the fullest extent the owner can afford.

27.     Pursuant to Defendants' marketing schemes, a veterinarian may prescribe a Prescription Pet Food for sale to pet owners.

28.     In order that this prescription may be fulfilled, a veterinarian may (a) sell Prescription Pet Food directly to the retail consumer with whom the veterinarian-client-patient

relationship exists, or (b) provide the consumer a written prescription that can be presented at a business that sells Prescription Pet Food, such as Banfield Pet Hospital locations, Blue Pearl Vet Hospital locations, and PetSmart stores with an onsite veterinarian.  That is, Defendants restrict the sale of Prescription Pet Food at retail to those with a prescription from a veterinarian.

29.     The prescription necessary to purchase Prescription Pet Food is hereinafter referred to as the "Prescription Authorization."

30.     For some pets, Prescription Pet Food may be prescribed only for a finite period of time, while, for others, Prescription Pet Food may be prescribed indefinitely, such as for the remainder of the pet's life.

31.     To a reasonable retail consumer, Prescription Pet Food is prescribed and purchased in the exact same manner as a prescription drug for a dog or cat—by veterinarian's orders.

**D.      The Prescription Authorization requirement enables Defendants to market and sell Prescription Pet Food at well above-market prices that would not otherwise prevail in the absence of the Prescription Authorization.**

32.     The American public, and Plaintiffs, as reasonable consumers, have a deep-rooted sense of the role of the prescription in healthcare and well-being.

33.     The American public, and Plaintiffs, as reasonable consumers, associate prescription fulfillment with following doctor's orders.

34.     Meriam Webster's Learner's Dictionary provides simple definitions for the word "prescription" including: "a written message from a doctor that officially tells someone to use a medicine, therapy, etc."; and "a medicine or drug that a doctor officially tells someone to use."

35.     The American public, and Plaintiffs, as reasonable consumers, reasonably expect and believe that a substance that requires a prescription to obtain, for a human or an animal, is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

36.     For instance, in 1997, John Steel, then the recently retired senior vice president of global marketing and sales at Colgate (of which Hill's is a wholly-owned subsidiary) was quoted

by the Wall Street Journal as stating with regard to Prescription Pet Food:  "It's just like taking drugs:  You go to the doctor and he prescribes something for you and you don't much question what the doctor says.  It's the same with animals."  *See* <u>Exhibit F</u>.

37.     In addition to Prescription Pet Food, Defendants also manufacture, produce, market, advertise, distribute, and/or sell one or more non-prescription pet foods, which are marketed for the same or similar conditions as Prescription Pet Foods and are sold at significantly lower prices than Prescription Pet Foods.

38.     Except for the Prescription Authorization and other practices of the Defendants described herein, there is no material difference between Prescription Pet Food and non-prescription pet food.  To the extent there are any differences, they are not sufficient to explain the price disparity between Prescription Pet Food and non-prescription pet food.

39.     Prescription Pet Food is sold at significantly higher prices than comparable pet food, which Plaintiffs and other similarly situated consumers pay due to false marketing and labeling indicating that Prescription Pet Food is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

**E.     Other than as imposed by Defendants, however, Prescription Pet Food is not required to be sold by prescription.**

40.     The FDA regulates foods and drugs, including pet foods and drugs.

41.     The FDA does not require that Prescription Pet Food be sold by prescription.

42.     No other governmental body or agency requires that Prescription Pet Food be sold by prescription.

43.     The Prescription Authorization is self-imposed by Defendant manufacturers and those acting in concert with them.

44.     Others, including PetSmart, Banfield Pet Hospital, and Blue Pearl Vet Hospital, abide by and perpetuate the Prescription Authorization requirement as they likewise benefit and profit from above-market prices for Prescription Pet Food.

45.     Although the message that Prescription Pet Food requires a prescription is repeated throughout Defendants' distribution, marketing, and/or advertising, that message is false. Prescription Pet Food is not legally required to be sold by prescription.

**F.      Prescription Pet Food contains no drug or other ingredient not also common in non-prescription pet food.**

46.     Prescription Pet Food:

a.      has not been subjected to the FDA process for evaluating the quality of drug ingredients and manufacturing processes;

b.      has not been subjected to the FDA process for evaluating the efficacy of claims and propriety of representations;

c.      does not contain any ingredients listed as a drug in the FDA's "Green Book," a publication listing all approved animal drugs;

d.      does not appear as a drug in the Green Book;

e.      does not contain any drug approved by the FDA; and

f.      does not bear the mandatory legend borne by those items required by the FDA to be sold by prescription (i.e. "Caution: Federal law restricts this drug to use by or on the order of a licensed veterinarian.").

