Michael A. Kelly (CA State Bar #71460)
mkelly@walkuplawoffice.com
Matthew D. Davis (CA State Bar #141986)
mdavis@walkuplawoffice.com
Spencer J. Pahlke (CA State Bar #250914)
spahlke@walkuplawoffice.com
WALKUP, MELODIA, KELLY
& SCHOENBERGER
650 California Street, 26th Floor
San Francisco, California 94108-2615
Telephone: (415) 981-7210
Facsimile: (415) 391-6965

Daniel Shulman (MN State Bar #100651)
daniel.shulman@gpmlaw.com
Julia Dayton Klein (MN State Bar #319181)
julia.daytonklein@gpmlaw.com
GRAY, PLANT, MOOTY, MOOTY,
& BENNETT, P.A.
80 South Eight Street, Suite 500
Minneapolis, Minnesota 55402
Telephone: (612) 632-3335
Facsimile: (612) 632-4335
*Admitted Pro Hac Vice*

Michael L. McGlamry (GA State Bar #492515)
mmcglamry@pmkm.com
Wade H. Tomlinson III (GA State Bar #714605)
triptomlinson@pmkm.com
Kimberly J. Johnson (GA State Bar #687678)
kimjohnson@pmkm.com
*Admitted Pro Hac Vice*
Caroline G. McGlamry (CA State Bar #308660)
carolinemcglamry@pmkm.com
POPE MCGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, Georgia 30326
Telephone: (404) 523-7706
Facsimile: (404) 524-1648

Lynwood P. Evans (NC State Bar #26700)
lpe@wardandsmith.com
Edward J. Coyne III (NC State Bar #33877)
ejcoyne@wardandsmith.com
Jeremy M. Wilson (NC State Bar #43301)
jw@wardandsmith.com
WARD AND SMITH, P.A.
127 Racine Drive
Wilmington, North Carolina 28403
Telephone: (910) 794-4800
Facsimile: (910) 794-4877
*Admitted Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFFS**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMARA MOORE, GRETA L. ERVIN, RAFF ARANDO, NICHOLS SMITH, RENEE EDGREN, CYNTHIA WELTON, SUSAN GOLIS, LYNN TUTAN, CHRISTINE KAROL, ISAAC DUNCAN HAM IV, ALAYNA JOHNSON, EDWARD BAKER, SEAN SPAINGLER, VALERIE ROBERTSON, and AVA STERLING, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARS PETCARE US, INC.; ROYAL CANIN U.S.A., INC.; NESTLE PURINA PETCARE COMPANY; HILL'S PET NUTRITION, INC.; PETSMART, INC.; MEDICAL | Case No. 3:16-cv-7001-MMC<br><br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

MANAGEMENT INTERNATIONAL, INC.
D/B/A BANFIELD PET HOSPITAL;
BLUEPEARL VET, LLC,

                      Defendants.

Plaintiffs (collectively referred to herein as "Plaintiffs" or "Plaintiffs/Class Representatives"), individually and on behalf of others similarly situated, file this Class Action Complaint against Defendants Mars Petcare US, Inc. ("Mars"); Royal Canin U.S.A., Inc. ("Royal Canin"); Nestle Purina Petcare Company ("Purina"); Hill's Pet Nutrition, Inc. ("Hill's"); PetSmart, Inc. ("PetSmart"); Medical Management International, Inc. d/b/a Banfield Pet Hospital ("Banfield Pet Hospital"); and BluePearl Vet, LLC ("Blue Pearl Vet Hospital") (collectively, "Defendants"), and allege as follows:

## I.    GENERAL OVERVIEW

1.    Defendants individually and collectively exercise significant market power in the United States market for dog and cat food ("pet food"), which is the relevant product and geographic market for purposes of the federal antitrust claims asserted herein.

2.    Defendants manufacture, market, and sell one or more lines of pet food that are sold at retail by "prescription."

3.    The prescription to purchase this pet food is written by a veterinarian, as would be done for a prescription drug for a dog or cat.

4.    Defendant manufacturers (i.e. Royal Canin/Mars, Hill's, and Purina) manufacture and market multiple varieties of pet food for which a prescription is required, a demonstrative list of which is attached hereto as Exhibit A.  Those pet foods listed on Exhibit A and all similar pet foods for which a prescription is required and that are manufactured, produced, marketed, advertised, distributed, and/or sold by Defendant manufacturers, are referred to collectively herein as "Prescription Pet Food," and the labels borne by the Prescription Pet Food identified on Exhibit A are incorporated herein by reference.

///

///

5.     The prescription-authorization requirement enables Defendants to market and sell Prescription Pet Food at well above market prices that would not otherwise prevail in the absence of the prescription-authorization requirement.

6.     Other than as imposed by Defendant manufacturers, and agreed to by Defendant retailers (i.e. PetSmart, Banfield Pet Hospital and Blue Pearl Vet Hospital), however, Prescription Pet Food is not required to be sold by prescription.  Indeed, since the commencement of this action, PetSmart has revealed that:

> The [Prescription Pet Food] sold at PetSmart does not require a prescription by federal or state law in order to purchase it. Certain manufacturers of the [Prescription Pet Food] require customers to have a prescription from a licensed veterinarian when purchasing such food.  Upon information and belief, manufacturers impose the prescription requirement to avoid enforcement actions by the U.S. Food and Drug Administration and to ensure that veterinarians are involved in a pet's continual care and nutritional management.  []Where a manufacturer requires a prescription in order to purchase [Prescription Pet Food], PetSmart will sell such food to a customer only if he or she has a prescription from a veterinarian for the specific animal food purchased . . . .

7.     Prescription Pet Food contains no drug or other ingredient not also common in non-prescription pet food.  In selling Prescription Pet Food, Defendants are taking advantage and betraying the trust of vulnerable pet owners concerned about the health of their pets, and are preying on the known propensities of consumers to love their pets and trust their vets.

8.     Defendants' marketing, labeling, and/or sale of Prescription Pet Food is deceptive, collusive, and in violation of federal antitrust law and various state consumer-protection laws.

9.     Defendants are engaged in an anticompetitive conspiracy to market and sell pet food as Prescription Pet Food to consumers at above-market prices that would not otherwise prevail in the absence of their collusive prescription-authorization requirement.

10.     Retail consumers, including Plaintiffs, have overpaid and made purchases they otherwise would not have made in the absence of Defendants' abuse and manipulation of the prescription requirement.  Plaintiffs bring this class action for violation of United States antitrust law on behalf of themselves and all those similarly situated purchasers of Prescription Pet Food

from Defendants, and seek redress in the form of damages, restitution, injunctive relief, and all other relief this Court deems just and proper. Plaintiffs bring this class action for violation of various state consumer-protection laws on behalf of themselves and all those similarly situated purchasers of Prescription Pet Food manufactured by Defendant manufacturers, and seek redress in the form of damages, restitution, injunctive relief, and all other relief this Court deems just and proper.

## II.    FACTUAL BACKGROUND

### A.    Defendants individually and collectively exercise significant market power in the United States market for pet food.

11.    Manufacturing, producing, marketing, advertising, distributing, and selling pet food is an approximately $24 billion per year industry in the United States. *See* American Pet Products Association Pet Industry Market Size & Ownership Statistics, attached hereto as <u>Exhibit B</u>.

12.    Hill's, a Delaware corporation with a principal place of business in Kansas, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels, including, but not limited to, the "prescription only" pet food Hill's "Prescription Diet." In 2015, Hill's was the fourth largest seller of pet food in the world, with over $1 billion in worldwide sales. *See* petfoodindustry.com Infographic: World's Top Pet Food Companies 2015, attached hereto as <u>Exhibit C</u>.

13.    Purina, a Missouri corporation with a principal place of business in Missouri, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels, including, but not limited to, the "prescription only" pet food Purina "Pro Plan Veterinary Diets." In 2015, Purina was the second largest seller of pet food in the world, with over $11 billion in worldwide sales. *See* <u>Exhibit C</u>.

14.    Mars, a Delaware corporation with a principal place of business in Tennessee, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various brands or labels. Until January 1, 2017, at which time Mars ceased selling the Iams foods complained of herein, Mars manufactured, produced, marketed, advertised, distributed, and/or sold the "prescription only" pet foods sold as Iams "Veterinary Formula."

4

Royal Canin, a Delaware corporation with a principal place of business in Missouri, is in the business of manufacturing, producing, marketing, advertising, distributing, and/or selling dog and cat food under various labels. Royal Canin is a subsidiary or affiliate of Mars, and Mars's website indicates Royal Canin and Iams to be two of its five billion-dollar brands. Some combination of Royal Canin and Mars manufactures, produces, markets, advertises, distributes, and/or sells the "prescription only" pet foods sold as Royal Canin "Veterinary Diet." Hereinafter, "Mars" is sometimes used to describe Mars and Royal Canin collectively. In 2015, Mars was the largest seller of pet food in the world, with over $17 billion in worldwide sales. *See* Exhibit C.

15. PetSmart, a Delaware corporation with a principal place of business in Arizona, is the largest pet goods retailer in the United States. Approximately 900 of PetSmart's approximately 1,145 nationwide stores include an onsite "Banfield Pet Hospital." Through these locations, and only these locations, PetSmart sells Prescription Pet Food to customers who have a prescription from a veterinarian. PetSmart is also the owner of the online pet-retailer pet360.com, and as of 2014, the combination of PetSmart and pet360.com accounted for over 40 percent of all pet-related website traffic. Through pet360.com, PetSmart sells Prescription Pet Food to customers who have a prescription from a veterinarian. PetSmart, in its stores and through pet360.com, also sells other, non-prescription foods manufactured by each Defendant manufacturer.

16. Banfield Pet Hospital, a Delaware corporation with a principal place of business in Oregon, is the largest veterinary chain in the United States, operating veterinary clinics at approximately 900 PetSmart locations, and at dozens of stand-alone locations, and employing approximately 3,200 veterinarians. Banfield Pet Hospital prescribes and sells Prescription Pet Food.

17. Banfield Pet Hospital has a contractual relationship with PetSmart to put hospitals in certain PetSmart stores throughout the United States. Through at least the first half of 2015, PetSmart owned approximately 21 percent of Banfield Pet Hospital, or a holding company that owned Banfield Pet Hospital, and Mars owned the remaining approximately 79 percent. Sometime later than June of 2015, Mars, or its parent company, came to own 100 percent of Banfield Pet Hospital. The partnership between PetSmart and Banfield Pet Hospital is long-

5

standing, according to Banfield Pet Hospital's website, which explains that in 1994: "Understanding the value of full-service veterinary care at its stores, PetSmart invest[ed] in Banfield and the two groups sign[ed] a strategic partnership agreement. Founded in 1986, PetSmart is the largest specialty pet retailer in North America."

18. Blue Pearl Vet Hospital, a Florida corporation with a principal place of business in Florida, is the largest chain of animal specialty and emergency care clinics in the United States, with approximately 50 locations and 600 veterinarians. Blue Pearl Vet Hospital prescribes and sells Prescription Pet Food.

