JOHN E. SCHMIDTLEIN (SBN 163520)
BENJAMIN M. GREENBLUM (*pro hac vice*)
XIAO WANG (SBN 301279)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-mail: jschmidtlein@wc.com
E-mail: bgreenblum@wc.com
E-mail: xwang@wc.com

*Attorneys for Defendants Mars Petcare US, Inc.;*
*Royal Canin USA, Inc.; Medical Management*
*International, Inc.; and BluePearl Vet, LLC*

EILEEN R. RIDLEY (SBN 151735)
JAMES T. MCKEOWN (*pro hac vice*)
ALAN R. OUELLETTE (SBN 272745)
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104-1520
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
E-mail: eridley@foley.com
E-mail: jmckeown@foley.com
E-mail: aouellette@foley.com

*Attorneys for Defendant PetSmart, Inc.*

*Other counsel on signature page*

BRYAN A. MERRYMAN (SBN 134357)
WHITE & CASE LLP
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
E-mail: bmerryman@whitecase.com

CHRISTOPHER M. CURRAN (*pro hac vice*)
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355
E-mail: ccurran@whitecase.com

*Attorneys for Defendant Nestlé Purina*
*PetCare Company*

RICHARD B. GOETZ (SBN 115666)
MICHAEL F. TUBACH (SBN 145955)
HANNAH Y. CHANOINE (*pro hac vice*)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: rgoetz@omm.com
E-mail: mtubach@omm.com
E-mail: hchanoine@omm.com

*Attorneys for Defendant Hill's Pet Nutrition,*
*Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| TAMARA MOORE, et al., | Case No. 3:16-CV-07001-MMC |
| Plaintiffs, | |
| v. | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| MARS PETCARE US, INC., et al., | |
| Defendants. | |

Date: July 7, 2017
Time: 9:00 a.m.
Courtroom: 7, 19th Floor
Judge: Hon. Maxine M. Chesney

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 7, 2017, at 9:00 a.m. in the courtroom of the Honorable Maxine M. Chesney, United States District Court for the Northern District of California, San Francisco Division, Courtroom 7 - 19th Floor, 450 Golden Gate Avenue, San Francisco, California, Defendants Mars Petcare US, Inc., Royal Canin U.S.A., Inc., Nestlé Purina PetCare Company, Hill's Pet Nutrition, Inc., PetSmart, Inc., Medical Management Inc. d/b/a Banfield Pet Hospital, and BluePearl Vet, LLC (collectively, "Defendants") each will, and hereby does, move to dismiss Count I of Plaintiffs' First Amended Complaint in its entirety with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

This Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice, any reply memorandum, the pleadings and files in this action, and such other matters as may be presented at or before the hearing.

Dated:  April 3, 2017

WILLIAMS & CONNOLLY LLP

By: _____ /s/ John E. Schmidtlein _____

John E. Schmidtlein (SBN 163520)
Benjamin M. Greenblum (*pro hac vice*)
Xiao Wang (SBN 301279)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
E-mail:  jschmidtlein@wc.com
E-mail:  bgreenblum@wc.com
E-mail:  xwang@wc.com

Jeffrey E. Faucette (SBN 193066)
SKAGGS FAUCETTE LLP
One Embarcadero Center, Suite 500
San Francisco, CA 94111
Telephone:  (415) 315-1669
Facsimile:  (415) 433-5994
E-mail:  jeff@skaggsfaucette.com

*Attorneys for Defendants Mars Petcare US, Inc.;*
*Royal Canin USA, Inc.; Medical Management*
*International, Inc.; and BluePearl Vet, LLC*

Dated:  April 3, 2017

WHITE & CASE LLP

By:  _____/s/ Bryan A. Merryman_____
    Bryan A. Merryman (SBN 134357)
    WHITE & CASE LLP
    555 South Flower Street, Suite 2700
    Los Angeles, CA 90071
    Telephone:  (213) 620-7700
    Facsimile:  (213) 452-2329
    E-mail:  bmerryman@whitecase.com

    Christopher M. Curran (*pro hac vice*)
    J. Frank Hogue (*pro hac vice*)
    WHITE & CASE LLP
    701 Thirteenth Street, N.W.
    Washington, D.C. 20005
    Telephone:  (202) 626-3600
    Facsimile:  (202) 639-9355
    E-mail:  ccurran@whitecase.com
    E-mail:  fhogue@whitecase.com

    *Attorneys for Defendant Nestlé Purina PetCare Company*

Dated:  April 3, 2017

FOLEY & LARDNER LLP

By:  _____/s/ Eileen R. Ridley_____
    Eileen R. Ridley (SBN 151735)
    James T. McKeown (*pro hac vice*)
    Alan R. Ouellette (SBN 272745)
    FOLEY & LARDNER LLP
    555 California Street, Suite 1700
    San Francisco, CA 94104-1520
    Telephone:  (415) 434-4484
    Facsimile:  (415) 434-4507
    E-mail:  eridley@foley.com
    E-mail:  jmckeown@foley.com
    E-mail:  aouellette@foley.com

    *Attorneys for Defendant PetSmart, Inc.*

Dated:  April 3, 2017

O'MELVENY & MYERS LLP

By:  _____/s/ Richard B. Goetz_____
    Richard B. Goetz

2

O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-mail: rgoetz@omm.com

Michael F. Tubach
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Telephone: (415) 984-8700
Facsimile: (415) 984-8701
E-mail: mtubach@omm.com

Hannah Y. Chanoine (*pro hac vice*)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: hchanoine@omm.com

*Attorneys for Defendant Hill's Pet Nutrition, Inc.*

DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIMS UNDER 15 U.S.C. § 1
CASE NO. 3:16-CV-07001-MMC

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.      PLAINTIFFS' ALLEGATIONS ............................................................................... 2

II.     ARGUMENT ........................................................................................................ 5

     A.    Legal Standard ........................................................................................ 5

     B.    Plaintiffs Fail to Allege Facts Evidencing the Requisite Agreement for Their Section 1 Claims. ........................................................................... 5