47.     Prescription Pet Food is made of the same ingredients contained in common pet foods.

**G.      Defendants' marketing, labeling, and/or sale of Prescription Pet Food is deceptive, collusive, and in violation of federal antitrust law and California consumer protection law.**

48.     Defendants have profited from the deep-rooted understanding of the American public, including Plaintiffs, with respect to the necessity of complying with the prescriptions of medical professionals for animal health.

49.     The Prescription Authorization and Defendants' marketing regarding Prescription Pet Food are not pursuant to a legal prescription regime, but rather a false and misleading marketing scheme to which all Defendants adhere.

50.     In addition to requiring that the food be sold pursuant to the Prescription Authorization, Defendants make further material representations, expressly and/or implicitly, that Prescription Pet Food is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

51.     For example:

a.     As to its Royal Canin "Veterinary Diet" line, Mars makes advertising and marketing representations to consumers including that its Royal Canin "Veterinary Diet" Prescription Pet Food "support[s] a wide range of health issues such as: Urinary Health, Skin and Food Allergies, Diabetes, Digestive Support, Liver Health, Joint Support, Illness and Surgery Recovery Support, Renal Health, Weight Management, and Cardiac Health."  Further, bags of Royal Canin "Veterinary Diet" Prescription Pet Food state that the food is "Veterinary Exclusive." *See* Exhibit G (consisting of an image of a bag of Royal Canin Veterinary Diet Calm cat food).

b.     As to its Iams "Veterinary Formula" line, Mars sells Prescription Pet Food purportedly meant to treat or prevent conditions, including, but not limited to, those related to the following:  "joint," "skin & coat," "intestinal," "glucose and weight control," "weight loss/mobility," "renal," and "urinary."  Bags of Iams "Veterinary Formula" state that the food is "prescribed and sold by veterinarians" and "[a]uthorized by prescription and sold only through veterinarians."  Further, bags of Iams "Veterinary Formula" also state: "Your veterinarian will recommend the Iams Veterinary Formula that best matches the health needs of your [pet].  When deemed appropriate by your veterinarian, your [pet] may be transitioned to an appropriate Iams Premium Protection®, Iams® or Eukanuba® [pet] formula."  *See* Exhibit H (consisting of images of various portions of a bag of Iams Veterinary Formula Intestinal Plus prescription dog food).

c.      As to its Purina "Pro Plan Veterinary Diets" line, Purina sells Prescription Pet Food purportedly meant to treat or prevent conditions, including, but not limited to, those related to the following: "food sensitivities," "GI upset," "overweight management," "joint mobility," "colitis and diabetes," "dietetic management," "urinary stones," "Feline Lower Urinary Tract Disease," "kidney conditions," "dental health," "skin inflammation," and "diarrhea." In addition, bags of Purina "Pro Plan Veterinary Diets" are branded with an "Rx" symbol. *See* Exhibit I (consisting of an image of a portion of a bag of Purina Pro Plan Veterinary Diet Urinary St/Ox prescription cat food).

d.      As to its Hill's "Prescription Diet" line, Hill's sells Prescription Pet Food purportedly meant to treat or prevent conditions, including, but not limited to, those related to the following: "weight management," "digestive care," "food sensitivities," "urinary care," "kidney care," "dental care," "aging care," "glucose management," "heart care," "joint care," "liver care," "skin sensitivity," "thyroid care," and "urgent care." Hill's further represents: "No matter what health issues your dog is facing, our alliance with veterinarians puts us in a unique position to find a solution. Ask your vet how the Prescription Diet® dog foods can help his weight, mobility, kidney, digestive, urinary and skin and coat health." In addition, bags of Hill's "Prescription Diet" represent that the contents are "Clinical Nutrition" and bear an image of a stethoscope. *See* Exhibit J (consisting of an image of a portion of a bag of Hill's Prescription Diet Digestive / Weight / Glucose Management w/d dog food).

52.      The Prescription Authorization and Defendant manufacturers' advertising and marketing statements regarding Prescription Pet Food misrepresent that Prescription Pet Food is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

53.      Consumers, including Plaintiffs, would not purchase Prescription Pet Food, or, would not Purchase Prescription Pet Food when priced so excessively relative to similar no-prescription-required pet foods, if not for the misleading marketing described herein.

54.     While Prescription Pet Food contains no drug, in the pursuit of profit, Defendants market, label, and/or sell it as if a prescription is required.  In so doing, and by failing to comply with the regulatory requirements referenced below, Defendants have manufactured and/or sold to consumers misbranded substances.

55.     For example, because it is marketed to diagnose, cure, mitigate, treat, or prevent diseases or other conditions, Prescription Pet Food falls within the statutory definition of a drug under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*. ("FD&C Act").