19. Mars, or its parent company, owns approximately 90 percent of the interests in Blue Pearl Vet Hospital.

20. Mars has entered into an agreement to acquire veterinary hospital chain VCA, Inc. This acquisition, expected to close in the third quarter of 2017, will give Mars ownership of approximately 800 additional veterinary locations. As an owner of Banfield Pet Hospital and the owner of Blue Pearl Vet Hospital, Mars now employs approximately 7.5 percent of the companion-animal veterinarians in the United States, employed at approximately 1,000 locations. *See* American Veterinary Medical Association Market Research Statistics, attached hereto as Exhibit D. With the acquisition of VCA, Mars's share of the companion-animal veterinarians employed in the United States will approximately double, and it will employ veterinarians at approximately 1,750 locations in the United States.

21. Worldwide, the top 40 pet food companies had total revenue of $46 billion in 2015. Of that, Mars, Purina, and Hill's had combined revenues of $30 billion, for a 65 percent worldwide market share. The market for pet food in the United States was half of that, $23 billion, of which Mars, Purina, and Hill's had at least a comparable share. *See* Exhibits B and C.

22. The past, present, and future ownership, operation, and control of veterinary clinics and hospitals by PetSmart and Mars has created substantial barriers to entry in the pet food market for actual and potential competitors by effectively foreclosing distribution outlets necessary for sellers of competing pet food, who cannot effectively reach customers without distribution through PetSmart and the veterinary chains owned by Mars.

6

**B.**    **Defendants manufacture, market, and sell one or more lines of pet food that are sold at retail by "prescription."**

23.    Prescription Pet Food is marketed and sold across the United States.

24.    Prescription Pet Food sales comprise approximately 5% of all pet food sales in the United States.

25.    Defendants misrepresent Prescription Pet Food, in a variety of ways, further discussed below, to be: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the Food and Drug Administration ("FDA") as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

**C.**    **The prescription to purchase Prescription Pet Food is written by a veterinarian, as would be done for a prescription drug for a dog or cat.**

26.    Most pet owners are familiar with the heartfelt concern and fear that accompanies some trips to the veterinarian, as well as the willingness to follow doctor's orders to, and sometimes beyond, the fullest extent the owner can afford.

27.    Pursuant to Defendants' marketing schemes, a veterinarian must prescribe a Prescription Pet Food for sale to pet owners.

28.    For this prescription to be fulfilled, a veterinarian may (a) sell Prescription Pet Food directly to the retail consumer with whom the veterinarian-client-patient relationship exists, or (b) provide the consumer a written prescription that can be presented at a business that sells Prescription Pet Food, such as Banfield Pet Hospital locations, Blue Pearl Vet Hospital locations, and PetSmart stores with an on-site veterinarian.  That is, Defendants restrict the sale of Prescription Pet Food at retail to those with a prescription from a veterinarian.

29.    The prescription necessary to purchase Prescription Pet Food is hereafter referred to as the "Prescription Authorization."

///

///

30.     For some pets, Prescription Pet Food may be prescribed only for a finite period of time, while, for others, Prescription Pet Food may be prescribed indefinitely, such as for the remainder of the pet's life.

31.     To a reasonable retail consumer, including Plaintiffs, Prescription Pet Food is prescribed and purchased in the exact same manner as a prescription drug for a dog or cat—by veterinarian's orders.

**D.      The Prescription Authorization requirement enables Defendants to market and sell Prescription Pet Food at well above-market prices that would not otherwise prevail in the absence of the Prescription Authorization.**

32.     The American public, and Plaintiffs, as reasonable consumers, have a deep-rooted sense of the role of the prescription in healthcare and well-being.

33.     The American public, and Plaintiffs, as reasonable consumers, associate prescription fulfillment with following doctor's orders.

34.     Meriam Webster's Learner's Dictionary provides simple definitions for the word "prescription" including: "a written message from a doctor that officially tells someone to use a medicine, therapy, etc."; and "a medicine or drug that a doctor officially tells someone to use."

35.     The American public, and Plaintiffs, as reasonable consumers, reasonably expect and believe that a substance that requires a prescription to obtain, for a human or an animal, is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

36.     Plaintiffs, as typical consumers, humanize their pets.  In marketing and selling Prescription Pet Food, Defendants are taking advantage and betraying the trust of vulnerable pet owners concerned about the health of the family pet, and preying on the known propensities of Plaintiffs, and others similarly situated, to, in short, love their pets and trust their vets.

37.     For instance, in 1997, John Steel, then the recently retired senior vice president of global marketing and sales at Colgate (of which Hill's is a wholly-owned subsidiary) was quoted by the Wall Street Journal as stating with regard to Prescription Pet Food:  "It's just like taking

8

drugs: You go to the doctor and he prescribes something for you and you don't much question what the doctor says. It's the same with animals." *See* <u>Exhibit E</u>.

38.     In addition to Prescription Pet Food, Defendants also manufacture, produce, market, advertise, distribute, and/or sell one or more non-prescription pet foods, which are marketed to cure, mitigate, treat, or prevent the same or similar conditions as Prescription Pet Foods and are sold at significantly lower prices than Prescription Pet Foods.

39.     Except for the Prescription Authorization and other practices of the Defendants described herein, there is no material difference between Prescription Pet Food and non-prescription pet food. To the extent there are any differences, they are not sufficient to explain the price disparity between Prescription Pet Food and non-prescription pet food.

40.     Prescription Pet Food is sold at significantly higher prices than comparable non-prescription pet food. Plaintiffs and other similarly situated consumers pay these higher prices for Prescription Pet Food due to the anticompetitive conduct of the Defendants, including false marketing and labeling indicating that Prescription Pet Food is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

**E.      Other than as imposed by Defendants, however, Prescription Pet Food is not required to be sold by prescription.**

41.     The FDA regulates foods and drugs, including pet foods and drugs.

42.     The FDA does not require that Prescription Pet Food be sold by prescription.

43.     No other governmental body or agency requires that Prescription Pet Food be sold by prescription.

44.     The Prescription Authorization is self-imposed by Defendant manufacturers and those acting in concert with them.

45.     Others, including PetSmart, Banfield Pet Hospital, and Blue Pearl Vet Hospital, abide by and perpetuate the Prescription Authorization requirement as they likewise profit from

above-market prices for Prescription Pet Food and related benefits, such as ensuring continued veterinary care.

46.     Although the message that Prescription Pet Food requires a prescription is repeated throughout Defendants' distribution, marketing, and/or advertising, that message is false.

47.     Prescription Pet Food is not legally required to be sold by prescription.  Each Defendant has at all times known that Prescription Pet Food is not legally required or allowed to be sold by prescription, that representing expressly or implicitly that a prescription is legally required is false, and that all other Defendants know this.

**F.     Prescription Pet Food contains no drug or other ingredient not also common in non-prescription pet food.**

48.     Prescription Pet Food:

         a.     has not been subjected to the FDA process for evaluating the quality of drug ingredients and manufacturing processes;

         b.     has not been subjected to the FDA process for evaluating the efficacy of claims and propriety of representations;

         c.     does not contain any ingredients listed as a drug in the FDA's "Green Book," a publication listing all approved animal drugs;

         d.     does not appear as a drug in the Green Book;

         e.     does not contain any drug approved by the FDA; and

         f.     does not bear the mandatory legend borne by those items required by the FDA to be sold by prescription (i.e. "Caution: Federal law restricts this drug to use by or on the order of a licensed veterinarian.").

49.     Prescription Pet Food is made of the same ingredients contained in common pet foods.

///

///

///

///

**G. Defendants' marketing, labeling, and/or sale of Prescription Pet Food is deceptive, collusive, and in violation of federal antitrust law and various state consumer protection laws.**

50. Defendants are profiteering off of the deep-rooted understanding of the American public, including Plaintiffs, with respect to the necessity of complying with the prescriptions of medical professionals for animal health.

51. The Prescription Authorization and Defendants' marketing regarding Prescription Pet Food are not pursuant to a legal prescription regime, but rather a false and misleading marketing scheme to which all Defendants adhere.

52. In addition to requiring that Prescription Pet Food be sold pursuant to the Prescription Authorization, Defendants make further material representations, expressly and/or implicitly, that Prescription Pet Food is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription. For example:

a. As to its Royal Canin "Veterinary Diet" line, Mars makes advertising and marketing representations to consumers including that its Royal Canin "Veterinary Diet" Prescription Pet Food "support[s] a wide range of health issues such as: Urinary Health, Skin and Food Allergies, Diabetes, Digestive Support, Liver Health, Joint Support, Illness and Surgery Recovery Support, Renal Health, Weight Management, and Cardiac Health." Further, bags of Royal Canin "Veterinary Diet" Prescription Pet Food state that the food is "Veterinary Exclusive." *See* Exhibit F (consisting of an image of a bag of Royal Canin Veterinary Diet Calm cat food).

b. As to its Iams "Veterinary Formula" line, Mars has sold Prescription Pet Food purportedly meant to treat or prevent conditions, including, but not limited to, those related to the following: "joint," "skin & coat," "intestinal," "glucose and weight control," "weight loss/mobility," "renal," and "urinary." Bags of Iams "Veterinary Formula" state that the food is "prescribed and sold by veterinarians" and "[a]uthorized by prescription and sold only through veterinarians." Further, bags of Iams "Veterinary Formula" also state: "Your veterinarian will

11

recommend the Iams Veterinary Formula that best matches the health needs of your [pet]. When deemed appropriate by your veterinarian, your [pet] may be transitioned to an appropriate Iams Premium Protection®, Iams® or Eukanuba® [pet] formula." *See* Exhibit G (consisting of images of various portions of a bag of Iams Veterinary Formula Intestinal Plus prescription dog food).

c.      As to its Purina "Pro Plan Veterinary Diets" line, Purina sells Prescription Pet Food purportedly meant to treat or prevent conditions, including, but not limited to, those related to the following:  "food sensitivities," "GI upset," "overweight management," "joint mobility," "colitis and diabetes," "dietetic management," "urinary stones," "Feline Lower Urinary Tract Disease," "kidney conditions," "dental health," "skin inflammation," and "diarrhea."  In addition, bags of Purina "Pro Plan Veterinary Diets" are branded with an "Rx" symbol.  *See* Exhibit H (consisting of an image of a portion of a bag of Purina Pro Plan Veterinary Diet Urinary St/Ox prescription cat food).

d.      As to its Hill's "Prescription Diet" line, Hill's sells Prescription Pet Food purportedly meant to treat or prevent conditions, including, but not limited to, those related to the following: "weight management," "digestive care," "food sensitivities," "urinary care," "kidney care," "dental care," "aging care," "glucose management," "heart care," "joint care," "liver care," "skin sensitivity," "thyroid care," and "urgent care."  Hill's further represents:  "No matter what health issues your dog is facing, our alliance with veterinarians puts us in a unique position to find a solution.  Ask your vet how the Prescription Diet® dog foods can help his weight, mobility, kidney, digestive, urinary and skin and coat health."  In addition, bags of Hill's "Prescription Diet" represent that the contents are "Clinical Nutrition" and bear an image of a stethoscope.  *See* Exhibit I (consisting of an image of a portion of a bag of Hill's Prescription Diet Digestive / Weight / Glucose Management w/d dog food).

e.      As to its pet360.com website, PetSmart denotes Prescription Pet Foods with an "RX" symbol, and explains that "[f]ood that requires a prescription will have 'RX Required' listed under the name of the product on our website."  The pet360.com website also explains that the order for Prescription Pet Food will not ship until veterinarian approval is received, and that "[i]f you have the prescription from your veterinarian, you can mail or fax it . . . ."

f.      As to the prescriptions its veterinarians write, Banfield Pet Hospital uses prescription cards that refer to the relevant Prescription Pet Food as "RX," provide an "RX Date," and provide an "RX#."  *See* Exhibit J (consisting of a picture of a prescription for Prescription Pet Food provided to Plaintiff Alayna Johnson by Banfield Pet Hospital).