          1.    Plaintiffs Fail to Sufficiently Allege Actionable Parallel Conduct. ............ 7

          2.    Plaintiffs Fail to Identify A Single Plus Factor That Makes Conspiracy More Plausible Than Independent Conduct. .......................... 9

               a.    Action Against Self-Interest (Third and Eighth Plus Factors) ...... 10

               b.    Banfield's Prescription Form (Sixth Plus Factor) ........................ 12

               c.    Participation in a Trade Association (Second Plus Factor) ........... 13

               d.    Defendants' "Business Relationships" (First Plus Factor) ............ 15

               e.    Structure of the Pet Food Industry and Dominant Market Share (Fourth and Fifth "Plus Factors") ........................................ 16

               f.    Foreign Government Enforcement Actions (Seventh Plus Factor) .............................................................................. 17

III.    THE COURT SHOULD DENY LEAVE TO AMEND ................................................. 18

IV.    CONCLUSION .................................................................................................. 18

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... *passim*

*Fayer v. Vaughn*, 649 F.3d 1061 (9th Cir. 2011) ........................................................ 5

*Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112 (9th Cir. 2014) ....... 4

*In re Airport Car Rental Antitrust Litig.*, 693 F.2d 84 (9th Cir. 1982) ...................... 14

*In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015) ........ 17, 18

*In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999) ........................................... 13

*In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007) ........................................ 18

*In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ....................................... 5

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011
    (N.D. Cal. 2007) ..................................................................................................... 8

*In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007) .............. 6, 8, 11

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015) ........... *passim*

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................. 9

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896 (6th Cir. 2009) ................... 11

*Int'l Healthcare Mgmt. v. Haw. Coal. For Health*, 332 F.3d 600 (9th Cir. 2003) ....................... 13

*Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119 (D.D.C. 2004) ......................... 9

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) ............................ 5, 6, 7, 15

*Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056 (9th Cir. 1998) ................................. 14

*Oliver v. SD-3C LLC*, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) .......................... 8

*Prosterman v. Am. Airlines, Inc.*, 2016 WL 7157667 (N.D. Cal. Dec. 8, 2016) ............... 8, 11, 16

*Salameh v. Tarsadia Hotel*, 726 F.3d 1124 (9th Cir. 2013) ....................................... 18

*Sanders v. Brown*, 504 F.3d 903 (9th Cir. 2007) ..................................................... 14

*Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) ................... 18

# MEMORANDUM OF POINTS AND AUTHORITIES

The first claim in the First Amended Complaint ("FAC") alleges that all Defendants entered into a price-fixing conspiracy, in violation of the Sherman Act, by agreeing among themselves to require consumers to obtain authorization from a veterinarian before purchasing certain pet foods. But the FAC is devoid of factual allegations to make this claim plausible. The FAC alleges no direct evidence of a conspiracy at all. It does not allege any particular people who agreed at any particular time or place to enter into the alleged conspiracy. The FAC does not even allege any pricing data, much less data suggesting that prices for the 233 products affected by the purported conspiracy have moved in concert at any particular point in time, or even that they moved in the same direction (or at all).

Instead, the FAC tries to support its claim of a conspiracy by alleging parallel conduct on the part of Defendants—the adoption of the requirement to obtain a veterinarian's authorization before purchasing certain pet foods—combined with various alleged "plus factors." But the FAC does not even properly allege parallel conduct. It contains no allegations about when Defendants adopted this practice. In fact, the FAC acknowledges that Defendants began selling therapeutic pet food decades apart. This failure alone dooms Plaintiffs' antitrust claim.

Plaintiffs' supposed plus factors also do not, in isolation or taken together, constitute facts that support a plausible inference of conspiracy. Plaintiffs point to benign and public facts, such as that Defendants are members of a trade association, that Mars, Inc. has an ownership interest in companies that employ an economically insignificant percentage of veterinarians in the United States, and that Defendant PetSmart sells the pet foods of the other Defendants. Other supposed plus factors simply reiterate the allegation that a requirement for authorization from a veterinarian is misleading, without alleging facts to support a plausible conspiracy among Defendants to impose the requirement. But what the FAC cannot avoid acknowledging is the obvious non-conspiratorial explanation for the requirement, namely, compliance with Food and Drug Administration (FDA) guidelines. With respect to the particular pet foods at issue, FDA directs that "veterinary oversight is especially important to provide periodic assessment of how the animal is reacting to the diet and to discontinue the product's use when warranted." *Infra*, at p. 4. Recognizing this obstacle,

Plaintiffs allege that certain Defendants conspired to lobby FDA to reach this conclusion, but even had the allegation any substance, it does not support a Sherman Act conspiracy claim because petitioning the government is protected First Amendment activity.

Defendants therefore respectfully submit the Court should dismiss Count I. Because Plaintiffs have already amended their complaint once, the Court should do so with prejudice.

## I. PLAINTIFFS' ALLEGATIONS

Plaintiffs are 15 dog and cat owners from seven states. FAC ¶¶ 80–94. Their pets suffered various maladies, such as kidney stones, other renal problems, diabetes and an autoimmune disease, and each Plaintiff consulted with their veterinarian regarding these conditions. *Id.* In each case, the veterinarian issued an authorization ("Veterinary Authorization") for the purchase of a pet food intended for such conditions and manufactured by one of Defendants Mars Petcare US, Inc. ("Mars Petcare"), Royal Canin U.S.A., Inc. ("Royal Canin"), Nestlé Purina PetCare Company ("Purina"), or Hill's Pet Nutrition, Inc. ("Hill's") (together, the "Manufacturer Defendants"). *Id.* These foods are a small part of the pet food market: they "comprise approximately 5% of all pet food sales in the United States." *Id.* ¶ 24.