56.     Because Prescription Pet Food is an article used for food for animals, Prescription Pet Food also meets the definition of food under the FD&C Act.

57.     By analogy, a box of Cheerios would meet the statutory definition of a drug if it were marketed to treat the flu (in humans or animals).  In addition, because it would still be a box of Cheerios, it would also meet the FD&C Act definition of food.

58.     Pursuant to the FD&C Act, in general, new drugs are unsafe unless they have an approved application, a conditional approval, or an index listing.

59.     None of the Prescription Pet Foods is an approved or listed new drug; as such, Prescription Pet Food, if a drug, is misbranded under the FD&C Act.

60.     The FD&C Act also requires that all drug manufacturers register and list drugs with the FDA.

61.     None of the Prescription Pet Foods comply with the drug registration and listing requirements of the FD&C Act; as such, Prescription Pet Food, if a drug, is misbranded.

62.     The FD&C Act requires that any animal drug products be manufactured in accordance with current good manufacturing practices applicable to drugs.

63.     Not all of the Prescription Pet Foods comply with the current good manufacturing practices applicable to drugs pursuant to the FD&C Act; as such, those Prescription Pet Foods, if drugs, are misbranded.

///

///

///

**H.      Defendants are engaged in an anticompetitive conspiracy to market pet food as prescription pet food to consumers at above-market prices that would not otherwise prevail in the absence of their collusive Prescription Authorization requirement.**

64.      The United States market for pet food is dominated by Mars, Hill's, and Purina, which collectively exercise market power in this market.

65.      These Defendants are the primary producers of prescription pet food sold in the United States, and sell and market their products in and through interstate commerce and instrumentalities of interstate commerce.

66.      For at least the four years next prior to the filing of this Complaint, all Defendants have entered into a contract, combination, or conspiracy to raise, fix, stabilize, or peg prices for Prescription Pet Food.

67.      By selling deceptively labeled and marketed Prescription Pet Food at above-market, non-competitive prices, all Defendants have engaged in similar, parallel conduct evidencing their contract, combination, or conspiracy, in that they have engaged in similar marketing and sales practices and programs to sell pet food as prescription pet food.

68.      In addition, there are plus factors tending to exclude the possibility of independent action and demonstrating the existence of a conscious commitment by Defendants to a common scheme designed to achieve their unlawful objective.

69.      The first such plus factor is the interlocking and common nature of the business relationships among Defendants.  Mars, which is the biggest seller of pet food and sells two of the four Prescription Pet Food brands, is also the owner of the largest veterinarian hospital chain in the United States, Blue Pearl Vet Hospital, which employs veterinarians writing prescriptions for Prescription Pet Food.  Mars also partners with the largest specialty pet retailer, PetSmart, in the ownership of the largest veterinarian clinic chain, Banfield Pet Hospital, which employs veterinarians writing prescriptions for Prescription Pet Food.  PetSmart sells non-prescription pet foods made by all Defendant manufacturers, and uses its relationship with Banfield to promote and sell Prescription Pet Food.  Blue Pearl Vet Hospital sells Prescription Pet Food.  Through this

vertical integration and common ownership and control of distribution and prescription-writing for Prescription Pet Food, Defendants are able effectively to implement their price-fixing agreement.

70.     A second plus factor is Defendant manufacturers' participation in and use of an industry trade association, the Pet Food Institute ("PFI"), to implement and perpetuate their price-fixing agreement.  Defendant manufacturers are all on PFI's board of directors and have used PFI's auspices to promote their price-fixing agreement that Prescription Pet Food should be sold ostensibly as a product subject to FDA regulation and the FD&C Act, but should not in fact be regulated by the FDA or held to the FD&C Act.  For example, the Defendant manufacturers, through PFI, have joined together to urge the FDA that, although Prescription Pet Foods "are not drugs" and "no drug registration or drug listing should be required," such products should nevertheless "only be available to the public through licensed veterinarians with whom the purchaser has a valid Veterinary-Client-Patient Relationship."  *See* Exhibit K attached hereto.

71.     A third plus factor is that each Defendant has acted contrary to its own individual, independent self-interest in marketing and selling Prescription Pet Food.  Specifically, each Defendant has known and understood that it was engaging in deceptive practices that could not succeed unless each other Defendant had agreed to engage in similar conduct.  Thus, each Defendant knew and understood that if even one Defendant acknowledged that no Prescription Authorization was actually required or exposed the scheme, all would be forced to follow and the scheme would fail, and each Defendant maintained a conscious commitment to abide by the deceptive scheme.  That all Defendants proceeded with the deceptive marketing practices, which all knew could be exposed by any of them, tends to exclude the possibility of independent action and is evidence of a conscious commitment to a common scheme to achieve an unlawful objective.