53.      The Prescription Authorization and Defendant manufacturers' advertising and marketing statements regarding Prescription Pet Food misrepresent that Prescription Pet Food is: (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the FDA as a drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

54.      Consumers, including Plaintiffs, would not purchase Prescription Pet Food, or, would not Purchase Prescription Pet Food when priced so excessively relative to similar non-prescription pet foods, if not for the misleading marketing described herein.

55.      While Prescription Pet Food contains no drug, in the pursuit of profit, Defendants market, label, and/or sell it as if a prescription is required.  In so doing, and by failing to comply with the regulatory requirements referenced below, Defendants have manufactured and/or sold to consumers misbranded substances.

56.      For example, because it is marketed to diagnose, cure, mitigate, treat, or prevent diseases or other conditions, Prescription Pet Food falls within the statutory definition of a drug under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FD&C Act").

57.      Because Prescription Pet Food is an article used for food for animals, Prescription Pet Food also meets the definition of food under the FD&C Act.

58.      By analogy, a box of Cheerios would meet the statutory definition of a drug if it were marketed to treat the flu (in humans or animals).  In addition, because it would still be a box of Cheerios, it would also meet the FD&C Act definition of food.

59.      Pursuant to the FD&C Act, in general, new drugs are unsafe unless they have an approved application, a conditional approval, or an index listing.

13

60.     None of the Prescription Pet Foods is an approved or listed new drug; as such, Prescription Pet Food, if a drug, is misbranded under the FD&C Act.

61.     The FD&C Act also requires that all drug manufacturers register and list drugs with the FDA.

62.     None of the Prescription Pet Foods complies with the drug registration and listing requirements of the FD&C Act; as such, Prescription Pet Food, if a drug, is misbranded.

63.     The FD&C Act requires that any animal drug products be manufactured in accordance with current good manufacturing practices applicable to drugs.

64.     Not all of the Prescription Pet Foods comply with the current good manufacturing practices applicable to drugs pursuant to the FD&C Act; as such, those Prescription Pet Foods, if drugs, are misbranded.

65.     Defendant manufacturers have not submitted to the FDA a New Animal Drug Application ("NADA"), an abbreviated New Animal Drug Application, or a conditional approval to sell as a prescription product any of the Prescription Pet Food.  If they had, such submission would result in either a denial, further confirming that it is unlawful to sell the product as requiring a prescription, or an approval, which would have subjected the product and its manufacturer to the FDA monitoring and oversight that is required by law, and expected by reasonable consumers, such as Plaintiffs, in relation to products sold by prescription.  Either of these outcomes would be adverse to Defendants.

**H.      Defendants are engaged in an anticompetitive conspiracy to market pet food as prescription pet food to consumers at above-market prices that would not otherwise prevail in the absence of their collusive Prescription Authorization requirement.**

66.     The United States market for pet food is dominated by Mars, Hill's, and Purina, which collectively have a market share of 65 percent or more and exercise market power in this market.

67.     These Defendants are the dominant and virtually exclusive producers of pet food for which a prescription is required in the United States, and sell and market their products in and through interstate commerce and instrumentalities of interstate commerce.

68.     For at least the four years next prior to the filing of this Complaint, all Defendants have entered into a contract, combination, or conspiracy to raise, fix, stabilize, or peg prices for Prescription Pet Food by agreeing to market and sell their products as Prescription Pet Food, so that they can charge a price premium for these products in excess of prices for non-prescription pet food, despite their knowledge that no prescription is legally required for the sale of Prescription Pet Food.  All Defendants have known that what they are doing in selling Prescription Pet Food is not required by law, is deceptive to consumers, and enables them to charge non-competitive prices that would not exist in the absence of their conspiracy and concerted action.  All Defendants have known that if a prescription was actually required for the Prescription Pet Foods, these foods and their manufacturers would be subject to related FDA monitoring and oversight.  Each Defendant has also known that the other Defendants possess the knowledge recited in this paragraph.

69.     By selling deceptively labeled and marketed Prescription Pet Food at above-market, non-competitive prices, all Defendants have engaged in similar, parallel conduct evidencing their contract, combination, or conspiracy, in that they have engaged in similar marketing and sales practices and programs.

70.     In addition, there are plus factors tending to exclude the possibility of independent action and demonstrating the existence of a conscious commitment by Defendants to a common scheme designed to achieve their unlawful objective.

71.     The first such plus factor is the interlocking and common nature of the business relationships among Defendants, which has enabled them to effectuate their conspiracy. Defendants maintain common ownership, control, and use of the main distribution channels for their Prescription Pet Food, and of thousands of veterinarians that order consumers to use Prescription Pet Food.  Defendants have knowingly and collectively created a fictitious market for Prescription Pet Food, a market with a vertically integrated market structure that enables Defendants collectively and deceptively to sell their products as Prescription Pet Food at inflated prices.  They collectively control the sale of Prescription Pet Food from manufacture to veterinarian to retail, which has allowed their deception and price-fixing conspiracy to be implemented and perpetuated with minimal risk of detection or defection.  Such control effectively

15

carves out a significant percentage of the market for pet food and suppresses the ability of other manufacturers to compete. Specifically:

a. Mars, which is the biggest seller of pet food and sells, or has sold, two of the four Prescription Pet Food brands, is also the owner of the largest veterinarian hospital chain in the United States, Blue Pearl Vet Hospital, which employs veterinarians writing prescriptions for Prescription Pet Food.

b. Mars also has partnered with the largest specialty pet retailer, PetSmart, in the ownership of the largest veterinarian clinic chain, Banfield Pet Hospital, which employs over 3,000 veterinarians, and which benefits from the veterinarian involvement in a pet's continual care and nutritional management that is ensured by the Prescription Authorization requirement. Mars is now the exclusive owner of Banfield Pet Hospital.

c. PetSmart, since 1994, has had a strategic partnership agreement with Banfield Pet Hospital, pursuant to which Banfield Pet Hospital has established locations at PetSmart stores for, *inter alia*, the sale of Prescription Pet Food. As a majority and then sole owner of Banfield Pet Hospital, Mars has been part of and participated in this strategic partnership.

d. Both Purina and Hill's have made themselves part of the strategic partnership among PetSmart, Banfield Pet Hospital, and Mars. PetSmart, in implementing the strategic partnership, has used its strategic partnership with Banfield Pet Hospital and Mars to promote and sell Purina and Hill's Prescription Pet Food as well as Mars Prescription Pet Food.

e. Blue Pearl Vet Hospital, 90-percent owned by Mars, employs 600 veterinarians with the ability to write prescriptions for, and to sell, Prescription Pet Food manufactured by Mars, Purina, and Hill's so as to aid, abet, and perpetuate the Defendants' strategic partnership.

f. Defendants' ownership, use, and control of distribution have enabled Defendants to erect a substantial barrier to entry by actual and potential competitors wishing to sell pet food meeting the demand for Prescription Pet Food, by preventing such competitors from

getting essential distribution for such products through PetSmart, Banfield Pet Hospital, and Blue Pearl Vet Hospital.

g.      Through their common use of PetSmart, Banfield Pet Hospital, and Blue Pearl Vet Hospital, Defendants are able to monitor each other to prevent and detect cheating on and defecting from their conspiracy, in that they all use and control the same distribution channels for their Prescription Pet Food, as well as the thousands of veterinarians who act as the gatekeepers for access to their Prescription Pet Food. For example, Mars—as the vertical owner of two retailers and prescribers, Banfield Pet Hospital and Blue Pearl Vet Hospital, and as partner to PetSmart in relation to Banfield Pet Hospital—is in the position to know what each of its manufacturing and retail competitors is doing in relation to Prescription Pet Food.

h.      Through this vertical integration and common ownership, control, and use of distribution and prescription-writing for Prescription Pet Food, Defendants are able effectively to implement their price-fixing agreement to sell Prescription Pet Food at inflated, non-competitive prices that would not otherwise exist in the absence of their agreement.

72.     A second plus factor is Defendant manufacturers' collaboration, participation in, and use of an industry trade association, the Pet Food Institute ("PFI"), to implement and perpetuate their price-fixing agreement. Defendant manufacturers are all members of PFI and on PFI's board of directors. They have used PFI's auspices to promote their price-fixing agreement that Prescription Pet Food should be sold ostensibly as a product subject to FDA regulation and the FD&C Act, but should not in fact be regulated by the FDA or held to the FD&C Act. For example, the Defendant manufacturers, through PFI, have joined together to urge the FDA that, although Prescription Pet Foods "are not drugs" and "no drug registration or drug listing should be required," such products should nevertheless "only be available to the public through licensed veterinarians with whom the purchaser has a valid Veterinary-Client-Patient Relationship." *See* Exhibit K.

73.     A third plus factor is that each Defendant has acted contrary to its own individual, independent self-interest in marketing and selling Prescription Pet Food. Specifically, each Defendant has known and understood that it was engaging in deceptive practices that could not

succeed unless each other Defendant agreed to engage in similar conduct. Thus, each Defendant knew and understood that if even one other Defendant went public and acknowledged that no Prescription Authorization is actually required and thereby exposed their scheme and deception, all would be forced to follow, Prescription Pet Food prices would fall, and the conspiracy would fail, with all Defendants being implicated. The deceptive sale of Prescription Pet Food at inflated prices is not something in which any rational company would engage unless it knew and understood that its competitors and distribution outlets had agreed to do likewise, because of the risk and adverse consequences of exposure. Similarly, each Defendant manufacturer has known and understood that it was manufacturing and distributing a misbranded drug. The decision of a manufacturer to manufacture a misbranded drug, and to let its horizontal competitor sell the misbranded drug through the competitor's vertical channels, or vice versa, where the manufacturer knows that its competitor will be fully aware of the fact the drug is misbranded, makes sense for a manufacturer only if it can be confident that its competitors will be taking similar action, and will not be taking competitive advantage (by, for example, reporting the unlawful practice in order to generate shelf space for their own lawful products). Each Defendant maintained a conscious commitment to abide by the deceptive and unlawful scheme only because it knew the others would do the same. That all Defendants proceeded with the deceptive marketing practices and selling of misbranded drugs, which all knew could be exposed by any of them, tends to exclude the possibility of independent action and is evidence of their conscious commitment to a common scheme to achieve an unlawful objective.