Thirteen Plaintiffs made these purchases directly from their veterinarians, none of whom are identified in the FAC (*id.* ¶¶ 80, 83–94); the remaining two Plaintiffs used Veterinary Authorizations to purchase the recommended pet food from retailer Defendant PetSmart, Inc. (*id.* ¶¶ 15, 81–82). Defendants Banfield Pet Hospital ("Banfield") and BluePearl Vet, LLC ("BluePearl") (together, the "Veterinary Defendants") are "chains" of veterinary clinics that "employ[] approximately 7.5 percent of the companion-animal veterinarians in the United States." *Id.* ¶¶ 16–18, 20. Only two of fifteen Plaintiffs claims to have visited a Banfield facility, and none visited a BluePearl location. *Id.* ¶¶ 52(f), 80–94.

No Plaintiff claims that the purchased products were ineffective in any respect. Instead, Plaintiffs allege that the requirement for a Veterinary Authorization misleadingly conveys to the average consumer that the prescribed food is one or more of:

> (a) a substance medically necessary to health; (b) a drug, medicine, or other controlled ingredient; (c) a substance that has been evaluated by the Food and Drug Administration ("FDA") as a

2

drug; (d) a substance as to which the manufacturer's representations regarding intended uses and effects have been evaluated by the FDA; and/or (e) a substance legally required to be sold by prescription.

*Id.* ¶ 25.

The Veterinary Authorization requirement is the sole basis for Plaintiffs' first claim, which alleges a conspiracy in violation of the Sherman Act. Specifically, Plaintiffs allege that the Manufacturer Defendants, the Veterinarian Defendants, and PetSmart "engaged in an anticompetitive conspiracy to market and sell pet food as Prescription Pet Food to consumers at above-market prices that would not otherwise prevail in the absence of their collusive prescription-authorization requirement." *Id.* ¶ 9. Plaintiffs further allege that the conspiracy resulted in a "price-fixing agreement to sell Prescription Pet Food at inflated, non-competitive prices." *Id.* ¶ 71(h).

Plaintiffs do not allege that the allegedly conspiring Manufacturing Defendants began selling pet food with a Veterinary Authorization requirement at or near the same points in time; indeed, the FAC does not specify when any of the Manufacturing Defendants began selling food with a Veterinary Authorization requirement. As FDA has explained, such products have been marketed "[f]or more than fifty years." Ex. 1 at 3. Moreover, a news article appended to the FAC as Exhibit E indicates that Hill's began selling such pet food years before any of its competitors; that Purina began to do so as of 1997 in response to Hill's' success, and that a Mars unit's market share had "tumbled 28%" for failure to sell such pet food. The article makes no mention of Royal Canin or PetSmart.

Plaintiffs instead allege that the Manufacturer Defendants—but not any of the other members of the alleged conspiracy—"joined together to urge the FDA that . . . such products should . . . 'only be available to the public through licensed veterinarians with whom the purchaser has a valid Veterinary-Client-Patient Relationship.'" *Id.* ¶ 72 (quoting FAC Exhibit K). The FAC omits that the Manufacturer Defendants' submission to FDA was part of FDA's notice-and-comment process, was preceded by a proposal *by FDA* to that effect, eventually leading to FDA's issuance in April 2016 of a Compliance Policy Guide entitled "Sec. 690.150 Labeling and Marketing of Dog and Cat Food Diets Intended to Diagnose, Cure, Mitigate, Treat, or Prevent Diseases" ("Compliance

Policy").[1]  The Compliance Policy addressed the subject of "dog and cat food diets that are labeled and/or marketed as intended for use to diagnose, cure, mitigate, treat, or prevent diseases," such as the products at issue here (FAC ¶ 56), and as noted, explained that such food had been marketed "[f]or more than fifty years." Ex. 1 at 3.[2]

FDA expressed concern about the use of such products "by pet owners *without the direction of a licensed veterinarian.*"  *Id.* at 5 (emphasis added).  When "marketed *directly* to pet owners" (*i.e.*, without veterinary supervision), the agency explained, "there is a greater potential for product misuse and/or misunderstanding of the role of the product in the disease treatment."  *Id.* (emphasis added).  Veterinary Authorization addresses precisely that issue:

> Veterinarians typically discuss an animal's nutritional needs with the pet owner, make periodic assessments of the animal's health, and provide direction to the pet owner for how to use the product. Veterinarians can also help ensure that animals diagnosed as suffering from a disease or other health condition receive other appropriate treatments for their condition.  Because these products have not been evaluated for safety and efficacy, ***veterinary oversight is especially important to provide periodic assessment of how the animal is reacting to the diet and to discontinue the product's use when warranted.***

*Id.* (emphasis added).  Accordingly, FDA determined that it would "exercise[] enforcement discretion"—as it had done for the last 50 years—to permit the marketing of such foods provided that, *inter alia*, they were "made available to the public *only* through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian." *Id.* at 4, 7 (emphasis added).

---

[1] FDA's Compliance Policy is attached to Defendants' Request for Judicial Notice as Exhibit 1.

[2] "There is no requirement that pet food products have pre-market approval by FDA.  However, FDA ensures that the ingredients used in pet food are safe and have an appropriate function in the pet food." *See* https://www.fda.gov/AnimalVeterinary/Products/AnimalFoodFeeds/PetFood/default.htm (last visited March 31, 2017).

II.    **ARGUMENT**

    A.    **Legal Standard**

    A complaint must be dismissed under Rule 12(b)(6) if it lacks sufficient facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "facial plausibility" standard requires factual allegations that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court need not accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit," *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014) (internal quotation marks omitted), or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). Nor is the Court required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (citation and internal quotation marks omitted). "[R]equir[ing] allegations that reach the level suggesting conspiracy" helps "to avoid the potentially enormous expense of discovery in cases with 'no reasonably founded hope that the discovery process will reveal relevant evidence' to support a § 1 claim." *Twombly*, 550 U.S. at 559 (alteration and internal quotation marks omitted).

    B.    **Plaintiffs Fail to Allege Facts Evidencing the Requisite Agreement for Their Section 1 Claims.[3]**

    To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs must allege facts establishing three elements: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States . . .; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

---

[3] Plaintiffs also lack standing to seek injunctive relief because they allege that they will no longer buy Prescription Pet Food products (FAC ¶ 138). *See* Defendants' Motion to Dismiss Plaintiffs' State Law Claims, pp. 12–13.