72.     A fourth plus factor is the structure of the pet food industry, which facilitates collusion and impedes new entry to disrupt collusive arrangements.  The Defendant manufacturers are the primary three firms marketing Prescription Pet Food, in essence sharing a monopoly that makes collusion practicable.  In addition, the Defendant manufacturers have well-established and entrenched distribution arrangements and relationships with Defendant PetSmart and veterinary

chains, which discourage and impede new entry for other potential manufacturers of Prescription Pet Food.  Collusion among the Defendant manufacturers is further attractive because of sunk costs in manufacturing facilities, which cannot be recovered by new entrants if new entry is unsuccessful, and the substantial fungibility of pet food.

73.     This prescription pet food scheme is a conspiracy in restraint of trade among Defendants to fix, raise, peg, and stabilize prices for Prescription Pet Food in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.  Alternatively, Defendants' agreement, combination, and conspiracy violates Section 1 under the Rule of Reason or Quick Look Rule of Reason, in that the anticompetitive effects of Defendants' concerted action overwhelmingly outweigh procompetitive benefits, if any, in the United States market for pet food, and less restrictive alternatives exist for the marketing of Defendants' pet food in the absence of collusion.

## III.   PARTIES

74.     Plaintiff/Class Representative Tamara Moore ("Ms. Moore") is a resident of Alameda County, State of California.  She has a dog named Pugalicious.  When Pugalicious had to undergo surgery to remove kidney stones, Ms. Moore received a Prescription Authorization from Pugalicious's veterinarian, located in Santa Clara County, for, and purchased, Hill's Prescription Diet d/u food.  This food is a Prescription Pet Food.  Ms. Moore purchased the referenced Prescription Pet Food from her veterinarian's office in Santa Clara County within the three years next prior to the filing of this Complaint.

75.     Plaintiff/Class Representative Raff Arando ("Mr. Arando") is a resident of San Mateo County, State of California.  Mr. Arando had a dog named Bella.  When Bella gained weight, Mr. Arando received a Prescription Authorization from Bella's veterinarian, located in San Mateo County, for, and purchased, Hill's Prescription Diet w/d food.  He later received a Prescription Authorization for the same food from a Banfield Pet Hospital adjacent to a PetSmart located in San Mateo County.  This food is a Prescription Pet Food.  Mr. Arando purchased the referenced Prescription Pet Food from a PetSmart located in San Mateo County within the three years next prior to the filing of this Complaint.

76.     Plaintiff/Class Representative Greta L. Ervin ("Mrs. Ervin") is a resident of San Diego County, State of California.  Mrs. Ervin has a dog named Teddy.  When Teddy became ill with giardia (a diarrheal infection associated with microscopic parasites that is not uncommon in dogs and cats), Mrs. Ervin received a Prescription Authorization from Teddy's primary-care veterinarian, located in California, for, and purchased, Royal Canin Veterinary Diet Gastrointestinal dry and wet dog food, and also received a Prescription Authorization from Teddy's specialty veterinarian, located in California, for, and purchased, Royal Canin Veterinary Diet Selected Protein Adult PV dry and wet dog food.  Each of these foods is a Prescription Pet Food.  Mrs. Ervin purchased Prescription Pet Food from PetSmart and also from her veterinarian, both located in California, within the three years next prior to the filing of this Complaint.

77.     Plaintiff/Class Representative Nichols Smith ("Mr. Smith") is a resident of San Luis County, State of California, and a former resident of Sonoma County, State of California.  Mr. Smith has a cat named Mimi, and, until recently, also had a cat named Neichi.  When Mimi and Neichi became overweight, Mr. Smith received a Prescription Authorization from the cats' veterinarian, located in Sonoma County, for, and purchased Hill's Prescription Diet from the veterinarian's clinic.  Mr. Smith later moved to San Luis County, where he purchased the same food from another veterinary clinic.  This food is a Prescription Pet Food.  Mr. Smith's purchases were made within the three years next prior to the filing of this Complaint.

78.     Plaintiff/Class Representative Renee Edgren ("Ms. Edgren") is a resident of the City and County of San Francisco, State of California.  Ms. Edgren has a dog named Barkley.  When Barkley experienced skin and coat problems, Ms. Edgren received a Prescription Authorization from Barkley's veterinarian, located in San Mateo County, for, and purchased, Iams Veterinary Skin & Coat Plus Response KO dog food.  This food is a Prescription Pet Food.  Ms. Edgren purchased this food within the three years next prior to the filing of this Complaint.

79.     Plaintiff/Class Representative Cynthia Welton ("Ms. Welton") is a resident of San Mateo County, State of California.  Ms. Welton has a dog named Kodiak.  When Kodiak became ill, Ms. Welton received a Prescription Authorization from Kodiak's veterinarian, located in San Mateo County, for, and purchased, Hill's Prescription Diet k/d dog food.  This food is a

Prescription Pet Food.  Ms. Welton purchased this food within the three years next prior to the filing of this Complaint.