74. A fourth plus factor is the structure of the pet food industry, which facilitates collusion and impedes new entry to disrupt collusive arrangements. The Defendant manufacturers are the primary firms marketing Prescription Pet Food, in essence sharing a monopoly that makes collusion practicable. In addition, the Defendant manufacturers have well-established and entrenched distribution arrangements and relationships with PetSmart and veterinary chains, which discourage and impede new entry for other potential manufacturers of competitive pet food. The role played by veterinarians further distorts competition in that—unlike prescription drugs for humans, which are prescribed by doctors but sold only by pharmacies—veterinarians, such as

18

Banfield Pet Hospital and Blue Pearl Vet Hospital, both sell Prescription Pet Food, and, when they write a prescription, prescribe not only the type of pet food, but also the particular brand of Prescription Pet Food. Collusion among the Defendant manufacturers is further attractive because of sunk costs in manufacturing facilities, which cannot be recovered by new entrants if new entry is unsuccessful, and the substantial fungibility of pet food.

75. A fifth plus factor tending to exclude the possibility of independent action is the combined dominant market share of Defendants in the manufacture and retail distribution of Prescription Pet Food. This facilitates their conspiracy in two ways. First, that all engage in selling Prescription Pet Food has fostered public acceptance and belief that the sale of Prescription Pet Food is a legitimate activity. Second, with all Defendants within the tent of their conspiracy, Defendants have been able to monitor each other to detect and deter potential cheating, and also maintain confidence that new entry cannot upset their conspiracy because of their stranglehold on distribution and veterinarians writing prescriptions.

76. A sixth plus factor is the knowing participation of Banfield Pet Hospital and PetSmart in facilitating, aiding, and abetting the Defendants' conspiracy, in that Banfield Pet Hospital veterinarians, with the knowledge and approval of PetSmart, use a prescription form both for animal drugs for which a prescription is actually required by the FDA, and for Prescription Pet Food, for which no prescription is legally required, and thereby mislead consumers, including Plaintiffs, into believing that a prescription is legally required for Prescription Pet Food. All Defendants know that PetSmart and Banfield Pet Hospital are engaging in this practice, which all know and understand to be deceptive

77. A seventh plus factor tending to exclude the possibility of independent action is that Defendants Mars, Purina, and Hill's have been found in the past to have engaged in similar anticompetitive, unlawful restraints over distribution of pet food so in order to eliminate price competition and fix, raise, stabilize, and peg prices. *See* Republique Francaise Autorite de la Concurrence, *Décision n°12-D-10 du 20 mars 2012 relative à des pratiques mises en œuvre dans le secteur de l'alimentation pour chiens et chats*. (Decision No. 12-D-10 of 20 March 2012 relating to practices implemented in the sector feeding for dogs and cats;

https://translate.google.com/translate?sl=auto&tl=en&js=y&prev=_t&hl=en&ie=UTF-8&u=http%3A%2F%2Fwww.autoritedelaconcurrence.fr%2Fpdf%2Favis%2F12d10.pdf&edit-text=) (French action involving Royal Canin France, Purina France, and Hill's France and fining each of them for restricting competition through unlawful distribution agreements); Office of Competition and Consumer Protection, Warsaw, Poland, July 2, 2014, decision, https://uokik.gov.pl/news.php?news_id=10856 (Polish action involving use by Royal Canin Poland of distribution channels requiring veterinarian supervision and fining Royal Canin Poland for breach of competition laws).

78.     An eighth plus factor is the common pretext all Defendants use to explain the Prescription Authorization requirement. Defendants explain that the Prescription Authorization requirement is intended to keep pets safe by ensuring that veterinarians are involved in the continual care and nutritional management of a pet. This explanation, however, is purely pretextual considering that, among other things:

a.     The packaging of most Prescription Pet Foods contains some form of an Association of American Feed Control Officials ("AAFCO") statement or representation indicating that the food is safe for long-term feeding in healthy animals. AAFCO, a non-governmental agency, publishes model regulations that have become the foundation for many states' laws and regulations for animal food and certain nutritional standards for complete and balanced pet food. It is inconsistent to say both that a pet food is not safe to feed without veterinarian care and also that it is safe for long-term feeding in healthy animals per AAFCO guidelines.

b.     Through PFI, Defendant manufacturers have agreed that "[w]eight management products have been sold at retail for many years and are not designed nor required to be sold by the direction of a veterinary recommendation," yet they each continue to sell a Prescription Pet Food marketed for weight management. *See* Exhibit K.

c.     Nothing blocks the Defendant manufacturers from seeking legal prescription status by submitting any Prescription Pet Food for review by the FDA as a new animal drug. Pet safety cannot be the explanation for avoiding FDA oversight.

79.     This Prescription Pet Food scheme is a conspiracy in restraint of trade among Defendants to fix, raise, peg, and stabilize prices for Prescription Pet Food in *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.  Alternatively, Defendants' agreement, combination, and conspiracy violates Section 1 under the Rule of Reason or Quick Look Rule of Reason, in that the anticompetitive effects of Defendants' concerted action overwhelmingly outweigh procompetitive benefits, if any, in the United States market for pet food, and less restrictive alternatives exist for the marketing of Defendants' pet food in the absence of collusion.

## III.    PARTIES

### A.    California-Resident Plaintiffs

80.     Plaintiff/Class Representative Tamara Moore ("Ms. Moore") is a resident of Alameda County, State of California.  She has a dog named Pugalicious.  When Pugalicious had to undergo surgery to remove kidney stones, Ms. Moore received a Prescription Authorization from Pugalicious's veterinarian, located in Santa Clara County, for, and purchased, Hill's Prescription Diet u/d food.  This food is a Prescription Pet Food.  Ms. Moore purchased the referenced Prescription Pet Food from her veterinarian's office in Santa Clara County within the three years next prior to the filing of this Complaint.

81.     Plaintiff/Class Representative Raff Arando ("Mr. Arando") is a resident of San Mateo County, State of California.  Mr. Arando had a dog named Bella.  When Bella gained weight, Mr. Arando received a Prescription Authorization from Bella's veterinarian, located in San Mateo County, for, and purchased, Hill's Prescription Diet w/d food.  He later received a Prescription Authorization for the same food from a Banfield Pet Hospital adjacent to a PetSmart located in San Mateo County.  This food is a Prescription Pet Food.  Mr. Arando purchased the referenced Prescription Pet Food from a PetSmart located in San Mateo County within the three years next prior to the filing of this Complaint.

82.     Plaintiff/Class Representative Greta L. Ervin ("Ms. Ervin") is a resident of San Diego County, State of California.  Ms. Ervin has a dog named Teddy.  When Teddy became ill with giardia (a diarrheal infection associated with microscopic parasites that is not uncommon in dogs and cats), Ms. Ervin received a Prescription Authorization from Teddy's primary-care

veterinarian, located in California, for, and purchased, Royal Canin Veterinary Diet Gastrointestinal dry and wet dog food, and also received a Prescription Authorization from Teddy's specialty veterinarian, located in California, for, and purchased, Royal Canin Veterinary Diet Selected Protein Adult PV dry and wet dog food. Each of these foods is a Prescription Pet Food. Ms. Ervin purchased Prescription Pet Food from PetSmart and also from her veterinarian, both located in California, within the three years next prior to the filing of this Complaint.

83. Plaintiff/Class Representative Nichols Smith ("Mr. Smith") is a resident of San Luis County, State of California, and a former resident of Sonoma County, State of California. Mr. Smith has a cat named Mimi, and, until recently, also had a cat named Neichi. When Mimi and Neichi became overweight, Mr. Smith received a Prescription Authorization from the cats' veterinarian, located in Sonoma County, for, and purchased Hill's Prescription Diet from the veterinarian's clinic. Mr. Smith later moved to San Luis County, where he purchased the same food from another veterinary clinic. This food is a Prescription Pet Food. Mr. Smith's purchases were made within the three years next prior to the filing of this Complaint.

84. Plaintiff/Class Representative Renee Edgren ("Ms. Edgren") is a resident of the City and County of San Francisco, State of California. Ms. Edgren has a dog named Barkley. When Barkley experienced skin and coat problems, Ms. Edgren received a Prescription Authorization from Barkley's veterinarian, located in San Mateo County, for, and purchased, Iams Veterinary Skin & Coat Plus Response KO dog food. This food is a Prescription Pet Food. Ms. Edgren purchased this food within the three years next prior to the filing of this Complaint.

85. Plaintiff/Class Representative Cynthia Welton ("Ms. Welton") is a resident of San Mateo County, State of California. Ms. Welton has a dog named Kodiak. When Kodiak became ill, Ms. Welton received a Prescription Authorization from Kodiak's veterinarian, located in San Mateo County, for, and purchased, Hill's Prescription Diet k/d dog food. This food is a Prescription Pet Food. Ms. Welton purchased this food within the three years next prior to the filing of this Complaint.

///

///

**B.     Missouri-Resident Plaintiff**

86.     Plaintiff/Class Representative Susan Golis ("Ms. Golis") is a resident of City of Joplin, State of Missouri.  Ms. Golis has cats named Nikki, Sam, and Leo, who suffer from urinary tract disease and/or kidney failure.  Ms. Golis received Prescription Authorizations from her veterinarian for, and purchased, Hill's Prescription Diet Urinary Care c/d Multicare cat food and Royal Canin Veterinary Diet Calm in Missouri.  These foods are Prescription Pet Foods.  Ms. Golis purchased these foods within the three years next prior to the filing of this Complaint.

**C.     Florida-Resident Plaintiff**

87.     Plaintiff/Class Representative Lynn Tutan ("Ms. Tutan") is a resident of City of Coral Gable, State of Florida.  Ms. Tutan has a dog named Zoey who underwent pancreatic surgery, related to bladder crystals, and is a little chubby.  Ms. Tutan received Prescription Authorizations from her veterinarian for, and purchased, Hill's Prescription Diet ID Low Fat, Hills Prescription Diet RD, and Royal Canin Veterinary Diet Urinary SO Moderate Calorie dog foods in Florida.  These foods are Prescription Pet Foods.  Ms. Tutan purchased these foods within the three years next prior to the filing of this Complaint.