Pleading an agreement requires alleging "not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true . . . . answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1047–48. "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. "[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific [factual] allegation . . . but a court is not required to accept such terms as a sufficient basis for a complaint." *Id.* (citation and internal quotation marks omitted).

Plaintiffs here do not allege facts directly evidencing a conspiracy among Defendants. Direct evidence would consist of "concrete" information "about the content and circumstances of an[] actual agreement," *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007), "such as a specific time, place, or person involved in the alleged conspirac[y]," *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 565 n.10), or "how the alleged conspiracy was organized and carried out," *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1190 & n.5 (9th Cir. 2015) (internal quotation marks omitted).

Plaintiffs' description of the agreement alleged here, by contrast, is confined to a single paragraph that presents nothing "concrete." *See* FAC ¶ 68. The FAC is devoid of factual allegations as to how any individual Defendant allegedly joined in any industry-wide conspiracy involving pet food manufacturers, veterinarians, and retail stores. Even under a reading most generous to Plaintiffs, the FAC fails to identify "who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at 1048. Plaintiffs do not allege when or where the agreement was reached, the individuals supposedly involved, or in what manner it was reached; nor do they identify what prices were charged, much less when or how they were allegedly increased or "fixed." Indeed, despite their claim that the Veterinary Authorization requirement somehow facilitated price-fixing, Plaintiffs' FAC lacks any pricing information whatsoever regarding any of the 233 products alleged to be at issue (FAC Ex. A), much less any allegation that Manufacturer Defendants charged similar prices for these products, or that their prices moved together.

Absent direct evidence of an agreement, Plaintiffs must plead parallel conduct and "'something more,' 'some further factual enhancement,' a 'further circumstance pointing toward a

6

meeting of the minds' of the alleged conspirators." *Musical Instruments*, 798 F.3d at 1193 (quoting *Twombly*, 550 U.S. at 557). Plaintiffs must "'nudge their allegations of . . . . agreement[] 'across the line from conceivable to plausible'" by "distinguish[ing] permissible parallel conduct from impermissible conspiracy by" pointing to "'plus factors,'" *i.e.*, "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Id.* at 1193–94 (original alterations omitted) (quoting *Twombly*, 550 U.S. at 570). When a plaintiff alleges similar conduct by defendants to support a conspiracy claim, the complaint must do more than allege actions that are consistent with a defendant's independent self-interest. "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Kendall*, 518 F.3d at 1049; *see also Twombly*, 550 U.S. at 554.

"Plus factors ***coupled with parallel conduct*** can take a complaint from merely possible to plausible." *Musical Instruments*, 798 F.3d at 1194 n.7 (emphasis added). As set forth below, Plaintiffs identify neither parallel conduct nor any plus factor that supports an inference of conspiracy.

### 1.    Plaintiffs Fail to Sufficiently Allege Actionable Parallel Conduct.

The only purported parallel conduct Plaintiffs allege is that each of the Manufacturer Defendants sells certain pet foods subject to a Veterinary Authorization requirement. (The Veterinary Defendants and PetSmart are alleged to have done nothing more than issue and require such authorizations, respectively.) Plaintiffs allege that the Veterinary Authorization requirement facilitated a "price-fixing conspiracy" in order to make sales "at above-market, non-competitive prices." FAC ¶¶ 69, 71. However, as noted, they nowhere allege any similarity in the pricing for each Manufacturer Defendant's products subject to the Veterinary Authorization requirement, other than the vague and conclusory allegation that prices were "above-market." *E.g.*, *id.* ¶ 9. In fact, Plaintiffs do not describe or identify the particular price of *any* particular product in the FAC,

despite that courts repeatedly have found price-fixing conspiracy allegations insufficient without

particularized allegations of price data showing actual price similarity.[4]

Nor do Plaintiffs allege that Defendants "adopt[ed]" the Veterinary Authorization

requirement "around the same time in response to similar market conditions." *Musical Instruments*,

798 F.3d at 1193. In fact, Plaintiffs' FAC is entirely devoid of any allegations about ***when*** each

Manufacturer Defendant adopted the Veterinary Authorization requirement. Plaintiffs only allege

in boilerplate fashion that, within the four-year statute of limitations for federal antitrust claims,

Defendants entered into a "contract, combination, or conspiracy" to violate the Sherman Act by

"agreeing to market and sell their products as Prescription Pet Food." FAC ¶ 68. But this

allegation says nothing about when the Manufacturer Defendants each began selling Prescription

Pet Food.

Ultimately, Plaintiffs do not (and cannot) allege that the manufacturers began selling these

products at points remotely close in time over the "fifty years" that such products have been

marketed. Ex. 1 at 3. Nor do Plaintiffs allege when or how the Veterinary Defendants or PetSmart

joined in any agreement. Without these critical allegations, Plaintiffs have failed to provide the

requisite "specificity as to the timing of" each Defendant's conduct. *Prosterman v. Am. Airlines,*

*Inc.*, 2016 WL 7157667, at *4 (N.D. Cal. Dec. 8, 2016); *see also Musical Instruments*, 798 F.3d at

1193 (parallel conduct may include "adopting similar policies around the same time"); *Late Fee*,

528 F. Supp. 2d at 962 ("The Complaint further explains that the defendants' fee levels have all

followed different pricing paths at different times, not even roughly in parallel.").

---

[4] *See, e.g.*, *Late Fee*, 528 F. Supp. 2d at 962 (inference of conspiracy unwarranted where pricing data showed that at least some of the "alleged co-conspirators have different . . . price levels" and that the defendants' price "levels have all followed different pricing paths at different times"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) ("scant allegations of pricing behavior that came before the alleged conspiracy" insufficient to establish inference of collusion from purported "'historically unprecedented' change in pricing structure"); *Oliver v. SD-3C LLC*, 2016 WL 5950345, at *7 (N.D. Cal. Sept. 30, 2016) (pricing data that, *inter alia*, lacked information "predating the alleged conspiracy and [for] the first four years of the alleged conspiracy" was "only weakly relevant" and could not show even "consciously parallel conduct that . . . may get [a] complaint close to stating a claim" (internal quotation marks omitted)).