80.     As discussed above:  Defendant Mars is a Delaware corporation with a principal place of business in Tennessee; Defendant Purina is a Missouri corporation with a principal place of business in Missouri; Defendant Hill's is a Delaware Corporation with a principal place of business in Kansas; Defendant PetSmart is a Delaware corporation with a principal place of business in Arizona; Defendant Banfield Pet Hospital is a Delaware corporation with a principal place of business in Oregon; and Defendant Blue Pearl Vet Hospital is a Florida corporation with a principal place of business in Florida.

## IV.   JURISDICTION

81.     This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331, 1337.  It also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class Member is a citizen of a state different from at least one Defendant.

## V.   INTRADISTRICT ASSIGNMENT

82.     Pursuant to Northern District of California Civil Local Rules 3-2 and 3-5, assignment to the San Francisco or Oakland Division of the Northern District of California is proper because a substantial number of the events or omissions that give rise to the claims asserted by the Plaintiffs and Class Representatives occurred in the counties of Alameda, San Mateo, and Sonoma.

## VI.   CLASS ACTION ALLEGATIONS

83.     Plaintiffs/Class Representatives bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**A.     The Classes.**

84.     Plaintiffs/Class Representatives Mrs. Ervin and Mr. Arando seek to represent a nationwide Class defined as all persons in the United States who purchased Prescription Pet Food from PetSmart, Banfield Pet Hospital, Blue Pearl Vet Hospital, or any other Defendant, for the purposes of Cause of Action I hereafter ("Nationwide Direct Purchaser Class").

85.     Plaintiff/Class Representative Mrs. Ervin seeks to represent a California statewide Class of all California residents who purchased Royal Canin Prescription Pet Foods from any retailer in California, for the purposes of Causes of Action II–V hereafter ("Royal Canin California Class").

86.     Plaintiff/Class Representative Ms. Edgren seeks to represent a California statewide Class of all California residents who purchased Iams Prescription Pet Foods from any retailer in California, for the purposes of Causes of Action II–V hereafter ("Iams California Class").

87.     Plaintiff/Class Representatives Ms. Moore, Mr. Arando, Ms. Welton, and Mr. Smith seek to represent a California statewide Class of all California residents who purchased Hill's Prescription Pet Foods from any retailer in California, for the purposes of Causes of Action II–V hereafter ("Hill's California Class").

88.     Excluded from the Classes are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) the attorneys involved in this matter; (d) governmental entities; (e) those persons who have suffered personal injuries or emotional distress as a result of the facts alleged herein; and (f) all persons or entities that purchased Prescription Pet Food for resale.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into subclasses, or modified in any other way.

**B.     The Classes satisfy the Rule 23 requirements.**

89.     Members of each of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class Members for each Class is currently unknown, and can only be ascertained through appropriate discovery, the members of the Classes are likely

to number at least in the thousands, and the disposition of the Class Members' claims in a single action will provide substantial benefits to all parties and to the Court.  Class Members are readily identifiable from information and records in the possession, custody, or control of Defendants, retailers of Prescription Pet Food, veterinarians, and the Class Members.

90.     Common questions of law and fact exist as to all members of the Classes, and predominate over any questions solely affecting individual members of each Class.  Questions of law and fact common to each of the Classes include the following:

a.     Whether Defendants may self-impose a "prescription" requirement on products they manufacture, market, and/or sell, notwithstanding that the product is not a drug and has not been subjected to FDA review or clearance as a drug;

b.     Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food contains some substance medically necessary to health;

c.     Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food is some sort of drug, medicine, or other controlled ingredient;

d.     Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that the statements regarding the intended uses and effects of Prescription Pet Food have been evaluated by the FDA;

e.     Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food requires a prescription per a federal, state, or other governmental body or agency law;

f.     Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food is so materially different from no-prescription-required pet food that paying a price premium is warranted;

g.     Whether the Prescription Pet Foods are misbranded;

h.     Whether Plaintiffs and Class Members are entitled to a declaratory judgment;

i.      Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

j.      Whether Plaintiffs and Class Members are entitled to restitution and/or disgorgement and the amount of such;

k.      Whether Plaintiffs and Class Members are entitled to punitive or exemplary damages and the amount of such; and

l.      Whether Defendants should be required to make restitution, disgorge profits, reimburse losses, pay damages, and/or pay treble damages as a result of the above-described practices.