**D.     New Jersey-Resident Plaintiff**

88.     Plaintiff/Class Representative Christine Karol ("Ms. Karol") is a resident of City of Medford, State of New Jersey.  Ms. Karol had dogs named Lola and Barley who suffered from renal disease.  Ms. Karol received Prescription Authorizations from her veterinarian for, and purchased, Hill's Prescription Diet k/d dog food and Royal Canin Renal Support dog food in New Jersey.  These foods are Prescription Pet Foods.  Ms. Karol purchased these foods within the four years next prior to the filing of this Complaint.

**E.     North Carolina-Resident Plaintiffs**

89.     Plaintiff/Class Representative Isaac Duncan Ham IV ("Mr. Ham") is a resident of City of Charlotte, State of North Carolina.  Mr. Ham has a dog named Boone who suffers from digestive conditions.  Mr. Ham received a Prescription Authorization from his veterinarian for, and purchased, Royal Canin Veterinary Diet HP dog food in North Carolina.  This food is a

Prescription Pet Food.  Mr. Ham purchased this food within the three years next prior to the filing of this Complaint.

90.    Plaintiff/Class Representative Alayna Johnson ("Ms. Johnson") is a resident of City of Leland, State of North Carolina.  Ms. Johnson has a dog named Beau who suffers from an allergy that causes hair loss and sores.  Ms. Johnson received a Prescription Authorization from her veterinarian for, and purchased, Hill's Prescription Diet z/d Ultra dog food in North Carolina. This food is a Prescription Pet Food.  Ms. Johnson purchased this food within the three years next prior to the filing of this Complaint.

**F.    Massachusetts-Resident Plaintiffs**

91.    Plaintiff/Class Representative Edward Baker ("Mr. Baker") is a resident of City of Marlborough, State of Massachusetts.  Mr. Baker has a dog named Abby who suffers from urinary tract issues.  Mr. Baker received a Prescription Authorization from his veterinarian for, and purchased, Royal Canin Veterinarian Diet Urinary s/o Moderate Calorie dog food in Massachusetts.  This food is a Prescription Pet Food.  Mr. Baker purchased this food within the three years next prior to the filing of this Complaint.

92.    Plaintiff/Class Representative Sean Spaingler ("Mr. Spaingler") is a resident of City of Billerica, State of Massachusetts.  Mr. Spaingler has a cat named Zorba who is diabetic and had a cat named Absolute who suffered from digestive issues.  Mr. Spaingler received a Prescription Authorization from his veterinarian for, and purchased, Purina Pro Plan Veterinary Diet DM cat food and Hill's Prescription Diet g/d cat food in Massachusetts.  These foods are Prescription Pet Foods.  Mr. Spaingler purchased these foods within the three years next prior to the filing of this Complaint.

**G.    New York-Resident Plaintiffs**

93.    Plaintiff/Class Representative Valerie Robertson ("Ms. Robertson") is a resident of City of Hilton, State of New York.  Ms. Robertson has a dog named Tank who suffers from an autoimmune disease.  Ms. Robertson received a Prescription Authorization from her veterinarian for, and purchased, Royal Canin Veterinary Diet Ultramino dog food in New York.  This food is a

Prescription Pet Food. Ms. Robertson purchased this food within the three years next prior to the filing of this Complaint.

94.     Plaintiff/Class Representative Ava Sterling ("Ms. Sterling") is a resident of City of New York, State of New York. Ms. Sterling has a cat named Felix, and had cats named Sassycat and Boocat who suffered from renal issues. Ms. Sterling received a Prescription Authorization from her veterinarian for, and purchased, Hill's Prescription Diet Kidney Care cat food in New York. This food is a Prescription Pet Food. Ms. Sterling purchased this food within the three years next prior to the filing of this Complaint.

**H.     Defendants**

95.     As discussed above: Defendant Mars is a Delaware corporation with a principal place of business in Tennessee; Defendant Royal Canin is a Delaware corporation with a principal place of business in Missouri; Defendant Purina is a Missouri corporation with a principal place of business in Missouri; Defendant Hill's is a Delaware Corporation with a principal place of business in Kansas; Defendant PetSmart is a Delaware corporation with a principal place of business in Arizona; Defendant Banfield Pet Hospital is a Delaware corporation with a principal place of business in Oregon; and Defendant Blue Pearl Vet Hospital is a Florida corporation with a principal place of business in Florida.

**IV.     JURISDICTION**

96.     This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15, 26, and 28 U.S.C. §§ 1331, 1337. It also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class Member is a citizen of a state different from at least one Defendant.

**V.     INTRADISTRICT ASSIGNMENT**

97.     Pursuant to Northern District of California Civil Local Rules 3-2 and 3-5, assignment to the San Francisco or Oakland Division of the Northern District of California is proper because a substantial number of the events or omissions that give rise to the claims asserted

by the Plaintiffs and Class Representatives occurred in the counties of San Francisco, Alameda, San Mateo, and Sonoma.

**VI.    CLASS ACTION ALLEGATIONS**

98.    Plaintiffs/Class Representatives bring this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**A.    The Classes.**

**1.    National Classes.**

99.    Plaintiffs/Class Representatives Ms. Ervin and Mr. Arando seek to represent a nationwide Class defined as all persons in the United States who purchased Prescription Pet Food from PetSmart, Banfield Pet Hospital, Blue Pearl Vet Hospital, or any other Defendant, for the purposes of Cause of Action I (hereafter "Nationwide Direct Purchaser Class").

100.    Plaintiff/Class Representative Mr. Spaingler seeks to represent a nationwide Class defined as all persons in the United States who purchased Prescription Pet Food advertised or sold by Purina for the purposes of Cause of Action VI (hereafter "Nationwide Purina Class").

**2.    State-Specific Classes.**

**a.    California Classes.**

101.    Plaintiff/Class Representative Ms. Ervin seeks to represent a California statewide Class of all California residents who purchased Royal Canin Prescription Pet Foods from any retailer in California, for the purposes of Causes of Action II–V (hereafter "Royal Canin California Class").

102.    Plaintiff/Class Representative Ms. Edgren seeks to represent a California statewide Class of all California residents who purchased Iams Prescription Pet Foods from any retailer in California, for the purposes of Causes of Action II–V (hereafter "Iams California Class").

103.    Plaintiff/Class Representatives Ms. Moore, Mr. Arando, Ms. Welton, and Mr. Smith seek to represent a California statewide Class of all California residents who purchased Hill's Prescription Pet Foods from any retailer in California, for the purposes of Causes of

Action II–V (hereafter "Hill's California Class," and, along with the Royal Canin California Class and Iams California Class, one of the "California Classes").

### b.     Missouri Classes.

104.    Plaintiff/Class Representative Ms. Golis seeks to represent a Missouri statewide Class of all Missouri residents who purchased Royal Canin Prescription Pet Foods from any retailer in Missouri, for the purposes of Cause of Action VI (hereafter "Royal Canin Missouri Class").

105.    Plaintiff/Class Representative Ms. Golis seeks to represent a Missouri statewide Class of all Missouri residents who purchased Hill's Prescription Pet Foods from any retailer in Missouri, for the purposes of Cause of Action VI (hereafter "Hill's Missouri Class," and, along with the Royal Canin Missouri Class, one of the "Missouri State Classes").

### c.     Florida Classes.

106.    Plaintiff/Class Representative Ms. Tutan seeks to represent a Florida statewide Class of all Florida residents who purchased Royal Canin Prescription Pet Foods from any retailer in Florida, for the purposes of Causes of Action VII and VIII (hereafter "Royal Canin Florida Class").

107.    Plaintiff/Class Representative Ms. Tutan seeks to represent a Florida statewide Class of all Florida residents who purchased Hill's Prescription Pet Foods from any retailer in Florida, for the purposes of Causes of Action VII and VIII (hereafter "Hills Florida Class," and, along with the Royal Canin Florida Class, one of the "Florida Classes").

### d.     New Jersey Classes.

108.    Plaintiff/Class Representative Ms. Karol seeks to represent a New Jersey statewide Class of all New Jersey residents who purchased Royal Canin Prescription Pet Foods from any retailer in New Jersey, for the purposes of Cause of Action IX (hereafter "Royal Canin New Jersey Class").

109.    Plaintiff/Class Representative Ms. Karol seeks to represent a New Jersey statewide Class of all New Jersey residents who purchased Hill's Prescription Pet Foods from any retailer in

New Jersey, for the purposes of Cause of Action IX (hereafter "Hill's New Jersey Class," and, along with the Royal Canin New Jersey Class, one of the "New Jersey Classes").

### e. North Carolina Classes.

110. Plaintiff/Class Representative Mr. Ham seeks to represent a North Carolina statewide Class of all North Carolina residents who purchased Royal Canin Prescription Pet Foods from any retailer in North Carolina, for the purposes of Causes of Action X and XI (hereafter "Royal Canin North Carolina Class").

111. Plaintiff/Class Representative Ms. Johnson seeks to represent a North Carolina statewide Class of all North Carolina residents who purchased Hill's Prescription Pet Foods from any retailer in North Carolina, for the purposes of Causes of Action X and XI (hereafter "Hill's North Carolina Class," and, along with the Royal Canin North Carolina Class, one of the "North Carolina Classes").

### f. Massachusetts Classes.

112. Plaintiff/Class Representative Mr. Baker seeks to represent a Massachusetts statewide Class of all Massachusetts residents who purchased Royal Canin Prescription Pet Foods from any retailer in Massachusetts, for the purposes of Cause of Action XII (hereafter "Royal Canin Massachusetts Class").

113. Plaintiff/Class Representative Mr. Spaingler seeks to represent a Massachusetts statewide Class of all Massachusetts residents who purchased Hill's Prescription Pet Foods from any retailer in Massachusetts, for the purposes of Cause of Action XII (hereafter "Hill's Massachusetts Class," and, along with the Royal Canin Massachusetts Class, one of the "Massachusetts Classes").

### g. New York Classes.

114. Plaintiff/Class Representative Ms. Robertson seeks to represent a New York statewide Class of all New York residents who purchased Royal Canin Prescription Pet Foods from any retailer in New York, for the purposes of Cause of Action XIII (hereafter "Royal Canin New York Class").

115.     Plaintiff/Class Representative Ms. Sterling seeks to represent a New York statewide Class of all New York residents who purchased Hill's Prescription Pet Foods from any retailer in New York, for the purposes of Cause of Action XIII (hereafter "Hill's New York Class," and, along with the Royal Canin New York Class, one of the "New York Classes").

116.     Excluded from the Classes are:  (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) the attorneys involved in this matter; (d) governmental entities; (e) those persons who have suffered personal injuries or emotional distress as a result of the facts alleged herein; and (f) all persons or entities that purchased Prescription Pet Food for resale.  Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that any Class should be expanded, divided into subclasses, or modified in any other way.

**B.     The Classes satisfy the Rule 23 requirements.**

117.     Members of each of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class Members for each Class is currently unknown, and can only be ascertained through appropriate discovery, the members of the Classes are likely to number at least in the thousands, and the disposition of the Class Members' claims in a single action will provide substantial benefits to all parties and to the Court.  Class Members are readily identifiable from information and records in the possession, custody, or control of Defendants, retailers of Prescription Pet Food, veterinarians, and the Class Members.