If anything, the FAC suggests that the Manufacturer Defendants began marketing pet food subject to a Veterinary Authorization at markedly different times. Specifically, Exhibit E to the FAC suggests that Hill's has marketed such food for many years before Mars Petcare, Royal Canin or Purina introduced any such food. On the face of the pleading, then, it is clear that the Manufacturer Defendants did not adopt these practices anywhere around the same time as one another. "Allegations of such slow adoption of similar policies does not raise the specter of collusion." *Musical Instruments*, 798 F.3d at 1196. Plaintiffs similarly fail to allege how PetSmart allegedly participated in the conspiracy—much less the specific who, what, when, and where of any such agreement.

In a final attempt to mask the lack of allegations of parallel conduct, Plaintiffs engage in an indiscriminate lumping together of "Defendants," hoping that a definitional shortcut may substitute for factual allegations of parallel conduct. *See, e.g.*, FAC ¶ 68 ("All Defendants have entered . . ."); *id.* ("All Defendants have known . . ."); *id.* ("All Defendants have engaged . . ."); *id.* ¶ 73 ("all Defendants proceeded . . ."); *id.* ¶ 76 ("All Defendants know . . ."); *id.* ¶ 78 ("all Defendants use . . ."). Plaintiffs cannot satisfy their pleading burden in this fashion. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (rejecting group pleading as "general allegations as to all defendants, to 'Japanese Defendants,' or to a single corporate entity such as 'Hitachi' is insufficient to put specific defendants on notice of the claims against them."). Plaintiffs "cannot escape their burden of alleging parallel conduct and that each defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations." *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004).

### 2. Plaintiffs Fail to Identify A Single Plus Factor That Makes Conspiracy More Plausible Than Independent Conduct.

Even if Defendants' adoption of the Veterinary Authorization requirement at unspecified points over "fifty years" qualified as parallel conduct (it does not), Plaintiffs still fail to allege facts demonstrating a plus factor that places parallel conduct "in a context that raises a suggestion of preceding agreement." *Twombly*, 550 U.S. at 557. Plaintiffs must explain why, in the particular

9

context of the Veterinary Authorization requirement, the asserted plus factors plausibly show "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194, 1197 & n.14.

Paragraphs 71 to 78 of the FAC purport to identify eight plus factors. Most are not even directed at an alleged *agreement* to impose a Veterinary Authorization requirement, but rather at the underlying claim that the requirement is improper. Indeed, many of these alleged "plus factors" are completely irrelevant or insufficient as to particular Defendants. To state a claim for an antitrust conspiracy subject to treble damages, however, Plaintiffs need much more: they must set forth factual allegations plausibly "pointing toward a meeting of the minds" among Defendants to impose the Veterinary Authorization requirement. *Twombly*, 550 U.S. at 557. Absent such factual allegations, parallel conduct remains in "neutral territory." *Id.* Ultimately, even taken together, the FAC's purported plus factors fall far short of "'nudg[ing]' their allegations . . . 'across the line from conceivable to plausible.'" *Musical Instruments*, 798 F.3d at 1194 (quoting *Twombly*, 550 U.S. at 570).

### a. Action Against Self-Interest (Third and Eighth Plus Factors)

Plus factors stemming from Plaintiffs' assertion that the Veterinary Authorization requirement is "contrary" to each Defendants' self-interest fail for three reasons.

*First*, the face of the FAC suggests the non-conspiratorial reason for the Veterinary Authorization requirement: long-standing FDA practice and a formal policy directing manufacturers to adopt such a requirement. As FDA explained in the April 2016 Compliance Policy, permitting the purchase of these products without Veterinary Authorization would, in FDA's view, pose an unacceptable safety risk:

> ***When these products are marketed directly to pet owners, there is a greater potential for product misuse and/or misunderstanding of the role of the product in the disease treatment****. . . .* For example, owners . . . may misinterpret claims to "control blood glucose" to represent that the product is the sole treatment required for diabetic dogs and cats when, in fact, these animals may require insulin therapy or other treatments to adequately control blood glucose.

Ex. 1 at 5 (emphasis added).  This was consistent with FDA's concern, expressed in the September 2012 draft of the Compliance Policy published for notice and comment, that "marketing directly to pet owners is of concern because many of these products affect physiological processes to extents that may not be tolerated by all animals and/or may not achieve effective treatment."  Ex. 2 at 5.

It is for this reason that FDA has for *fifty years* exercised enforcement discretion with respect to "dog and cat food diets . . . that claim to treat or prevent disease when," *inter alia*, the products are "made available to the public only through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian."  Ex. 1 at 3–4, 7.  There is nothing conspiratorial about individual competitors each conforming their conduct to regulatory guidance.  *Late Fee*, 528 F. Supp. 2d at 963 n.8, 965 ("inference of conspiracy" lacking where change in federal regulations provided "natural explanations" for allegedly conspiratorial change in the defendants' behavior (internal quotation marks omitted)).  Here, FDA's Compliance Policy explains Defendants' unilateral conduct, and therefore defeats the conspiracy claim.  *See Musical Instruments*, 798 F.3d at 1196 ("manufacturers' similar response to" "demand[s]" from "the same important customer . . . is a hallmark of independent parallel conduct—not collusion").

*Second*, while Plaintiffs conjecture that the Veterinary Authorization requirement "could not succeed unless" Defendants all "agreed to" adopt it (FAC ¶ 73), this allegation too is contradicted by the FAC.  Exhibit K reflects that Defendants adopted the Veterinary Authorization requirement, and thus the common justification for it, *publicly*.  Imitation of public conduct is not indicative of conspiracy because it provides no "facts to support a finding that . . . Defendants were aware of each other's" intentions "*prior to*" any Defendant acting.  *Prosterman*, 2016 WL 7157667, at *4 & n.5 (emphasis added).  And an inference of conspiracy from public conduct is particularly inappropriate where, as here, the FAC identifies only similarity of general practices and fails to otherwise allege that Defendants "set identical or even substantially similar [prices] for any given" type of pet food.  *Id.*; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (adoption of identical commission structures not suggestive of conspiracy where the

"leader . . . (the first to announce and implement a commission cut) publicly announced its cut and implemented the change almost immediately").