91.    Other common questions that predominate over any questions affecting only individual Class Members include:

a.      Whether Defendants have agreed, combined, or conspired to fix, raise, stabilize, or peg the prices of Prescription Pet Food (Nationwide Direct Purchaser Class);

b.      Whether Defendants' conspiracy to fix, raise, stabilize, or peg the prices of Prescription Pet Food has caused injury to business or property (Nationwide Direct Purchaser Class);

c.      The amount of the overcharge and damage paid as a result of Defendants' conspiracy to fix, raise, stabilize, or peg the prices of Prescription Pet Food (Nationwide Direct Purchaser Class);

d.      Whether Defendants' actions as described above violate Section 1 of the Sherman Act, 15 U.S.C. § 1 (Nationwide Direct Purchaser Class);

e.      Whether Defendant manufacturers' actions as described above violate the California Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq*. (Royal Canin California Class, Iams California Class, and Hill's California Class);

f.      Whether Defendant manufacturers' actions as described above violate the California False Advertising Law, California Business & Professions Code §§ 17500, *et seq*. (Royal Canin California Class, Iams California Class, and Hill's California Class); and

g.      Whether Defendant manufacturers' actions as described above violate the California Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq*. (Royal Canin California Class, Iams California Class, and Hill's California Class).

92.     Plaintiffs/Class Representatives' claims are typical of the claims of Class Members because Plaintiffs and each member of the Classes purchased Prescription Pet Food, and suffered a monetary loss as a result of that purchase.  Further, the factual bases of Defendants' conduct are common to all Plaintiffs in each Class and represent a common thread of misconduct resulting in injury common to all Class Members.

93.     Plaintiffs/Class Representatives are adequate representatives of the respective Classes because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

94.     Class certification and class-wide litigation and relief are appropriate because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members is impracticable.  Furthermore, as the damages suffered by the individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for most members of the Classes individually to redress the wrongs done to them.  Absent a class action, Class Members' damages will go uncompensated, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact will also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

95.     Defendants have acted in a uniform manner with respect to the Plaintiffs and Class Members of each Class.

96.     Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the Classes, and inconsistent adjudications with respect to Defendants' liability would establish

incompatible standards and substantially impair or impede the ability of Class Members to protect their interests.  Class-wide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding Prescription Pet Food.

**CAUSE OF ACTION I**
**VIOLATION OF SECTION 1 OF SHERMAN ACT**
**(15 U.S.C. § 1)**
*(All Defendants)*

97.     Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

98.     As set forth hereinabove, during the four years next prior to the filing of this Complaint, Defendants entered into a continuing agreement, combination, and conspiracy in restraint of trade to fix, raise, stabilize, or peg prices of Prescription Pet Food in per se violation of Section 1 of the Sherman Antitrust Act,15 U.S.C.§ 1.

99.     The contract, combination, or conspiracy alleged above has substantial horizontal elements, including agreements between Defendant manufacturers, to limit competition between and among themselves with regard to Prescription Pet Food, even though they otherwise would be competitors in the pet food market, such that application of the per se rule is justified under the facts and circumstances set forth herein.

100.    Alternatively, the contract, combination, or conspiracy alleged above has resulted in substantial anticompetitive effects in the United States market for pet food, without any countervailing procompetitive benefits, and thereby violates Section 1 under the Rule of Reason, under either full Rule of Reason treatment or Quick Look treatment.

101.    This contract, combination, or conspiracy has led to anticompetitive effects, including unjustifiably increased prices, and otherwise caused injury to consumers and competition in the relevant market.

102.    Defendants' contract, combination, agreement, understanding, or concerted action occurred in or affected interstate commerce.

1    103.    Defendants' unlawful conduct was through mutual understandings, combinations,

2    or agreements by, between, and among Defendants.

3    104.    Defendants' anticompetitive conduct has directly and proximately caused antitrust

4    injury, in the form of higher prices charged to consumers, as set forth above.  Plaintiffs/Class

5    Representatives and other consumers will continue to suffer antitrust injury and other damage

6    unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

7    105.    Plaintiffs/Class Representatives are entitled to all damages proximately caused by

8    Defendants' anticompetitive conduct, including the unjustified price premium paid by them, and

9    are entitled to three-fold such damages as they show themselves to have sustained and the jury

10   shall find, together with injunctive relief, and their cost of suit, including reasonable attorneys'

11   fees, pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

12   **CAUSE OF ACTION II**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
13   **(Bus. & Prof. Code §§ 17200, *et seq.*)**
***(Mars and Hill's)***

14

15   106.    Plaintiffs/Class Representatives and Class Members hereby re-allege and

16   incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

17   107.    Each Defendant manufacturer is subject to the Unfair Competition Law ("UCL"),

18   Business & Professions Code §§ 17200, *et seq.*  The UCL provides, in pertinent part:  "Unfair

19   competition shall mean and include unlawful, unfair or fraudulent business practices and unfair,

20   deceptive, untrue or misleading advertising …."