118.     Common questions of law and fact exist as to all members of the Classes, and predominate over any questions solely affecting individual members of each Class.  Questions of law and fact common to each of the Classes include the following:

         a.     Whether Defendants may self-impose a "prescription" requirement on products they manufacture, market, and/or sell, notwithstanding that the product is not a drug and has not been subjected to FDA review or clearance as a drug;

         ///

         ///

b. Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food contains some substance medically necessary to health;

c. Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food is some sort of drug, medicine, or other controlled ingredient;

d. Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that the statements regarding the intended uses and effects of Prescription Pet Food have been evaluated by the FDA;

e. Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food requires a prescription per a federal or state law;

f. Whether the Prescription Authorization and Defendants' related representations and omissions materially misrepresent that Prescription Pet Food is so materially different from no-prescription-required pet food that paying a price premium is warranted;

g. Whether the Prescription Pet Foods are misbranded;

h. Whether Plaintiffs and Class Members are entitled to a declaratory judgment;

i. Whether Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

j. Whether Plaintiffs and Class Members are entitled to restitution and/or disgorgement and the amount of such;

k. Whether Plaintiffs and Class Members are entitled to punitive or exemplary damages and the amount of such; and

l. Whether Defendants should be required to make restitution, disgorge profits, reimburse losses, pay damages, and/or pay treble damages as a result of the above-described practices.

119.   Other common questions that predominate over any questions affecting only individual Class Members include:

a.   Whether Defendants have agreed, combined, or conspired to fix, raise, stabilize, or peg the prices of Prescription Pet Food (Nationwide Direct Purchaser Class);

b.   Whether Defendants' conspiracy to fix, raise, stabilize, or peg the prices of Prescription Pet Food has caused injury to business or property (Nationwide Direct Purchaser Class);

c.   The amount of the overcharge and damage paid as a result of Defendants' conspiracy to fix, raise, stabilize, or peg the prices of Prescription Pet Food (Nationwide Direct Purchaser Class);

d.   Whether Defendants' actions as described above violate Section 1 of the Sherman Act, 15 U.S.C. § 1 (Nationwide Direct Purchaser Class);

e.   Whether Defendant manufacturers' actions as described above violate the California Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.*, California False Advertising Law, California Business & Professions Code §§ 17500, *et seq.*, and/or California Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq.* (California Classes);

f.   Whether Defendant manufacturers' actions as described above violate the Missouri Merchandising Practices Act § 407.010 *et seq.* (Nationwide Purina Class and Missouri State Classes);

g.   Whether Defendant manufacturers' actions as described above violate the Florida Deceptive and Unfair Trade Practices Act § 501.201 *et seq.* (Florida Classes);

h.   Whether Defendant manufacturers' actions as described above violate the New Jersey Consumer Fraud Act § 56:8-2 *et seq.* (New Jersey Classes);

i.   Whether Defendant manufacturers' actions as described above violate the North Carolina Unfair and Deceptive Trade Practices Act § 75-1.1 *et seq.* (North Carolina Classes);

j.     Whether Defendant manufacturers' actions as described above violate the Massachusetts Consumer Protection Act § 93A *et seq.* (Massachusetts Classes); and

k.     Whether Defendant manufacturers' actions as described above violate the New York Consumer Protection Act § 349 *et seq.* (New York Classes).

120.     Plaintiffs/Class Representatives' claims are typical of the claims of Class Members because Plaintiffs and each member of the Classes purchased Prescription Pet Food, and suffered a monetary loss as a result of that purchase.  Further, the factual bases of Defendants' conduct are common to all Plaintiffs in each Class and represent a common thread of misconduct resulting in injury common to all Class Members.

121.     Plaintiffs/Class Representatives are adequate representatives of the respective Classes because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

122.     Class certification and class-wide litigation and relief are appropriate because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Joinder of all members is impracticable.  Furthermore, as the damages suffered by the individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for most members of the Classes individually to redress the wrongs done to them.  Absent a class action, Class Members' damages will go uncompensated, and Defendants' misconduct will continue without remedy.  Class treatment of common questions of law and fact will also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

123.     Defendants have acted in a uniform manner with respect to the Plaintiffs and Class Members of each Class.

124.     Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the

Classes, and inconsistent adjudications with respect to Defendants' liability would establish

incompatible standards and substantially impair or impede the ability of Class Members to protect

their interests. Class-wide relief assures fair, consistent, and equitable treatment and protection of

all Class Members, and uniformity and consistency in Defendants' discharge of their duties to

perform corrective action regarding Prescription Pet Food.

**CAUSE OF ACTION I**
**VIOLATION OF SECTION 1 OF SHERMAN ACT**
**(15 U.S.C. § 1)**
*(All Defendants)*

125.     Plaintiffs/Class Representatives and Class Members hereby re-allege and

incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

126.     As set forth hereinabove, during the four years next prior to the filing of this

Complaint, Defendants entered into a continuing agreement, combination, and conspiracy in

restraint of trade to fix, raise, stabilize, or peg prices of Prescription Pet Food in *per se* violation of

Section 1 of the Sherman Antitrust Act,15 U.S.C.§ 1.

127.     The contract, combination, or conspiracy alleged above has substantial horizontal

elements, including agreements between Defendant manufacturers, to limit competition between

and among themselves with regard to Prescription Pet Food, even though they otherwise would be

competitors in the pet food market, such that application of the *per se* rule is justified under the

facts and circumstances set forth herein. The remaining Defendants—PetSmart, Banfield Pet

Hospital, and Blue Pearl Vet Hospital—have joined this horizontal conspiracy, and materially

aided, abetted, and perpetuated it, so as to render themselves liable as co-conspirators with the

manufacturer Defendants Mars, Purina, and Hill's in their *per se* violation.

128.     Alternatively, the contract, combination, or conspiracy alleged above has resulted

in substantial anticompetitive effects in the United States market for pet food, without any

countervailing procompetitive benefits, and thereby violates Section 1 under the Rule of Reason,

under either full Rule of Reason treatment or Quick Look treatment.

129.    This contract, combination, or conspiracy has led to anticompetitive effects, including unjustifiably increased prices, and otherwise caused injury to consumers and competition in the relevant market.

130.    Defendants' contract, combination, agreement, understanding, or concerted action occurred in or affected interstate commerce.

131.    Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants.

132.    Defendants' anticompetitive conduct has directly and proximately caused antitrust injury, in the form of higher prices charged to consumers, as set forth above. Plaintiffs/Class Representatives and other consumers will continue to suffer antitrust injury and other damage unless Defendants are enjoined from continuing to engage in the foregoing violations of law.

133.    Plaintiffs/Class Representatives are entitled to all damages proximately caused by Defendants' anticompetitive conduct, including the unjustified price premium paid by them, and are entitled to three-fold such damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including reasonable attorneys' fees, pursuant to Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

## CAUSE OF ACTION II
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("CA UCL")
### (Bus. & Prof. Code §§ 17200, *et seq.*)
### *(Mars and Hill's)*

134.    Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

135.    Each Defendant manufacturer is subject to the CA UCL. The CA UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

136.    Each Defendant manufacturer violated the "unlawful" prong of the CA UCL by violating California's Consumers Legal Remedies Act ("CA CLRA") as described in Cause of Action IV, and by violating California's False Advertising Law ("CA FAL") as described in Cause of Action III.

34

137. Each Defendant manufacturer's conduct, described herein, further violated the CA UCL because each Defendant manufacturer misrepresented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

      a.     are purchasing some sort of drug, medicine, or other controlled ingredient(s);

      b.     are meeting a medicinal requirement for their pet's health and well-being;

      c.     are purchasing a pet food that has been evaluated by the FDA as a drug;

      d.     are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

      e.     are purchasing a pet food requiring a prescription per a federal or state law; and

      f.     are purchasing a pet food for which a particular price premium is warranted.

138. Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of each Defendant manufacturer's CA UCL violations because: (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

139. Pursuant to the CA UCL, Plaintiffs/Class Representatives and Class Members are entitled to all damages proximately caused by Defendants' conduct, including the unjustified price premium paid by them, together with injunctive relief.

**CAUSE OF ACTION III**
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW ("CA FAL")**
**(Bus. & Prof. Code § 17500 *et seq.*)**
***(Mars and Hill's)***

140. Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

141. Each Defendant manufacturer violated the CA FAL by publicly disseminating misleading and false advertisements through the Prescription Authorization itself, and through

35

advertising and marketing statements, suggesting that consumers purchasing Prescription Pet Food:

      a.      are purchasing some sort of drug, medicine, or other controlled ingredient(s);

      b.      are meeting a medicinal requirement for their pet's health and well-being;

      c.      are purchasing a pet food that has been evaluated by the FDA as a drug;

      d.      are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

      e.      are purchasing a pet food requiring a prescription per a federal or state law; and

      f.      are purchasing a pet food for which a price premium is warranted.

142.      Each Defendant manufacturer's misleading and false advertisements were disseminated to increase sales of Prescription Pet Food.

143.      Each Defendant manufacturer knew or should have known its false advertisements were untrue or misleading.

144.      Each Defendant manufacturer publicly disseminated the false advertisements as part of a plan or scheme and with the intent to create a price premium for Prescription Pet Food.

145.      Plaintiffs/Class Representatives and Class Members have suffered harm as a result of these violations of the CA FAL because: (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning the products had been known; and (b) Defendant manufacturers did not conform to Defendant manufacturers' representations and promises.

146.      Pursuant to the CA FAL, Plaintiffs/Class Representatives and Class Members seek an order of this Court permanently enjoining each Defendant manufacturer from continuing to publicly disseminate misleading and false advertisements as alleged herein. Plaintiffs/Class Representatives and Class Members also seek an order requiring each Defendant manufacturer to: (a) make full restitution for all monies wrongfully obtained; and (b) disgorge all ill-gotten revenues and/or profits.

**CAUSE OF ACTION IV**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CA CLRA")**
**(Civil Code §§ 1750,** *et seq.***)**
*(Mars and Hill's)*

147.    Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

148.    The CA CLRA prohibits, among other things, "[m]isrepresenting the affiliation, connection or association with, or certification by, another," "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have," "[r]epresenting that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model, if they are not," and "[a]dvertising goods or services with intent not to sell them as advertised."  Each Defendant manufacturer violated these provisions by misrepresenting through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

a.    are purchasing some sort of drug, medicine, or other controlled ingredient(s);

b.    are meeting a medicinal requirement for their pet's health and well-being;

c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

d.    are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.    are purchasing a pet food requiring a prescription per a federal or state law; and

f.    are purchasing a pet food for which a particular price premium is warranted.