*Third*, under Plaintiffs' theory, any time a manufacturer engaged in allegedly deceptive marketing, a conspiracy would be inferred from its competitors' failure to challenge the alleged deception. This either proves too much, or suggests that failure to attack a rival, without more, suggests a conspiracy. *But see Twombly*, 550 U.S. at 567–68 ("a natural explanation for" failing to pursue allegedly "attractive business opportunities" is the "adage about him who lives by the sword"; competitors may "sit[] tight, expecting their [rivals] to do the same thing" (internal quotation marks omitted)).

And Exhibit E to the FAC refutes such a theory here: it indicates that Hill's alone marketed pet food requiring a Veterinary Authorization for years before any other Defendant. According to Plaintiffs' logic, the other three Manufacturer Defendants—as well as the two manufacturers who the FAC describes as selling billions of dollars in pet food that is not subject to a Veterinary Authorization requirement, Big Heart and Diamond (FAC Ex. C)—should have challenged Hill's years ago. Plaintiffs allege no such challenge; their theory of a conspiracy to deceptively market fails at the threshold.

### b. Banfield's Prescription Form (Sixth Plus Factor)

Plaintiffs allege that a conspiracy should be inferred from their allegation that all Defendants "know[]" about, and that PetSmart "approv[ed]," Banfield's "mislead[ing]" use of the same prescription form for pet food and drugs. FAC ¶ 76. This purported plus factor merely restates Plaintiffs' allegation that the Veterinary Authorization requirement is deceptive. Nowhere do Plaintiffs explain how this alleged plus factor is "more consistent with an illegal agreement than with rational and competitive business strategies." *Musical Instruments*, 798 F.3d at 1189. Further, as noted, even if the alleged conduct amounted to deceptive marketing (it does not), such conduct is not inherently indicative of conspiracy, and Plaintiffs fail to allege anything peculiar to the Veterinary Authorization requirement that would raise such an inference here.

### c. Participation in a Trade Association (Second Plus Factor)

Plaintiffs also point to the Manufacturer Defendants' participation in the Pet Food Institute ("PFI"), "an industry trade association," and their alleged use of PFI to jointly "urge the FDA" to adopt the Veterinary Authorization requirement. FAC ¶ 72. Even if accepted as true, this cannot support an inference of conspiracy for three reasons.

*First*, "mere participation" in a trade association is not indicative of a conspiracy. *Musical Instruments*, 798 F.3d at 1196; *see also, e.g.*, *Twombly*, 550 U.S. at 567 n.12; *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) (mere attendance at trade association meetings insufficient to support inference of conspiracy). Rather, "trade associations often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services." *Citric Acid*, 191 F.3d at 1098.

*Second*, PFI's submission of comments (Exhibit K) in FDA's notice-and-comment period relating to the Compliance Policy falls well within the considerable breadth of permissible conduct by a trade association. As an initial matter, it was FDA, and not any of the Defendants, who proposed the Veterinary Authorization requirement as part of the Compliance Policy; the policy that was put out for notice-and-comment was proposed by FDA in draft form in September 2012 (*see* Ex. 2); at most, the November 2012 submission to which Plaintiffs point in FAC Exhibit K establishes that Defendants agreed with FDA's proposed policy in this regard. Additionally, and in any event, antitrust law does not prohibit trade associations from "speak[ing] out" and providing "advice," even if the trade association is "influential" and "its . . . members listen and a substantial number take whatever action" the association recommends, so long as the association cannot "constrain anyone to follow the advice," an allegation nowhere made in the FAC. *Int'l Healthcare Mgmt. v. Haw. Coal. For Health*, 332 F.3d 600, 606 (9th Cir. 2003) (internal quotation marks omitted). Conspiracy is not afoot "whenever a trade association t[akes] . . . action." *Citric Acid*, 191 F.3d at 1098.

*Third*, inferring conspiracy from a submission to FDA—made on behalf of not only Defendants but of numerous companies not even alleged to have been part of the alleged conspiracy

(*see* FAC Ex. K)—runs headlong into the *Noerr–Pennington* doctrine, which provides "private actors" with "immun[ity] from antitrust liability for petitioning the government, even when the private actors' motives are anticompetitive." *Sanders v. Brown*, 504 F.3d 903, 912 (9th Cir. 2007).[5] The immunity extends to "any injuries that result 'directly' from valid government action taken on the petitioner's behalf," including even "supracompetitive . . . prices." *Id.* at 914. Longstanding authority protects Defendants' exercise of their First Amendment petitioning rights from antitrust scrutiny. *E.g.*, *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1059–60 (9th Cir. 1998) (describing the broad sweep of the *Noerr-Pennington* doctrine "to set aside antitrust actions premised on state law, as well as those based on federal law."). Defendants are not subject to antitrust liability for petitioning FDA to exercise enforcement discretion with respect to certain pet foods on the basis of a Veterinary Authorization requirement.

Plaintiffs' assertion that lawful petitioning conduct could simultaneously qualify as a plus factor demonstrating an unlawful antitrust conspiracy misapprehends the hierarchy of the Petition Clause and the Sherman Act. *See Kottle*, 146 F.3d at 1059 (summarizing the Ninth Circuit's implementation of *Noerr-Pennington* principles and noting that the doctrine summarily dispenses with "claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government"). Here, PFI advocated on behalf of its members for adoption of an FDA proposal. FDA determined that the Veterinary Authorization requirement, which it had informally embraced for years and was included in the 2012 draft of the Compliance Policy, was sufficiently important to warrant formal adoption as part of the April 2016 Compliance Policy. For lawful conduct such as this to simultaneously evidence an unlawful conspiracy would "unduly chill speech"—which is precisely what the *Noerr–Pennington* doctrine is intended to avoid. *Sanders*, 504 F.3d at 912.