21   108.    Each Defendant manufacturer violated the "unlawful" prong of the UCL by

22   violating California's Consumers Legal Remedies Act ("CLRA") as described in Cause of Action

23   IV.

24   109.    Each Defendant manufacturer also violated the "unlawful" prong of the UCL by

25   violating California's False Advertising Law ("FAL") as described in Cause of Action III.

26   110.    Each Defendant manufacturer's conduct, described herein, violated the "unfair"

27   prong of the UCL because each Defendant manufacturer misrepresented through the Prescription

28

Authorization, its advertising and marketing statements, and its failure to include any adequate

disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

      a.    are purchasing some sort of drug, medicine, or other controlled

ingredient(s);

      b.    are meeting a medicinal requirement for their pet's health and well-being;

      c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

      d.    are purchasing a pet food as to which the representations regarding intended

uses and effects have been evaluated by the FDA;

      e.    are purchasing a pet food requiring a prescription per a federal, state, or

other governmental body or agency; and

      f.    are purchasing a pet food for which a particular price premium is warranted.

111.    Each Defendant manufacturer's conduct, described herein, violated the "fraudulent"

prong of the UCL because each Defendant manufacturer misrepresented through the Prescription

Authorization, its advertising and marketing statements, and its failure to include any adequate

disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

      a.    are purchasing some sort of drug, medicine, or other controlled

ingredient(s);

      b.    are meeting a medicinal requirement for their pet's health and well-being;

      c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

      d.    are purchasing a pet food as to which the representations regarding intended

uses and effects have been evaluated by the FDA;

      e.    are purchasing a pet food requiring a prescription per a federal, state, or

other governmental body or agency; and

      f.    are purchasing a pet food for which a particular price premium is warranted.

112.    Plaintiffs/Class Representatives and Class Members suffered lost money or

property as a result of each Defendant manufacturer's UCL violations because:  (a) they would not

have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the

same terms if the true facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

**CAUSE OF ACTION III**
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("FAL")**
**(Bus. & Prof. Code § 17500 *et seq*.)**
***(Mars and Hill's)***

113.   Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

114.   Each Defendant manufacturer violated California Business & Professions Code § 17500 by publicly disseminating misleading and false advertisements through the Prescription Authorization itself, and through advertising and marketing statements, suggesting that consumers purchasing Prescription Pet Food:

    a.   are purchasing some sort of drug, medicine, or other controlled ingredient(s);

    b.   are meeting a medicinal requirement for their pet's health and well-being;

    c.   are purchasing a pet food that has been evaluated by the FDA as a drug;

    d.   are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

    e.   are purchasing a pet food requiring a prescription per a federal, state, or other governmental body or agency; and

    f.   are purchasing a pet food for which a price premium is warranted.

115.   Each Defendant manufacturer's misleading and false advertisements were disseminated to increase sales of Prescription Pet Food.

116.   Each Defendant manufacturer knew or should have known its false advertisements were untrue or misleading.

117.   Each Defendant manufacturer publicly disseminated the false advertisements as part of a plan or scheme and with the intent to create a price premium for Prescription Pet Food.

118.   Plaintiffs/Class Representatives and Class Members have suffered harm as a result of these violations of the FAL because:  (a) they would not have purchased Prescription Pet Food

or would not have purchased Prescription Pet Food on the same terms if the true facts concerning

the products had been known; and (b) Defendant manufacturers did not conform to Defendant

manufacturers' representations and promises.

119.    Pursuant to Business & Professions Code § 17500, Plaintiffs/Class Representatives

and Class Members seek an order of this Court permanently enjoining each Defendant

manufacturer from continuing to publicly disseminate misleading and false advertisements as

alleged herein.  Plaintiffs/Class Representatives and Class Members also seek an order requiring

each Defendant manufacturer to:  (a) make full restitution for all monies wrongfully obtained; and

(b) disgorge all ill-gotten revenues and/or profits.

**CAUSE OF ACTION IV**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA")**
**(Civil Code §§ 1750, *et seq*.)**
***(Mars and Hill's)***

120.    Plaintiffs/Class Representatives and Class Members hereby re-allege and

incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

121.    CLRA § 1770(a) prohibits, among other things, "[m]isrepresenting the affiliation,

connection or association with, or certification by, another," "[r]epresenting that goods or services

have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do

not have," "[r]epresenting that goods or services are of a particular standard, quality or grade or

that goods are of a particular style or model, if they are not," and "[a]dvertising goods or services

with intent not to sell them as advertised."  Each Defendant manufacturer violated these provisions

by misrepresenting through the Prescription Authorization, its advertising and marketing

statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that

consumers purchasing Prescription Pet Food:

a.    are purchasing some sort of drug, medicine, or other controlled

ingredient(s);

b.    are meeting a medicinal requirement for their pet's health and well-being;

c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

25

d.      are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.      are purchasing a pet food requiring a prescription per a federal, state, or other governmental body or agency; and

f.      are purchasing a pet food for which a particular price premium is warranted.