149.    Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

37

150.    Prior to the filing of the initial Complaint, CA CLRA notice letters were served on Mars and Hill's, which complied in all respects with California Civil Code § 1782(a). Plaintiffs/Class Representatives sent each Defendant manufacturer their letter via certified mail, return receipt requested, advising each Defendant manufacturer that it is in violation of the CA CLRA and must correct, repair, replace or otherwise rectify the goods alleged to be in violation of § 1770.  Each Defendant manufacturer was further advised that in the event that the relief requested has not been provided within thirty (30) days, Plaintiffs would amend this Complaint to include a request for monetary damages, including punitive damages, pursuant to the CA CLRA. Defendants have not responded, and more than thirty (30) days have passed.

151.    Pursuant to the CA CLRA, Plaintiffs/Class Representatives and Class Members are entitled to all damages proximately caused by Defendants' conduct, including the unjustified price premium paid by them, and are entitled to damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, punitive damages, and their cost of suit, including reasonable attorneys' fees.

### CAUSE OF ACTION V
### RESTITUTION BASED ON QUASI-CONTRACT/UNJUST ENRICHMENT IN CALIFORNIA
**(Ca. Civil Code §§ 1750, *et seq.*)**
***(Mars and Hill's)***

152.    Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

153.    Plaintiffs/Class Representatives conferred benefits on each Defendant manufacturer by purchasing Prescription Pet Food at a premium price.

154.    Each Defendant manufacturer has knowledge of such benefits.

155.    Each Defendant manufacturer has been unjustly enriched in retaining the revenues derived from Plaintiffs/Class Representatives and Class Members' purchases of Prescription Pet Food.

156.    Retention of those moneys under these circumstances is unjust and inequitable because each Defendant manufacturer falsely and misleadingly represented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any

38

adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

    a.    are purchasing some sort of drug, medicine, or other controlled ingredient(s);

    b.    are meeting a medicinal requirement for their pet's health and well-being;

    c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

    d.    are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

    e.    are purchasing a pet food requiring a prescription per a federal or state law; and

    f.    are purchasing a pet food for which a particular price premium is warranted.

157.    These misrepresentations and omissions caused injuries to Plaintiffs/Class Representatives and Class Members because they would not have purchased Prescription Pet Food, or paid a price premium for Prescription Pet Food, had the facts been known.

158.    Because each Defendant manufacturer's retention of the non-gratuitous benefits conferred on it by Plaintiffs/Class Representatives and Class Members is unjust and inequitable, Defendant manufacturers ought to pay restitution to Plaintiffs/Class Representatives and Class Members for their unjust enrichment, as ordered by the Court.

159.    As a direct and proximate result of each Defendant manufacturer's unjust enrichment, Plaintiffs/Class Representatives and Class Members are entitled to restitution or restitutionary disgorgement in an amount to be proven at trial.

**CAUSE OF ACTION VI**
**VIOLATION OF MISSOURI'S MERCHANDISING PRACTICES ACT**
**("MO MPA")**
**(Mo. Stat. § 407.010,** *et seq.***)**
**(*Purina, Mars, and Hill's*)**

160.    Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

161.    Each Defendant manufacturer is subject to the MO MPA. The MO MPA declares it unlawful for any person to act, use or employ "any deception, fraud, false pretense, false

39

promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri."

162.    Purina is incorporated and headquartered in Missouri.

163.    Packages of Prescription Pet Food manufactured by Purina indicate that the food is "[m]anufactured and guaranteed by: Nestle Purina PetCare Company, St. Louis, MO", ensuring that consumers, such as Plaintiffs/Class Representatives, were aware they were dealing with a Missouri company.

164.    Purina manufacturers, assembles, and/or packages Prescription Pet Food in Missouri, and controls from Missouri any portion of any manufacturing, assembling, and packaging that occurs elsewhere.

165.    Purina, through the employment of its website, act of developing its packaging, act of developing and approving its advertising, employment of its marketing campaign, use of the Prescription Authorization requirement in its distribution, and other acts, advertises direct to consumers, including Plaintiffs/Class Representatives, from Missouri.

166.    Purina's agreements, policies, requirements, advertisements, marketing, distributing, manufacturing, and other actions, in relation to Prescription Pet Food, which were done within or emanate from Missouri, used and employed deception, false promise, misrepresentation, and unfair practice, and concealed, suppressed, or omitted material facts in connection with the sale or advertisement of Prescription Pet Food, in violation of the MO MPA, by misrepresenting through the Prescription Authorization, advertising and marketing statements, and failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Purina Prescription Pet Food:

a.    are purchasing some sort of drug, medicine, or other controlled ingredient(s);

b.    are meeting a medicinal requirement for their pet's health and well-being;

c.       are purchasing a pet food that has been evaluated by the FDA as a drug;

d.       are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.       are purchasing a pet food requiring a prescription per a federal or state law; and

f.       are purchasing a pet food for which a price premium is warranted.

167.    Each Defendant manufacturer used and employed deception, false promise, misrepresentation, and unfair practice, and concealed, suppressed, or omitted material facts in connection with the sale or advertisement of Prescription Pet Food, in violation of the MO MPA, by misrepresenting through the Prescription Authorization, advertising and marketing statements, and failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

a.       are purchasing some sort of drug, medicine, or other controlled ingredient(s);

b.       are meeting a medicinal requirement for their pet's health and well-being;

c.       are purchasing a pet food that has been evaluated by the FDA as a drug;

d.       are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.       are purchasing a pet food requiring a prescription per a federal or state law; and

f.       are purchasing a pet food for which a price premium is warranted.

168.    These misrepresentations and omissions caused injuries to Plaintiffs/Class Representatives and Class Members because they would not have purchased Prescription Pet Food, or paid a price premium for Prescription Pet Food, had the facts been known.

169.     Plaintiffs/Class Representatives and Class Members purchased Prescription Pet Food primarily for personal, family, or household purposes.

170.     Each Defendant manufacturer's violation of the MO MPA was wanton, willful, and outrageous in that Defendant manufacturers imposed the Prescription Authorization requirement, and sought to deceive and mislead a necessarily vulnerable population—pet owners concerned for a loved pet diagnosed with a medical condition by a trusted veterinarian.

171.     Plaintiffs/Class Representatives and Class Members suffered an ascertainable loss of money or property as a result of Purina's above-described violation of the MO MPA because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

172.     Pursuant to the MO MPA, Plaintiffs/Class Representatives and Class Members are entitled to equitable relief, and actual damages, punitive damages, and attorney's fees in an amount to be proven at trial.

### CAUSE OF ACTION VII
### VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FL DUTPA")
### (Fla. Stat. § 501.201, *et seq.*)
### *(Mars and Hill's)*

173.     Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

174.     Each Defendant manufacturer is subject to the FL DUTPA.  The FL DUTPA provides that unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

175.     The FL DUTPA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

176.     Each Defendant manufacturer violated the FL DUTPA because each Defendant manufacturer misrepresented through the Prescription Authorization, its advertising and

42

marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

        a.     are purchasing some sort of drug, medicine, or other controlled ingredient(s);

        b.     are meeting a medicinal requirement for their pet's health and well-being;

        c.     are purchasing a pet food that has been evaluated by the FDA as a drug;

        d.     are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

        e.     are purchasing a pet food requiring a prescription per a federal or state law; and

        f.     are purchasing a pet food for which a price premium is warranted.

177.    These herein described deceptive acts were likely to mislead a reasonable consumer, and did in fact mislead reasonable consumers, including Plaintiffs.

178.    Each Defendant manufacturer knew or should have known its statements to the public were untrue or misleading.

179.    Each Defendant manufacturer's misrepresentations were part of a plan or scheme to create a price premium for Prescription Pet Food.

180.    Each Defendant manufacturer's misrepresentations sought to increase sales of Prescription Pet Food.

181.    Each Defendant manufacturer's misrepresentations involved the conduct of trade or commerce because the misrepresentations influenced the purchasing decisions of reasonable consumers, including Plaintiffs, in the public marketplace and caused such reasonable consumers to purchase Prescription Pet Food: (a) they would not have purchased or would not have purchased on the same terms if the facts concerning the products had been known; and (b) that did not conform to Defendant manufacturers' representations and promises.

182.     Each Defendants manufacturer's misrepresentations and omissions have caused injuries to Plaintiffs/Class Representatives and Class Members.

183.     Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations of FL DUTPA because: (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

184.     Pursuant to the FL DUTPA, Plaintiffs/Class Representatives and Class Members are entitled to all damages proximately caused by Defendants' deceptive and unfair conduct, including the unjustified price premium paid by them, and are entitled to damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including reasonable attorneys' fees.

## CAUSE OF ACTION VIII
## RESTITUTION BASED ON QUASI-CONTRACT/UNJUST ENRICHMENT IN FLORIDA
### (Mars and Hill's)

185.     Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

186.     Plaintiffs/Class Representatives conferred benefits on each Defendant manufacturer by purchasing Prescription Pet Food at a premium price.

187.     Each Defendant manufacturer has knowledge of such benefits.

188.     Each Defendant manufacturer has been unjustly enriched in retaining the revenues derived from Plaintiffs/Class Representatives and Class Members' purchases of Prescription Pet Food.

189.     Retention of those moneys under these circumstances is unjust and inequitable because each Defendant manufacturer falsely and misleadingly represented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

44

a.     are purchasing some sort of drug, medicine, or other controlled

ingredient(s);

b.     are meeting a medicinal requirement for their pet's health and well-

being;

c.     are purchasing a pet food that has been evaluated by the FDA as a

drug;

d.     are purchasing a pet food as to which the representations regarding

intended uses and effects have been evaluated by the FDA;

e.     are purchasing a pet food requiring a prescription per a federal or

state law; and

f.     are purchasing a pet food for which a particular price premium is

warranted.

190.     These misrepresentations and omissions caused injuries to Plaintiffs/Class

Representatives and Class Members because they would not have purchased Prescription Pet

Food, or paid a price premium for Prescription Pet Food, had the facts been known.

191.     Because each Defendant manufacturer's retention of the non-gratuitous

benefits conferred on it by Plaintiffs/Class Representatives and Class Members is unjust and

inequitable, Defendant manufacturers ought to pay restitution to Plaintiffs/Class Representatives

and Class Members for their unjust enrichment, as ordered by the Court.

192.     Pursuant to Florida's unjust enrichment and quasi-contract law,

Plaintiffs/Class Representatives and Class Members are entitled to restitution or restitutionary

disgorgement in an amount to be proven at trial.

## CAUSE OF ACTION IX
## VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT ("NJ CFA")
### (N.J. Stat. Ann. § 56:8-2 *et seq.*)
### (*Mars and Hill's*)

193.     Plaintiffs/Class Representatives and Class Members hereby re-allege and

incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

45

194.     The NJ CFA prohibits, among other things, the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise.  Each Defendant manufacturer violated these provisions by misrepresenting through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

a.     are purchasing some sort of drug, medicine, or other controlled ingredient(s);

b.     are meeting a medicinal requirement for their pet's health and well-being;

c.     are purchasing a pet food that has been evaluated by the FDA as a drug;

d.     are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.     are purchasing a pet food requiring a prescription per a federal or state law; and

f.     are purchasing a pet food for which a particular price premium is warranted.