---

[5] *See also In re Airport Car Rental Antitrust Litig.*, 693 F.2d 84 (9th Cir. 1982) (*Noerr-Pennington* bars antitrust claims based on allegations that rental car companies lobbied for airport lease restrictions).

#### d. Defendants' "Business Relationships" (First Plus Factor)

Plaintiffs infer conspiracy from the allegedly "interlocking and common nature" of Defendants' "business relationships," which allegedly "enabled them" to "collectively control" a Veterinary Authorization requirement "from manufacture to veterinarian to retail." FAC ¶ 71. Such conclusory suppositions are not themselves "further *factual* enhancement," and Plaintiffs' related factual assertions fail to "nudge their allegations of . . . agreement[] across the line from conceivable to plausible." *Musical Instruments*, 798 F.3d at 1193 (emphasis added) (internal quotation marks and original alterations omitted).

*First*, even assuming all Defendants share "interlocking" and "common" relationships (they do not), Plaintiffs plead no facts regarding how Defendants exercised common control over the market. While Plaintiffs allege that non-party Mars, Inc. (the parent of Defendants Royal Canin and Mars Petcare) and PetSmart have or had ownership interests in the Veterinarian Defendants (FAC ¶¶ 17, 19), there is no specific allegation in the FAC that evinces the ***actual exercise of control*** by Mars, Inc. or PetSmart—much less control that would or did facilitate the conspiracy alleged here; nor do Plaintiffs allege how Mars, Inc. and PetSmart, two independently owned companies, exercise control over one another. Similarly, while Plaintiffs allege that Defendant Banfield has "approximately 900" veterinary clinics located adjacent to PetSmart stores (*id.* ¶ 16), nowhere do Plaintiffs allege how that circumstance facilitated the alleged conspiracy. Nor, more generally, do Plaintiffs explain why "interlocking" or "common" relationships do not "just as easily suggest rational, legal business behavior by the defendants." *Kendall*, 518 F.3d at 1049.

The label of "interlocking and common nature" of "business relationships" is no more meaningful as to Purina or Hill's. Neither is alleged to have any ownership interest in any Veterinarian Defendant; Plaintiffs allege only that the Veterinary Defendants write prescriptions for Purina and Hill's products and that PetSmart sells those products. FAC ¶ 71(d). Moreover, while Plaintiffs assert that distribution and sale through the Veterinarian Defendants and PetSmart facilitated this "monitor[ing]" of the purported conspiracy (*id.* ¶ 75), Plaintiffs allege no facts regarding how the alleged "monitoring" operates, or even an explanation for why such monitoring is necessary, given that all of Defendants' allegedly wrongful conduct—adhering to the Veterinary

Authorization requirement—was entirely public. Defendants are aware of no case in which a court inferred a conspiracy from the bare fact that a retail store sold a defendant's product.

*Second*, Plaintiffs allege only vertical supplier-customer relationships between Purina and Hill's and the Veterinary Defendants, and that PetSmart authorized and sold their pet food. *Id.* ¶ 71(d). Regarding an alleged agreement involving Purina, Hill's, the Veterinary Defendants and PetSmart, Plaintiffs' conspiracy theory makes little sense. If, as Plaintiffs assert, merely abiding by the Veterinary Authorization requirement is indicative of conspiracy, then every veterinarian or pet food retailer in the United States that abides by it is a co-conspirator (including Plaintiffs' own personal veterinarians). The FAC is, unsurprisingly, devoid of factual material suggestive of such a sweeping, industry-wide conspiracy.

Plaintiffs similarly have not explained why Mars, Inc.'s relationships with PetSmart or the Veterinarian Defendants supports an inference of anticompetitive agreements between Purina and Hill's and either (a) Mars Petcare or Royal Canin or (b) the Veterinary Defendants and PetSmart. Nor could they. It is facially and economically implausible that an agreement among the Manufacturer Defendants could be facilitated by Mars, Inc.'s relationship with a *single* retailer (PetSmart) or with Veterinary Defendants that employ at most 7.5% of veterinarians in the United States (FAC ¶ 20). By Plaintiffs' own math, over 90% of the veterinarians in the country are independent of any Defendant in this case—confirming that Plaintiffs' "business relationships" allegations do not advance their conspiracy claim.

### e. Structure of the Pet Food Industry and Dominant Market Share (Fourth and Fifth "Plus Factors")

Plaintiffs ask the Court to infer a conspiracy from allegations that Defendants have a "combined dominant market share" (FAC ¶ 75) and the Manufacturer Defendants "in essence shar[e] a monopoly," including so-called "entrenched distribution arrangements and relationships" with PetSmart and the Veterinarian Defendants (*id.* ¶ 74). Setting aside the accuracy of such allegations, simply describing a market as susceptible to collusion where "a few relatively large sellers account for the bulk of the output" does not itself raise an inference of conspiracy. *Prosterman*, 2016 WL 7157667, at *4 (internal quotation marks omitted). "In an interdependent

16

market," lawful conscious parallelism is to be expected. *Musical Instruments*, 798 F.3d at 1193.

Accordingly, even in a relevant market concentrated up to 90% with alleged co-conspirators—a

threshold to which even the FAC does not stretch—parallel behavior alone remains insufficient to

suggest a conspiracy. *Twombly*, 550 U.S. at 550 n.1, 553–54 ("Even conscious parallelism, a

common reaction of firms in a concentrated market that recognize their shared economic interests

and their interdependence with respect to price and output decisions is not in itself unlawful."

(alterations and internal quotation marks omitted)).