122.    Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the true facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

123.    Prior to the filing of this Complaint, CLRA notice letters were served on Mars and Hill's, which complied in all respects with California Civil Code § 1782(a).  Plaintiffs/Class Representatives sent each Defendant manufacturer their letter via certified mail, return receipt requested, advising each Defendant manufacturer that it is in violation of the CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Each Defendant manufacturer was further advised that in the event that the relief requested has not been provided within thirty (30) days, Plaintiffs would amend this Complaint to include a request for monetary damages, including punitive damages, pursuant to the CLRA.

**CAUSE OF ACTION V**
**RESTITUTION BASED ON QUASI-CONTRACT/UNJUST ENRICHMENT**
**(Civil Code §§ 1750, *et seq.*)**
***(Mars and Hill's)***

124.    Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

125.    Plaintiffs/Class Representatives conferred benefits on each Defendant manufacturer by purchasing Prescription Pet Food at a premium price.

126.    Each Defendant manufacturer has knowledge of such benefits.

127.    Each Defendant manufacturer has been unjustly enriched in retaining the revenues derived from Plaintiffs/Class Representatives and Class Members' purchases of Prescription Pet Food.

128.    Retention of those moneys under these circumstances is unjust and inequitable because each Defendant manufacturer falsely and misleadingly represented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

 a. are purchasing some sort of drug, medicine, or other controlled ingredient(s);

 b. are meeting a medicinal requirement for their pet's health and well-being;

 c. are purchasing a pet food that has been evaluated by the FDA as a drug;

 d. are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

 e. are purchasing a pet food requiring a prescription per a federal, state, or other governmental body or agency; and

 f. are purchasing a pet food for which a particular price premium is warranted.

129.    These misrepresentations and omissions caused injuries to Plaintiffs/Class Representatives and Class Members because they would not have purchased Prescription Pet Food, or paid a price premium for Prescription Pet Food, had the true facts been known.

130.    Because each Defendant manufacturer's retention of the non-gratuitous benefits conferred on it by Plaintiffs/Class Representatives and Class Members is unjust and inequitable, Defendant manufacturers ought to pay restitution to Plaintiffs/Class Representatives and Class Members for their unjust enrichment, as ordered by the Court.

131.    As a direct and proximate result of each Defendant manufacturer's unjust enrichment, Plaintiffs/Class Representatives and Class Members are entitled to restitution or restitutionary disgorgement in an amount to be proven at trial.

 ///

## **RELIEF DEMANDED**

WHEREFORE, Plaintiffs/Class Representatives, individually and on behalf of all others similarly situated, request the Court enter judgment against Defendants including:

1.     An order certifying the Nationwide Direct Purchaser Class, the Royal Canin California Class, the Iams California Class, and the Hill's California Class under Rule 23 of the Federal Rules of Civil Procedure and naming the respective Plaintiffs as representatives of the respective Classes, and Plaintiffs' attorneys as Class Counsel to represent the Class Members;

2.     An order enjoining Defendants from engaging in further deceptive distribution, marketing, and/or sales practices with respect to Prescription Pet Food;

3.     A declaration that Defendants are financially responsible for notifying all Class Members about the true nature of Prescription Pet Food;

4.     An order declaring that Defendants' conduct violates the statutes referenced herein;

5.     An order finding in favor of Plaintiffs/Class Representatives and the members of the Classes on all Causes of Action asserted herein;

6.     An order finding in favor of Plaintiffs/Class Representatives and the Classes on all Causes of Action asserted herein;

7.     A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits received from the sale of Prescription Pet Food;

8.     An award of three-fold damages;

9.     An award of compensatory, statutory, exemplary, and punitive damages in amounts to be determined by the Court and/or jury;

10.     An award of prejudgment interest on all amounts awarded;

11.     An order of restitution and all other forms of equitable monetary relief;

12.     Injunctive relief as plead or as the Court may deem proper; and

///
///
///
///

13.     An order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

Dated:  December 7, 2016                 WALKUP, MELODIA, KELLY & SCHOENBERGER

/s/ *Michael A. Kelly*
MICHAEL A. KELLY
Attorneys for Plaintiffs

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  December 7, 2016                 WALKUP, MELODIA, KELLY & SCHOENBERGER

/s/ *Michael A. Kelly*
MICHAEL A. KELLY
Attorneys for Plaintiffs