195.     Each Defendant manufacturer's misrepresentations are misleading and outside the norm of a reasonable business practice.

196.     Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

197. Pursuant to the NJ CFA, Plaintiffs/Class Representatives and Class Members are entitled to all damages proximately caused by Defendants' deceptive and unfair conduct, including the unjustified price premium paid by them, and are entitled to damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including reasonable attorneys' fees.

**CAUSE OF ACTION X**
**VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("NC UDTPA")**
**(N.C. Gen. Stat. § 75-1.1 *et seq.*)**
***(Mars and Hill's)***

198. Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the preceding paragraphs as if fully set forth herein.

199. Each Defendant manufacturer is subject to the NC UDTPA. The NC UDTPA provides that unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are unlawful.

200. Each Defendant manufacturer violated the NC UDTPA because each Defendant manufacturer misrepresented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

a. are purchasing some sort of drug, medicine, or other controlled ingredient(s);

b. are meeting a medicinal requirement for their pet's health and well-being;

c. are purchasing a pet food that has been evaluated by the FDA as a drug;

d. are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e. are purchasing a pet food requiring a prescription per a federal or state law; and

47

f.    are purchasing a pet food for which a particular price premium is warranted.

201.    Each Defendant manufacturer's misrepresentations sought to increase sales of Prescription Pet Food.

202.    Each Defendant manufacturer knew or should have known its statements to the public were untrue or misleading.

203.    Each Defendant manufacturer's misrepresentations were part of a plan or scheme to create a price premium for Prescription Pet Food.

204.    Each Defendant manufacturer's misrepresentations affected commerce by influencing the purchasing decisions of reasonable consumers, including Plaintiffs, in the public marketplace and causing such reasonable consumers to purchase Prescription Pet Food: (a) they would not have purchased or would not have purchased on the same terms if the facts concerning the products had been known; and (b) that did not conform to Defendant manufacturers' representations and promises.

205.    Each Defendants manufacturer's misrepresentations and omissions have caused injuries to Plaintiffs/Class Representatives and Class Members.

206.    Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations of NC UDTPA because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

207.    Pursuant to the NC UDTPA, Plaintiffs/Class Representatives and Class Members are entitled to all damages proximately caused by Defendants' unfair and deceptive conduct, including the unjustified price premium paid by them, and are entitled to three-fold such damages as they show themselves to have sustained and the jury shall find, together with injunctive relief, and their cost of suit, including reasonable attorneys' fees.

///

///

## CAUSE OF ACTION XI
## RESTITUTION BASED ON QUASI-CONTRACT/UNJUST ENRICHMENT IN NORTH CAROLINA
### *(Mars and Hill's)*

208.    Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

209.    Plaintiffs/Class Representatives conferred benefits on each Defendant manufacturer by purchasing Prescription Pet Food at a premium price.

210.    Each Defendant manufacturer has knowledge of such benefits.

211.    Each Defendant manufacturer has been unjustly enriched in retaining the revenues derived from Plaintiffs/Class Representatives and Class Members' purchases of Prescription Pet Food.

212.    Retention of those moneys under these circumstances is unjust and inequitable because each Defendant manufacturer falsely and misleadingly represented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

a.    are purchasing some sort of drug, medicine, or other controlled ingredient(s);

b.    are meeting a medicinal requirement for their pet's health and well-being;

c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

d.    are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.    are purchasing a pet food requiring a prescription per a federal or state law; and

f.    are purchasing a pet food for which a particular price premium is warranted.

213. These misrepresentations and omissions caused injuries to Plaintiffs/Class Representatives and Class Members because they would not have purchased Prescription Pet Food, or paid a price premium for Prescription Pet Food, had the facts been known.

214. Because each Defendant manufacturer's retention of the non-gratuitous benefits conferred on it by Plaintiffs/Class Representatives and Class Members is unjust and inequitable, Defendant manufacturers ought to pay restitution to Plaintiffs/Class Representatives and Class Members for their unjust enrichment, as ordered by the Court.

215. Pursuant North Carolina's unjust enrichment and quasi-contract laws, Plaintiffs/Class Representatives and Class Members are entitled to restitution or restitutionary disgorgement in an amount to be proven at trial.

**CAUSE OF ACTION XII**
**VIOLATION OF MASSACHUSETTS'S CONSUMER PROTECTION ACT**
**("MA CPA")**
**(M.G.L. c. 93A)**
***(Mars and Hill's)***

216. Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

217. Each Defendant manufacturer is subject to the MA CPA. The MA CPA prohibits, among other things, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

218. Each Defendant manufacturer violated the MA CPA because each Defendant manufacturer misrepresented through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

    a. are purchasing some sort of drug, medicine, or other controlled ingredient(s);

    b. are meeting a medicinal requirement for their pet's health and well-being;

    c. are purchasing a pet food that has been evaluated by the FDA as a drug;

50

d.    are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

e.    are purchasing a pet food requiring a prescription per a federal or state law; and

f.    are purchasing a pet food for which a particular price premium is warranted.

219.    These violations could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted.

220.    Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

221.    Defendant manufacturers' violations have caused similar injury to both Plaintiffs/Class Representatives and Class Members, the Class Members constitute numerous other persons similarly situated with Plaintiffs/Class Representatives, and Plaintiffs/Class Representatives adequately and fairly represent the Class Members.

222.    Defendants manufacturers' violations of the MA CPA are "knowing" and "willful" violations as those terms are used in MA CPA.

223.    Neither Royal Canin/Mars nor Hill's maintain a place of business or keep assets within Massachusetts.  For example, neither Royal Canin/Mars nor Hill's maintain a registered agent in Massachusetts, even though Massachusetts law requires all foreign corporations that transact business or have a usual place of business in Massachusetts to maintain a registered agent in Massachusetts.

224.    Pursuant to the MA CPA, Plaintiffs/Class Representatives and Class Members are entitled to all damages proximately caused by Defendants' unfair and deceptive conduct, including the unjustified price premium paid by them (or $25, whichever is greater), and

are entitled to three-fold such damages as they show themselves to have sustained and the jury shall find, together with their cost of suit, including reasonable attorneys' fees.

**CAUSE OF ACTION XIII**
**VIOLATION OF NEW YORK'S CONSUMER PROTECTION ACT ("NY CPA")**
**(N.Y. Gen. Bus. Law § 349)**
***(Mars and Hill's)***

225. Plaintiffs/Class Representatives and Class Members hereby re-allege and incorporate by reference the allegations of the paragraphs above as if fully set forth herein.

226. Each Defendant manufacturer is subject to the NY CPA. The NY CPA prohibits, among other things, deceptive acts or practices in the conduct of any business, trade or commerce. Each Defendant manufacturer violated these provisions by misrepresenting through the Prescription Authorization, its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels, that consumers purchasing Prescription Pet Food:

      a.    are purchasing some sort of drug, medicine, or other controlled ingredient(s);

      b.    are meeting a medicinal requirement for their pet's health and well-being;

      c.    are purchasing a pet food that has been evaluated by the FDA as a drug;

      d.    are purchasing a pet food as to which the representations regarding intended uses and effects have been evaluated by the FDA;

      e.    are purchasing a pet food requiring a prescription per a federal or state law; and

      f.    are purchasing a pet food for which a particular price premium is warranted.

227. Each Defendant manufacturer's misrepresentations described above:

      a.    are consumer-oriented and have a broader impact on consumers at large;

b.       are misleading in a material way;

c.       are likely to mislead a reasonable consumer acting reasonably under the circumstances; and

d.       have misled Plaintiffs/Class Representatives and Class Members.

228.     Plaintiffs/Class Representatives and Class Members suffered lost money or property as a result of these violations because:  (a) they would not have purchased Prescription Pet Food or would not have purchased Prescription Pet Food on the same terms if the facts concerning those products had been known; and (b) they paid a price premium due to the false representations and omissions about the products.

229.     Plaintiffs/Class Representatives and Class Members hereby waive the right to recover treble damages arising from this Cause of Action only, specifically those treble damages that would otherwise be recoverable under N.Y. Gen. Bus. Law § 349(h).

230.     Pursuant to NY CPA, Plaintiffs/Class Representatives and Class Members are entitled to an injunction and all damages proximately caused by Defendants' unfair and deceptive conduct, including the unjustified price premium paid by them (or $50, whichever is greater), as they show themselves to have sustained and the jury shall find, together with their cost of suit, including reasonable attorneys' fees.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiffs/Class Representatives, individually and on behalf of all others similarly situated, request the Court enter judgment against Defendants including:

1.       An order certifying the Nationwide Direct Purchaser Class, the Nationwide Purina Class, the Royal Canin California Class, the Iams California Class, the Hill's California Class, the Missouri Royal Canin Class, the Missouri Hill's Class, the Florida Royal Canin Class, the Florida Hill's Class, the New Jersey Royal Canin Class, the New Jersey Hill's Class, the North Carolina Royal Canin Class, the North Carolina Hill's Class, the Massachusetts Royal Canin Class, the Massachusetts Hill's Class, the New York Royal Canin Class, and the New York Hill's Class under Rule 23 of the Federal Rules of Civil Procedure and naming the respective Plaintiffs as

representatives of the respective Classes, and Plaintiffs' attorneys as Class Counsel to represent the Class Members;

      2.     An order enjoining Defendants from engaging in further deceptive distribution, marketing, and/or sales practices with respect to Prescription Pet Food;

      3.     A declaration that Defendants are financially responsible for notifying all Class Members about the true nature of Prescription Pet Food;

      4.     An order declaring that Defendants' conduct violates the statutes referenced herein;

      5.     An order finding in favor of Plaintiffs/Class Representatives and the members of the Classes on all Causes of Action asserted herein;

      6.     An order finding in favor of Plaintiffs/Class Representatives and the Classes on all Causes of Action asserted herein;

      7.     A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits received from the sale of Prescription Pet Food;

      8.     An award of three-fold damages;

      9.     An award of compensatory, statutory, exemplary, and punitive damages in amounts to be determined by the Court and/or jury;

      10.     An award of prejudgment interest on all amounts awarded;

      11.     An order of restitution and all other forms of equitable monetary relief;

      12.     Injunctive relief as plead or as the Court may deem proper; and

      13.     An order awarding Plaintiffs and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

Dated: February 16, 2017          WALKUP, MELODIA, KELLY & SCHOENBERGER

                                    /s/ *Michael A. Kelly*
                                    MICHAEL A. KELLY
                                    Attorneys for Plaintiffs

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  February 16, 2017

WALKUP, MELODIA, KELLY & SCHOENBERGER

/s/ *Michael A. Kelly*
MICHAEL A. KELLY
Attorneys for Plaintiffs