### f. Foreign Government Enforcement Actions (Seventh Plus Factor)

Finally, Plaintiffs contend that a conspiracy should be inferred from the fact that Polish and

French regulators allegedly brought unrelated enforcement actions under their respective

competition laws against foreign affiliates of Royal Canin, Purina and/or Hill's for

"anticompetitive, unlawful restraints over distribution of pet food." FAC ¶ 77. However, the FAC

does not allege—nor could it—that those actions alleged a conspiracy of any kind between the

manufacturers, much less one to maintain a Veterinary Authorization requirement in the United

States. The conduct at issue in these foreign proceedings—alleged restrictions in the vertical

distribution of pet food in France and Poland that did not involve the legality of a Veterinary

Authorization requirement at all—does not plausibly suggest conspiratorial horizontal conduct by

separate Purina, Royal Canin, Mars Petcare and Hill's entities as to Prescription Pet Food in the

United States. And even had Plaintiffs somehow alleged that foreign distribution of pet food was

related to Veterinary Authorization in the United States, "a foreign antitrust conspiracy . . . without

more, generally does not tend to prove a domestic conspiracy." *In re Chocolate Confectionary

Antitrust Litig.*, 801 F.3d 383, 402–03 (3d Cir. 2015).

This is "especially" so where, as here, "the conduct observed domestically is just as

consistent with lawful interdependence as with an antitrust conspiracy," and where, as here, there is

no allegation that the foreign and domestic markets "are sufficiently similar or adjacent" or that "the

relevant activities therein are sufficiently linked or tied in some way, e.g., the people involved in the

conspiracies are the same or overlapping." *Id.* at 403. "[U]nabashed propensity reasoning—the

fallacy that 'if it happened there, it could have happened here,'" cannot support a "reasonable . . .

inference of a domestic conspiracy." *Id.*; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam) ("Allegations of anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here . . . do not nudge . . . [conspiracy] claims across the line from conceivable to plausible." (original alterations and internal quotation marks omitted)); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1316–17 (11th Cir. 2003) (evidence that defendants "conspired to fix prices in 10 different foreign countries" did "not rise to the level of a plus factor" because plaintiffs offered no "palpable tie between these overseas activities and . . . pricing actions in the United States").

## III.    THE COURT SHOULD DENY LEAVE TO AMEND

"[D]ismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment.  A district court's discretion to deny leave to amend is particularly broad where the plaintiff has previously amended."  *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (alterations and internal quotation marks omitted).  This is such a case:  Plaintiffs requested, and with Defendants' consent took, more than two months at the outset of the case to re-plead.  Both the original complaint and the FAC, however, fail to adequately plead a price-fixing conspiracy.  There is no reason to believe that further amendment would cure this deficiency.  Accordingly, Defendants respectfully submit that the Court should deny Plaintiffs leave to amend.

## IV.    CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claim under section 1 of the Sherman Act, 15 U.S.C. § 1, for failure to state a claim.


Dated:  April 3, 2017                      WILLIAMS & CONNOLLY LLP


By:  _____/s/ John E. Schmidtlein_____
       John E. Schmidtlein (SBN 163520)
       Benjamin M. Greenblum (*pro hac vice*)
       Xiao Wang (SBN 301279)
       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, D.C. 20005
       Telephone:  (202) 434-5000
       Facsimile:  (202) 434-5029

18

E-mail: jschmidtlein@wc.com
E-mail: bgreenblum@wc.com
E-mail: xwang@wc.com

Jeffrey E. Faucette (SBN 193066)
SKAGGS FAUCETTE LLP
One Embarcadero Center, Suite 500
San Francisco, CA 94111
Telephone: (415) 315-1669
Facsimile: (415) 433-5994
E-mail: jeff@skaggsfaucette.com

*Attorneys for Defendants Mars Petcare US, Inc.;
Royal Canin USA, Inc.; Medical Management
International, Inc.; and BluePearl Vet, LLC*

Dated: April 3, 2017                    WHITE & CASE LLP

By: _____/s/ Bryan A. Merryman_____
   Bryan A. Merryman (SBN 134357)
   WHITE & CASE LLP
   555 South Flower Street, Suite 2700
   Los Angeles, CA 90071
   Telephone: (213) 620-7700
   Facsimile: (213) 452-2329
   E-mail: bmerryman@whitecase.com

   Christopher M. Curran (*pro hac vice*)
   J. Frank Hogue (*pro hac vice*)
   WHITE & CASE LLP
   701 Thirteenth Street, N.W.
   Washington, D.C. 20005
   Telephone: (202) 626-3600
   Facsimile: (202) 639-9355
   E-mail: ccurran@whitecase.com

   *Attorneys for Defendant Nestlé Purina PetCare
   Company*

Dated: April 3, 2017                    FOLEY & LARDNER LLP

By: _____/s/ Eileen R. Ridley_____
   Eileen R. Ridley (SBN 151735)
   James T. McKeown (*pro hac vice*)
   Alan R. Ouellette (SBN 272745)
   FOLEY & LARDNER LLP
   555 California Street, Suite 1700

19

San Francisco, CA 94104-1520
Telephone: (415) 434-4484
Facsimile: (415) 434-4507
E-mail: eridley@foley.com
E-mail: jmckeown@foley.com
E-mail: aouellette@foley.com

*Attorneys for Defendant PetSmart, Inc.*

Dated: April 3, 2017          O'MELVENY & MYERS LLP

By: _____ /s/ Richard B. Goetz _____
          Richard B. Goetz
          O'MELVENY & MYERS LLP
          400 South Hope Street, 18th Floor
          Los Angeles, CA 90071
          Telephone: (213) 430-6000
          Facsimile: (213) 430-6407
          E-mail: rgoetz@omm.com

          Michael F. Tubach
          O'MELVENY & MYERS LLP
          Two Embarcadero Center, 28th Floor
          San Francisco, CA 94111
          Telephone: (415) 984-8700
          Facsimile: (415) 984-8701
          E-mail: mtubach@omm.com

          Hannah Y. Chanoine (*pro hac vice*)
          O'MELVENY & MYERS LLP
          Times Square Tower
          7 Times Square
          New York, NY 10036
          Telephone: (212) 326-2000
          Facsimile: (212) 326-2061
          E-mail: hchanoine@omm.com

*Attorneys for Defendant Hill's Pet Nutrition, Inc.*

## ATTESTATION PURSUANT TO LR 5-1(i)(3)

I, Jeffrey Faucette, am the ECF User whose identification and password are being used to file this **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**. I hereby attest that concurrence in the filing of this document has been obtained from the other Signatory.

By: _____ /s/ Jeffrey Faucette _____
          Jeffrey Faucette