1   Jeffrey E. Faucette (State Bar No. 193066)
2   SKAGGS FAUCETTE LLP
    Four Embarcadero Center, Suite 1400 PMB #72
3   San Francisco, CA 94111
    Telephone:  (415) 295-1197
4   Facsimile:  (888) 980-6547
5   E-mail:  jeff@skaggsfaucette.com

6   Stephen D. Raber (State Bar No. 121958)
    Joseph S. Bushur (*pro hac vice*)
7   Campbell E. Curry-Ledbetter (*pro hac vice*)
8   WILLIAMS & CONNOLLY LLP
    680 Maine Avenue SW
9   Washington, D.C. 20024
    Telephone:  (202) 434-5000
10  Facsimile:  (202) 434-5029
    E-mail:  sraber@wc.com
11  E-mail:  jbushur@wc.com
12  E-mail:  ccurry-ledbetter@wc.com

13  *Attorneys for Defendant Mars Petcare US, Inc.*

14                  UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
15                   SAN FRANCISCO DIVISION

16

17  TAMARA MOORE, et al.,                    Case No. 3:16-CV-07001-MMC

18              Plaintiffs,                   **MARS PETCARE US, INC.'S
                                              OPPOSITION TO PLAINTIFF RENEE
19      v.                                    EDGREN'S MOTION FOR CLASS
                                              CERTIFICATION**
20  MARS PETCARE US, INC., et al.,
21              Defendants.                   Date:  Friday, October 6, 2023
                                              Time:  9:00 am
22                                            Courtroom:  7
                                              Judge:  Hon. Maxine M. Chesney
23

24

25

26

27

28

1
2

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF THE ISSUES TO BE DECIDED ................................................ 3

STATEMENT OF FACTS ....................................................................................... 4

      A.     Veterinarians Recommended Veterinary Formula Pet Food to Pet Owners
            Based on Individualized Factors and Communicated Their Recommendations
            in a Variety of Different Ways. ................................................................... 4

      B.     Mars Petcare's Authorization Requirement for Veterinary Formula Pet Food
            Was Not Uniformly Represented to Pet Owners. .................................... 6

      C.     Pet Owners Purchased Veterinary Formula in Various Retail Outlets and
            Encountered Different Information in Different Outlets. ....................... 7

      D.     Ms. Edgren's Veterinarians Recommend Various Foods, Including IAMS
            Veterinary Formula. ................................................................................ 8

      E.     Ms. Edgren Decides to Sue Mars Petcare. ............................................. 9

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ........................................................................................................ 10

I.      THE COURT SHOULD DENY CERTIFICATION BECAUSE INDIVIDUAL
        ISSUES ON LIABILITY PREDOMINATE. ......................................... 10

III.    THE COURT SHOULD DENY CLASS CERTIFICATION BECAUSE
        PLAINTIFF'S CLAIMS ARE NOT TYPICAL OF THE CLAIMS OF THE CLASS.... 20

IV.    NO "ISSUES" CLASS SHOULD BE CERTIFIED UNDER RULE 23(c)(4). .............. 20

V.     NO CLASS SHOULD BE CERTIFIED UNDER RULE 23(b)(2). ............................... 22

CONCLUSION ...................................................................................................... 23

1

2

**TABLE OF AUTHORITIES**

3

Cases

4

*Allen v. Hyland's Inc.*, 300 F.R.D. 643 (C.D. Cal. 2014) ...........................................................20

5

*Berger v. Home Depot USA, Inc.*, 741 F.3d 1061 (9th Cir. 2014) .........................................11, 12, 14

6

*Bruno v. Quten Rsch. Inst.*, LLC, 280 F.R.D. 524 (C.D. Cal. 2011) ...................................................12

7

*Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517 (S.D. Cal. 2011)...................................16

8

*Castillo v. Johnson*, 853 F. App'x 125 (9th Cir. 2021).......................................................................19

9

*Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017 (9th Cir. 2008) .............................................1, 14

10

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ..........................................................................11, 19

11

*Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576 (9th Cir. 2016) .......................................................19

12

*Dunn v. Costco Wholesale Corp.*, 2021 WL 4205620 (C.D. Cal. July 30, 2021) .............................20

13

*Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App.4th 544 (2011)................................13

14

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018) ..................12

15

*Gross v. Vilore Foods Co.*, 2022 WL 1063085 (S.D. Cal. Apr. 8, 2022).........................................11

16

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014)...................................................10

17

*Herskowitz v. Apple, Inc.*, 301 F.R.D. 460 (N.D. Cal. 2014).............................................................22

18

*In re 5-Hour Energy Mktg. and Sales Practices Litig.*,
   2017 WL 2559615 (C.D. Cal. June 7, 2017)..................................................................................2, 15

19

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) ....................................................18

20

*In re Ferrero Litig.*, 794 F. Supp. 2d 1107 (S.D. Cal. 2011) .............................................................20

21

*In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) ...............................................................17, 18

22

*Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ...............................15

23

*Just Film, Inc. v. Buono*, 847 F.3d 1108 (9th Cir. 2017) ...................................................................19

24

*Knapp v. AT&T Wireless Serv., Inc.*, 195 Cal. App. 4th 932, 943, 124 Cal.Rptr.3d 565 (2011) ......12

25

*Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217 (N.D. Cal. 2015)............................................12, 20

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lambert v. Nutraceutical Corp.*, 870 F.3d 1170 (9th Cir. 2017) .......................................... 19

*Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) ........................ 17

*Leyva v. v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013). ......................................... 19

*McKinniss v. Sunny Delight Beverages Co.*, 2007 WL 4766525 (C.D. Cal. Sept. 4, 2007)............. 11

*McKinnon v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 4537957 (N.D. Cal. July 27, 2015) ...........................................................................................................22

*Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007 (9th Cir. 2020) ........................................... 3

*Morales v. Conopco, Inc.*, 2016 WL 6094504 (E.D. Cal. Oct. 18, 2016) ...................................... 1, 14

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc)..................................................................................................... 10

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345 (C.D. Cal. June 23, 2016)........... 20

*Rahman v. Mott's LLP*, 693 F. App'x 578 (9th Cir. 2017) ................................................. 21

*Ries v. Arizona Beverages USA LLC*, 2013 WL 1287416 (N.D. Cal. March 28, 2013)............... 2, 14

*Shanks v. Jarrow Formulas, Inc.* 2019 WL 4398506 (C.D. Cal. Aug. 27, 2019) ........................... 15

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ......................................... 11, 17

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630 (N.D. Cal. 2015) ................... 21

*Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018)............................ 15

*Tucker v. Pac. Bell Mobile Serv.*, 208 Cal. App. 4th 201, 145 Cal.Rptr.3d 340 (2012)................... 11

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996) ........................................ 10

*Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530 (N.D. Cal. 2021) ...................................... 11

*Wal-Mart Stores, Inc. v. Dukes*,  564 U.S. 338 (2011) ........................................... 2, 10, 16

*Willis v. City of Seattle*, 943 F.3d 882 (9th Cir. 2019).................................................. 22

*Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ........................... 20

*Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 690-91 (N.D. Cal. 2021)................................. 12

**Other Authorities**

7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1790 (3d ed. 2023 Update) ...................................................................................................................21

William B. Rubenstein, 2 *Newberg and Rubenstein on Class Actions* § 4:92 (6th ed. 2023) ...........21

**Rules**

Federal Rule of Civivil Procedure 23 ...................................................................... 10, 22, 25

## INTRODUCTION

Plaintiff has essentially abandoned her effort to certify a class of California pet owners in her lawsuit against Mars Petcare.  After moving to Florida, she made the decision not to designate any expert witnesses to support her motion for class certification.  This decision is in contrast to the plaintiffs who assert claims against the other defendants.  None of the experts retained by the plaintiffs has any opinions relating to Mars Petcare or its IAMS Veterinary Formula pet food:

- The "materiality" expert, Thomas Maronick, was not asked to form any opinions relating to Mars Petcare and does not have any opinions relating to Mars Petcare.  Ex. A (Maronick Dep.) 31:20-22; 32:6-11.  He agrees that it would be wrong for anyone to say that his opinions support any claims against Mars Petcare.  *Id.* at 35:4-13.

- The "survey" expert, Dr. Rebecca Reed-Arthurs, admits that she has not conducted an analysis of Mars Petcare products and is not offering a specific opinion with respect to anything related to IAMS Veterinary Formula pet food.  Ex. B (Reed-Arthurs Dep.) 81:5-24.

- The "damages" expert, Janet Netz, testified that she has "no opinions with regard to IAMS," the Veterinary Formula pet food sold by Mars Petcare.  Ex. C (Netz Dep.) 29:18-22.  According to Plaintiff's motion, "Plaintiffs admittedly have not presented a classwide damages model for Mars' VF sales to the Class."  Mot. 15.[1]

Plaintiff's decision not to retain any experts or perform a survey, and her half-hearted attempt to certify a class, are fatal to her motion.  Courts hold that a plaintiff's "individual testimony is insufficient to establish whether defendant's representations on its products would deceive a reasonable consumer."  *Morales v. Conopco, Inc.*, 2016 WL 6094504, at *4 (E.D. Cal. Oct. 18, 2016) (citing *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025-26 (9th Cir. 2008)).  Absent a consumer survey or other market research to indicate how consumers reacted to the [challenged] statements, and how they valued those statements … [p]laintiffs have not offered sufficient evidence of materiality across the class."  *In re 5-Hour Energy Mktg. and Sales Practices Litig.*,

---

[1] References to Plaintiff Renee Edgren's motion for class certification (Dkt. 263-1) are abbreviated "Mot."  References to exhibits to that motion are abbreviated "Pl.'s Ex. ___."  References to exhibits to the Declaration of Joseph Bushur, attached hereto, are abbreviated as "Ex. A," "Ex. B," etc.

2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017).  Thus, "anecdotal evidence alone is insufficient …. [T]o prevail, plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead [reasonable] consumers."  *Ries v. Arizona Beverages USA LLC*, 2013 WL 1287416, at *6 (N.D. Cal. March 28, 2013).

Plaintiff's own testimony cannot satisfy her burden to prove, by a preponderance of the evidence, that beliefs about IAMS Veterinary Formula and decisions by class members about whether to buy "prescription" pet food "can be determined in one stroke" that applies equally to all pet owners.  *Wal-Mart Stores, Inc. v. Dukes*,  564 U.S. 338, 349 (2011).  No such proof exists.  The evidence bears out this Court's observation that the questions of what was said to and understood by individual pet owners are fact-intensive and "nuanced".  Dkt. 253 (Summ. J. Hr'g Tr.) 75:14-21.  Indeed, Plaintiff admits that:

- Her dog, Barkley, is allergic to chicken.  Pl.'s Ex. 5 (R. Edgren Dep.) 59:12-14.  Her purchasing decisions for Barkley's dog food were based on her dealings with her veterinarian and her particular dog, relating to Barkley's individual medical conditions and needs.  *Id.* at 68:17-25.

- Her decision to buy IAMS dog food for Barkley was a personal, individualized decision that she made as Barkley's owner, with her vet.  *Id.* at 69:1-3.

- If we wanted to know why other consumers in California bought the IAMS veterinary formula diet, "[w]e would have to ask them."  *Id.* at 68:8-16.  It would be better to ask other consumers in California about their interactions with their veterinarians if we wanted to know whether they were similar to hers.  *Id.* at 115:10-13.

- The package for the IAMS dog food says "**PET FOOD ONLY**" in all caps and bold text.  *Id.* at 112:19-22.  Anyone who read that statement on the packaging would conclude that this product consists only of food.  *Id.* at 113:10-21.

Despite these admissions, and with no expert testimony or survey to back her up, Plaintiff contends that class certification is appropriate because deception, materiality, and damages are common questions that predominate over any individual questions.  According to Plaintiff, when a veterinarian prescribes or authorizes IAMS Veterinary Formula for a sick pet with unique needs,

and the pet owner purchases the food based on the veterinarian's recommendation, classwide liability and damages can be determined in one fell swoop based on the experience of a single pet owner.

This Court recognizes that buying therapeutic pet food in this context is "more nuanced" than Plaintiff suggests. Dkt. 253 at 75:14-21. This case involves pet owners coming to veterinarians with a variety of sick pets requiring individualized care, and individually-tailored advice from veterinarians. As the Court noted, Plaintiff's understanding about the food and "veterinary authorization" derives from conversations with her veterinarian. *Id.* at 74:10-17. This process involves "a whole panoply of words," along with written material that the pet owner may or may not receive "that perhaps distinguish[es] between medication and ordinary food." *Id.* at 75:14-21. What pet owners believe, and whether they were deceived by the authorization requirement, depends on "what was said, what was understood by [them], and what was reasonable for them to understand." *Id.* at 75:22-24.

In short, Plaintiff gave up on any attempt to support her class certification motion by not submitting evidence such as expert testimony, a consumer survey, or a damages model applicable to the proposed class. Plaintiff does not have the evidence she would need to prove that the prerequisites of Rule 23 have been satisfied. The motion for class certification should be denied.[2]

## STATEMENT OF THE ISSUES TO BE DECIDED

1.      Whether a class should be certified under Rule 23(b)(3) where class members were exposed to unique representations based on their unique interactions with their individual veterinarians; where Plaintiff has no expert survey to address the issues of deception, materiality, the interactions between pet owners and their veterinarians, or damages; where Plaintiff has not

---

[2] As noted by the Ninth Circuit in this case, Mars Petcare stopped selling Veterinary Formula pet food under the IAMS label on January 1, 2017. *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1013 (9th Cir. 2020). Mars Petcare made this decision months before this lawsuit was filed. *See* Dkt. 256 (Mars Petcare's Supp. Mem. in Support of Mot. for Summ. J. on Pl. Renee Edgren's Claims for Injunctive Relief) at 1, 5-6. Contrary to Plaintiff's assertions, Mars Petcare did not "re-brand" as a Royal Canin food the IAMS food that Ms. Edgren bought. *See* Dkt. 269 (Mars Petcare's Reply in Support of Mot. for Summ. J. on Pl. Renee Edgren's Claims for Injunctive Relief) at 1-4.

presented any classwide damages model; and where the evidence shows that individualized issues predominate on the questions of deception, materiality, causation, and damages.

2.      Whether a class should be certified under Rule 23(c)(4) where common questions will not predominate in the adjudication of the proposed issues and certification on those issues will not materially advance the disposition of the litigation as a whole.

3.      Whether a class should be certified under Rule 23(b)(2) where Mars Petcare no longer sells IAMS Veterinary Formula pet food; Plaintiff lacks standing to seek injunctive relief; and the evidence fails to show that Mars Petcare has acted or refused to act on grounds that apply generally to the class.

## STATEMENT OF FACTS

**A.      Veterinarians Recommended Veterinary Formula Pet Food to Pet Owners Based on Individualized Factors and Communicated Their Recommendations in a Variety of Different Ways.**

There is no dispute that each pet owner who purchased Veterinary Formula was recommended the food by his or her veterinarian.  And there is no dispute that veterinarians who recommended Veterinary Formula did so because they believe the food will help the pets they are treating.  Veterinarian testimony and survey evidence demonstrates that veterinarians' decisions to recommend therapeutic pet foods like Veterinary Formula are based on a variety of factors, including an evaluation of the needs of the individual pet they are treating, the pet's medical and nutritional history, and a determination of what food will best meet those needs.  Pl.'s Ex. 13 (S. Hill Dep.) 50:10–52:10; Ex. D (A. Moore Dep.) 41:2-8; Ex. E (Butler Rep.) ¶¶ 171-185.

When veterinarians recommended Veterinary Formula to pet owners, they had a conversation with the pet owner.  Veterinarians provided pet owners with a variety of information about the nutritional components of the foods and why they are appropriate for each individual pet. Not all veterinarians provided the same information.  One veterinarian. Dr. Steve Hill, explained that he discusses nutrients and health benefits when recommending therapeutic pet food:

Q.  When you recommended a veterinary diet food to a pet owner, what did you tell them?

A.  You know, we -- we wouldn't only discuss diets with owners.  We discussed the nutrient profile and the potential health benefits, and so those diets would be considered to be appropriate for those conditions.

So that would be the discussion, is that, you know, this diet for these nutritional reasons is going to be what's recommended and most medically appropriate for this condition. And in some cases we would, of course, get [improvement in the disease], maybe complete, oftentimes partial, as part of the treatment plan.

Pl.'s Ex. 13 at 23:1-14.  Another veterinarian, Dr. Alexandra Moore, explained that she discusses pet owners' goals, food type preferences, and brand preferences before recommending therapeutic diets:

Q.  So what is the process -- like, what is the process you go through in deciding to recommend a therapeutic prescription diet product for a pet?

A.  Obviously, in those cases I'll have a relationship with the client and the pet, so I'll already have done, you know, an exam or an exam within the last year.  And usually it's during the exam or after we get blood work that I'll make those recommendations, depending on what's going on with the animal.

We talk about, you know, what our goals are for that patient and what type of food that they like.  Do they like wet, do they like dry, what's their regular routine of how they eat their food?  Is it impossible, could we switch them to a wet food if they only like dry and they have kidney disease or add water to their food.

And then often times owners will have preferences of brands that they feel comfortable with, that they fed their dog in the past, or cat.  And we'll go through, kind of, the different options that are available for -- for their pet.

Ex. D 21:13–22:9; *see also id.* at 22:10–27:6.  The conversation is not one-way.  Pet owners frequently ask their veterinarians questions about the therapeutic pet foods they are recommending—including about the efficacy of the food, why it costs more, and what makes it different from non-therapeutic food—and veterinarians answer those questions.  Ex. E ¶¶ 186-188.

At the conclusion of a conversation, some veterinarians provide a written prescription or authorization to the pet owner, while other veterinarians do not.  Pl.'s Ex. 13 at 89:14–90:17 (whether written authorization provided depended on the circumstances); Ex. D 27:8-25.  Many veterinarians simply note that a diet was authorized in a patient chart and do not provide a written authorization.  Ex. E ¶ 196 (majority of veterinarians who recommend therapeutic pet food available for purchase at their clinics do not provide written authorizations).  If a pet owner is going

1   to purchase a diet outside of a clinic, veterinarians are somewhat more likely to provide a written

2   authorization, but, even then, many veterinarians do not provide a written authorization.  *Id.* at ¶ 198

3   (38% of veterinarians do not provide a written authorization when therapeutic pet food is being

4   purchased outside of clinic).  Some veterinarians also provide some pet owners with written feeding

5   instructions, which may distinguish between recommended foods and prescribed medications.  Pl.'s

6   Ex. 13 at 48:1–49:17; Ex. D 56:21–59:25.

7         **B.      Mars Petcare's Authorization Requirement for Veterinary Formula Pet Food**
          **Was Not Uniformly Represented to Pet Owners.**

8

9          Therapeutic foods like Veterinary Formula are different from retail foods.  Pl.'s Ex. 13 at

10  29:4–30:22.  Veterinary Formula foods were "scientifically formulated to address specific

11  conditions," not the general nutrition of the healthy pet.  Pl.'s Ex. 11 (IAMS Veterinary Formula

12  Product Reference Guide) at Mars002695.  In light of the nature of the pet population for which

13  Veterinary Formula foods were intended, Mars Petcare did not make the foods available for general

14  public purchase.  Instead, Mars Petcare required the veterinarian and non-veterinarian retailers that

15  sold Veterinary Formula to sell the food pursuant to a valid veterinary authorization.  Pl.'s Ex. 7 at

16  Resp. to Request No. 1.

17         Mars Petcare did not require veterinarians to use any particular words or follow any

18  particular script in recommending Veterinary Formula food to pet owners.  Thus, when

19  veterinarians described Mars Petcare pet food to pet owners, they necessarily did so in a variety of

20  ways—as they do with other therapeutic diets.  *See* Ex. B 191:17–192:7 (veterinarian

21  communications with pet owners will "vary, potentially to a significant degree"); Ex. A 96:16-24

22  (agreeing that "each conversation between the veterinarian and a particular sick pet is going to be

23  different, depending on the vet, depending on the pet, depending on the pet's condition, depending

24  on what[] stuff [is] available"); Ex. C 81:6-12 (agreeing that "individual consumers' understanding

25  of what is meant by 'veterinarian's authorization' will depend on what the individual's veterinarian

26  tells him or her").  As they do with other therapeutic diets, different pet owners would have asked

27  their veterinarians different questions about the Veterinary Formula recommendation, leading to

28

1  further variation in the ways that veterinarians describe Veterinary Formula food and refer to an

2  authorization or requirement (if they refer to it at all).  *See* Ex. E ¶¶ 186-188.

3       As discussed above, some veterinarians will provide some pet owners with a written

4  authorization or prescription, but many pet owners will not receive a written authorization or

5  prescription.  Plaintiffs' proffered damages expert acknowledges that some purchases of therapeutic

6  diets were told a "veterinary authorization" was required, while others were told a "prescription"

7  was required—and she does not know what share of the class was told either.  Ex. C 67:16–68:18,

8  83:23–84:10 (acknowledging people may have different understandings of the words "prescription"

9  and "authorization").  Plaintiffs' experts also acknowledge that some class members purchased

10 therapeutic pet foods without being first told that the food is being "prescribed" or "authorized."

11 Ex. B 130:3–131:11 (estimating that "11 percent" of the time "the veterinarian just goes and

12 provides the food without saying anything about whether they've written a prescription"); Ex. C

13 59:7–60:12 (opining that a "relatively small" share of purchasers bought therapeutic diets without

14 first having received a prescription or authorization).

15     **C.    Pet Owners Purchased Veterinary Formula in Various Retail Outlets and Encountered Different Information in Different Outlets.**

16       Pet owners who were recommended a Veterinary Formula food by their veterinarian may

17 have purchased the food directly from their veterinarian or at another retailer.  Pet owners may

18 have—depending on the retail location where they choose to purchase the food—encountered

19 additional or different information about Veterinary Formula.  Pet owners who purchase the food

20 directly from their veterinarian may encounter no additional information beyond their veterinarians'

21 recommendation.  *See* Ex. B 130:3–131:11.  Some pet owners who purchase a therapeutic food in-

22 store may encounter a requirement to provide an authorization or prescription; other pet owners

23 who purchase the food in-store will not be required to provide an authorization or prescription, *see*

24 Ex. C 39:16–40:22 (purchased Prescription Diet from pet store for years and never presented

25 written prescription).

### D.     Ms. Edgren's Veterinarians Recommend Various Foods, Including IAMS Veterinary Formula.

Ms. Edgren purchased her dog Barkley, a Maltese shih tzu hybrid, in February 2011.  Pl.'s. Ex. 5 at 128:10–129:11; Ex. F (Pl. Renee Edgren's Resp. to Def. Mars Petcare U.S.A., Inc.'s First Set of Interrogs.) at Resp. to Interrog. No. 3.  Barkley began suffering from pruritus, or itchy skin, at a young age.  Pl's Ex. 5 at 54:4–56:5.  Over the years, Ms. Edgren purchased a number of different diets at her veterinarian's recommendation to relieve Barkley's itching.  *See id.* at 80:14-25, 82:2–83:20; 84:2-22.  In November 2014, Ms. Edgren's veterinarian referred Barkley to a dermatology specialist, Dr. Katherine Doerr.  *Id.* at 86:9-18.  Dr. Doerr examined Barkley, prescribed three medications, and also recommended a "strict 6-8 week elimination diet trial by transitioning from current food to IAMS K/O diet."  *Id.* at 87:6–89:10.  Dr. Doerr recorded her recommendations in a letter that included separate sections for "Treatment/Medications Dispensed" and "Recommendations":

**Treatment/Medications Dispensed**
Atopica 25mg 15ct - (#2) Starting tomorrow, give 1 capsule by mouth every 24 hours.  Give with food for first 7 days, and on empty stomach thereafter (2 hours before or after a meal).  Store capsules in freezer to minimize stomach upset.  If you notice any vomiting, diarrhea or inappetence, please call our office for further recommendations.  Call for refills.

Malaseb Shampoo 500mls - (#1) Bathe every two weeks.  Lather and let sit on coat for 8-10 minutes prior to rinsing well with cool to lukewarm water.  Towel or air dry.

Written prescription provided for Trifexis (oral flea/heartworm pill).  Give 1 tablet by mouth once monthly with a full meal.

**Recommendations**
1. Diet Trial
Starting next Wednesday, begin the strict 6-8 week elimination diet trial by transitioning from current food to Iams K/O diet. **No other treats, snacks, supplements, human food, flavored medications, chewies or flavored toothpaste, etc. during this strict diet trial.** The only exceptions are canned kangaroo/squash food and kangaroo jerky from the

Rayne website, sweet potato treats from www.snookdog.com, and plain, cooked sweet potatoes.  Please see provided handout for more details. (We have provided a canned sample of the Rayne kangaroo/squash diet today.)

2. Taper Prednisone as directed.

3. Please give our office a call in 1-2 weeks to let us know how Barkley is doing.

4. Dr. Doerr's email address is kdoerrdvm@gmail.com.

5. Please review provided handouts (treatment options, why animals itch, food trial packet, skinny on skin testing

Ex. G (R. Edgren Dep. Ex. 4) at Plaintiffs_00000449-50.

When asked "What attracted you to this IAMS KO diet?" Ms. Edgren testified, "My vet prescribed it.  And it was a protein that he'd never had before, kangaroo.  So that was supposed to make it better for his allergies."  Pl.'s Ex. 5 at 63:12-16.  Ms. Edgren bought one bag of the IAMS

KO food at Dr. Doerr's office. *Id.* at 90:1-7. Dr. Doerr did not tell Ms. Edgren that the food had any allergy medicine in it. *Id.* at 102:22-24. Ms. Edgren did not see or read any advertising for the IAMS KO food before purchasing it. *Id.* at 103:21-24. She never looked at the IAMS or Mars website to determine the contents of the IAMS KO diet. *Id.* at 76:1-4. She did not look at the ingredients of the IAMS diet before she bought the food. *Id.* at 92:6-8. Nor did she look at the label of the food before purchasing it. *Id.* at 106:6-9. She trusted that the ingredients would be the right ingredients because she trusted her vet: "I just trusted the vet. Whatever they prescribed to me, you know, I trusted the ingredients in there would be the right active ingredients." *Id.* at 106:14-20.

Nine days after starting the IAMS KO diet trial, Ms. Edgren took Barkley back to Dr. Doerr for a recheck examination. *Id.* at 93:3-20, 95:9-15. Ms. Edgren reported that Barkley's pruritus was "greatly improved." *Id.* at 94:3-24. Dr. Doerr recommended that Ms. Edgren continue a strict diet of IAMS KO for another two weeks, then go back to Barkley's old food to see if his itchiness returned. *Id.* at 96:9-24. When Ms. Edgren stopped feeding Barkley the IAMS KO diet and switched back to his old food, "he started itching like crazy." *Id.* at 98:3-17. Ms. Edgren testified that the diet trial "did what it was supposed to do" because it helped identify what food made him itch. *Id.* at 99:2-13.

After the IAMS KO diet trial, Barkley's veterinarian advised that he needed to go back on a limited-ingredient diet (not necessarily the IAMS KO diet). *Id.* at 98:18–99:1. Ms. Edgren agreed with the veterinarian's plan to seek out and feed Barkley a limited-ingredient diet. *Id.* at 99:14-17. A veterinarian at Barkley's clinic recommended a Blue Buffalo duck and potato diet, which Ms. Edgren purchased and fed to Barkley. *Id.* at 101:1-21.

**E.      Ms. Edgren Decides to Sue Mars Petcare.**

In late 2015 or early 2016, Ms. Edgren's brother-in-law, a shareholder at the Walkup firm which represents Plaintiff in this case, learned that Ms. Edgren fed Barkley a "strict prescription diet" and suggested she speak with Plaintiffs' attorney Matthew Davis, who was considering "representing people in a case about [prescription pet food]." *Id.* at 37:1-22, 34:18–36:19. During her first conversation with Mr. Davis, Ms. Edgren learned that IAMS KO could be purchased only at the veterinarian's office. *Id.* at 119:7-15. Ms. Edgren agreed to be a plaintiff in this case after

her conversation with Mr. Davis.  *Id.* at 36:16-19.  Ms. Edgren "had not thought about a lawsuit" before her brother-in-law suggested that she get involved.  *Id.* at 35:25–36:6.

## LEGAL STANDARD

A district court may not certify a class unless the plaintiff has established the four prerequisites of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  Plaintiff must then establish "at least one of the alternative requirements of [Rule] 23(b)."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  To do so, Plaintiff must "affirmatively demonstrate" with "evidence" that she has satisfied all of its prerequisites.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 346, 350-51 (2011).  A class can only be certified if the Court, after a "rigorous analysis," determines that plaintiffs have "in fact" proven each of the Rule 23 requirements.  *Id.* at 346, 350-51; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (plaintiffs "must actually *prove*—not simply plead—that their proposed class" satisfies Fed. R. Civ. P. 23).

## ARGUMENT

## I.     THE COURT SHOULD DENY CERTIFICATION BECAUSE INDIVIDUAL ISSUES ON LIABILITY PREDOMINATE.

"What matters to class certification… is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate ***common answers*** apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350.  Plaintiffs must show that trying their claims will resolve "'in one stroke,'" at one trial, the issues that are central to the validity of all the class members' claims.  *Id.*  The Ninth Circuit requires that plaintiffs seeking class certification satisfy a "preponderance of the evidence standard."  *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc).

The evidence here falls well short of proving that common questions of law or fact predominate.  To the contrary, individualized issues overwhelm this case on core issues of liability: deception, materiality, causation, and damages.

### A. Plaintiff Cannot Show That Evidence of Deception Is Common.

The distinct requirement of deception requires proof that the representations "are likely to deceive a reasonable consumer." *McKinniss v. Sunny Delight Beverages Co.*, 2007 WL 4766525, at \*3 (C.D. Cal. Sept. 4, 2007).  "The term 'likely' indicates that deception must be probable, not just possible." *Id.*  At the class certification stage, "the plaintiff must point to common evidence ***other than the alleged misrepresentations themselves*** to establish that the question of likelihood of deception can be resolved on a classwide basis." *Vizcarra v. Unilever U.S., Inc.*, 339 F.R.D. 530, 548 (N.D. Cal. 2021) (emphasis added); *see also Gross v. Vilore Foods Co.*, 2022 WL 1063085, at \*5-6 (S.D. Cal. Apr. 8, 2022) (unless plaintiffs present "common evidence that could establish likelihood of deception, they cannot satisfy the commonality requirement" as to their UCL, FAL, or CLRA claims).  Although the deception inquiry focuses on a reasonable consumer, "the question of likely deception does not automatically translate into a class-wide question"—in particular, no class-wide question arises where, as here, the evidence shows the class was not uniformly exposed to the same allegedly misleading statements. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft v. Baker*, 528 U.S. 23 (2017).

The evidence fails to establish a likelihood of deception among pet owners who are buying pet food that requires a prescription or authorization from a veterinarian.

### 1. No uniform "prescription" representations to class members.

Class certification should be denied because Mars Petcare's "alleged misrepresentations were made to the named Plaintiffs and to proposed class members in a variety of ways." *Tucker v. Pac. Bell Mobile Serv.*, 208 Cal. App. 4th 201, 221, 145 Cal. Rptr. 3d 340, 356 (2012).  Courts reject classwide treatment where, as here, class members were "exposed to quite disparate information," *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011), *abrogated on other grounds by Comcast Corp. v. Behrend*, 569 U.S. 27 (2013); the "alleged misrepresentations were not uniformly made to proposed class members," *Knapp v. AT&T Wireless Serv., Inc.,* 195

---

1   Cal. App. 4th 932, 943, 124 Cal. Rptr. 3d 565 (2011); the alleged misrepresentations "do not fall

2   into neatly separate categories," *Kosta v. Del Monte Foods, Inc.,* 308 F.R.D. 217, 228 (N.D. Cal.

3   2015); or when the representations vary "over time and among … different … locations," *Berger*,

4   741 F.3d at 1069.  Here, members of the class "stand in a myriad of different positions insofar as

5   the essential allegation in the complaint is concerned," making this case unsuitable for class

6   treatment.  *Knapp*, 195 Cal. App. 4th at 943, 124 Cal. Rptr. 3d 565.

7          First, contrary to Plaintiff's unsupported assertions of "uniform" representations, Plaintiff

8   does not identify any deceptive statement or omission by Mars Petcare that was made uniformly to

9   class members.  Indeed, unlike many of the cases cited by Plaintiff, there is no evidence that class

10   members were uniformly exposed to a deceptive label.[3]  Plaintiff did not look at the label until after

11   she bought the food, Pl.'s Ex. 5 at 106:6-9, so the label cannot have deceived her.  None of

12   plaintiffs' experts contends that the IAMS Veterinary Formula label is deceptive—indeed, none of

13   them opined on IAMS Veterinary Formula at all.  Plaintiffs' experts agree that the importance of pet

14   food labels depends on the individual consumer, and how often pet owners see the labels will also

15   vary based on the consumer.  Ex. A 111:23–112:5; Ex. B 113:15-24, 166:6-18.  Here, the package

16   for the IAMS dog food says "**PET FOOD ONLY**" in all caps and bold text.  Pl.'s Ex. 5 at 112:19-

17   22.  Plaintiff Edgren testified that anyone who read that statement on the packaging would conclude

18   that this product consists only of food.  *Id.* at 113:10-21.  She admitted that the label said the

19   product was "dog food" for "nutritional management," which she understood referred to food.  *Id.*

20   at 107:3-108:8; *see also* Ex. H (IAMS KO label (R. Edgren Dep. Ex. 6)).  She also admitted that the

21   label contained numerous additional references to food, including "Feeding Guidelines," "Safe

22

23   [3] Plaintiff cites cases in which consumers all saw the same, uniform misrepresentations. *See, e.g.*,

24   *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 607 (N.D. Cal. 2018) (cited at
Mot. 9) (alleging that injured consumers were uniformly deceived by the phrase 'Made From Real

25   Ginger' on the label of Canada Dry Ginger Ale); *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 690-
91 (N.D. Cal. 2021) (cited at Mot. 8-9) (alleging that product labels misled all purchasers through

26   the same omission—the failure to disclose the presence of arsenic, lead, and bisphenol A); *Bruno v.
Quten Rsch. Inst.*, LLC, 280 F.R.D. 524, 528 (C.D. Cal. 2011) (cited at Mot. 9) (alleging that all

27   injured consumers were misled by the same misrepresentation on a label: that the product's active
ingredient had "6X BETTER ABSORPTION" and was "6 Times More Effective" than the

28   equivalent active ingredient in competing brands).

handling tips for any pet foods and treats," "Feed as directed by your veterinarian," "your dog may need more food depending on age," and "total recommended volume of food per day."  Pl.'s Ex. 5 at 110:6-16, 111:9–112:15.  After reviewing the label, Plaintiff conceded that "everything in the label and packaging that we've looked at says that this is food," and that she could not point to anything on the label that is inaccurate.  *Id.* at 115:14-16, 121:4-6.

Second, the allegedly deceptive conduct (Mars Petcare's "self-imposed prescription requirement," Mot. 12) is communicated to pet owners by their veterinarians, not Mars Petcare. The pet owner's understanding of the "prescription requirement" thus depends on "what was said, what was understood by [them], and what was reasonable for them to understand."  Dkt. 253 at 75:22-24.  The information communicated to pet owners by their veterinarians is not uniform.  And class members' understandings will vary from consumer to consumer because the information conveyed by veterinarians varied.  Ex. B 125:13-18, 191:17-24; *see Fairbanks v. Farmers New World Life Ins. Co.*, 197 Cal. App. 4th 544, 562 (2011) (No predominance, and certification inappropriate, where claim turned "on inquiry into the practices employed by any given independent [insurance sales] agent."  Even where the language in the insurance contracts was uniform, "it is still impossible to consider the language of the policies without considering the information conveyed by the [insurance] agents in the process of selling" the policies.).

Third, Plaintiff presents no evidence that Mars Petcare imposed a uniform requirement of a "prescription," or that veterinarians uniformly referred to Veterinary Formula as "prescription" food.  Plaintiffs' expert admits that the terms "authorization" and "prescription" are used in connection with other therapeutic diets, that "prescription" and "authorization" are "two different words," and consumers may have different understandings of the terms depending on what their veterinarians tell them.  Ex. C 67:16–68:7, 80:21–81:12, 83:23–84:10.  Plaintiffs' survey expert, Reed-Arthurs, "did not separately survey or test the word 'authorization' as compared to 'prescription.'"  Ex. B 148:11-17.  She acknowledged that there can be "heterogeneity" on how consumers interpret the terms "prescription" or "authorization" as compared to "recommended."

*Id.* at 147:13-25.  Yet she glossed over the heterogeneity of these terms and treated them all the same in her survey.  *Id.* at 148:11-17.[4]

Fourth, pet owners encounter a variety of circumstances when it comes time to buy the food. For purchases directly from the veterinarian, an "economically meaningful" percentage of consumers get therapeutic food without the veterinarian saying anything about whether they've written a prescription.  *Id.* at 130:3–131:11.  If the veterinarian provides a written authorization for the pet owner to take to a retail location, the pet owner will experience different procedures for validating the authorization.  For example, PetSmart requires consumers to obtain a "MedCard" while other retailers do not.  *Id.* at 192:24–193:20.  Such variance among retailers makes class certification inappropriate.  *See Berger*, 741 F.3d at 1069-70 (denying certification based on variations in the representations "over time and among … different [retail] locations").

### 2.     No expert testimony showing deception.

To satisfy the reasonable consumer standard, plaintiffs must adduce extrinsic evidence— such as a consumer survey—to show that the challenged conduct tends to mislead reasonable consumers.  *Ries*, 2013 WL 1287416, at *6; *Morales,* 2016 WL 6094504, at *4 ("[Plaintiffs'] individual testimony is insufficient to establish whether defendant's representations on its products would deceive a reasonable consumer ….") (citing *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025-26 (9th Cir. 2008)).

Plaintiff argues that the Reed-Arthurs survey "demonstrates that a significant portion of the general public or targeted consumers are likely to be misled by Mars' marketing and sale of 'Veterinary Formula' labeled products."  Mot. 13.  That argument misstates the record.  The Reed-Arthurs survey did not include anything related to Mars Petcare or the IAMS Veterinary Formula pet food.  Reed-Arthurs admits that she has not conducted an analysis of Mars Petcare products and is not offering a specific opinion with respect to anything related to IAMS Veterinary Formula pet food.  Ex. B 81:5-24.  Plaintiff's statement to the contrary is inexplicable.

---

[4] Similarly, the Ninth Circuit addressed the term "prescription" without considering whether consumers would believe something different if the term "authorization" were used.  *Moore*, 966 F.3d at 1018-20.

1    Plaintiff thus fails to show any common evidence that reasonable consumers were deceived

2    by anything that Mars Petcare did.  The Reed-Arthurs survey did not address anything related to

3    Mars Petcare or IAMS Veterinary Formula.  Accordingly, Plaintiff fails to offer evidence sufficient

4    to show deception on a classwide basis.

5         **B.    Plaintiff Cannot Show That Evidence of Materiality Is Common.**

6             **1.    Plaintiff has no survey evidence showing materiality.**

7         In the context of UCL, FAL and CLRA claims, class certification should be denied where

8    Plaintiff fails to put forward evidence that the challenged statements were material.  *Shanks v.*

9    *Jarrow Formulas, Inc.* 2019 WL 4398506, at *4-5 (C.D. Cal. Aug. 27, 2019); *see Townsend v.*

10   *Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1045 (C.D. Cal. 2018) (plaintiff must present

11   evidence "to assess whether the challenged statements were in fact material to [consumer's]

12   purchases, as opposed to, or in addition to, prices, promotions, retail positioning, taste, []brand

13   recognition" or any other factors that influence consumer purchasing decisions).  "Absent a

14   consumer survey or other market research to indicate how consumers reacted to the [challenged]

15   statements, and how they valued those statements … [p]laintiffs have not offered sufficient

16   evidence of materiality across the class."  *In re 5-Hour Energy Mktg. and Sales Practices Litig.*,

17   2017 WL 2559615, at *8.

18        Plaintiff did not conduct a materiality survey.  Ex. B 98:19–99:10, 100:3-8, 104:11-16; Ex.

19   A 38:4-7, 39:9-11.  In fact, plaintiffs' materiality expert, Maronick, admitted that his failure to do a

20   survey in this case departed from what he regularly does in other cases.  Ex. A 37:15–38:7.  He

21   explained that it would not be "possible to design a study that would isolate or identify the impact

22   of each of th[e] individual factors" in the marketing program.  *Id.* at 55:23–56:24.  This absence of

23   proof is enough to deny certification because Plaintiff does not show "how the challenged

24   statements, together or alone, were a factor in any consumer's purchasing decision."  *Jones v.*

25   *ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014); *see In re 5-Hour*

26   *Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *8.

27        Moreover, as noted above, none of the experts retained by plaintiffs has any opinions

28   relating to Mars Petcare or IAMS Veterinary Formula pet food.  Plaintiff thus misstates the

1   record—again—by referring to Maronick's opinion and arguing that "expert evidence demonstrates

2   that the prescription required by Mars and its misrepresentations and omission about VF products

3   are material to reasonable consumers."  Mot. 15.  Maronick was not asked to form any opinions

4   relating to Mars Petcare and does not have any opinions relating to Mars Petcare.  Ex. A 31:20-22;

5   32:6-11.  Maronick also agrees that "***it would be wrong*** for anyone to say that [his] opinions in this

6   case support claims against Mars Petcare and a Mars Petcare brand."  *Id.* at 35:4-13 (emphasis

7   added).  Yet Plaintiff persists in making this argument that her own expert says would be "wrong"

8   to make.[5]

9              **2.      Class members do not uniformly experience the "prescription**
                         **requirement" or the alleged misrepresentations.**
10

11          Materiality is not susceptible to classwide proof where, as here, the alleged

12   misrepresentations were not uniformly made to class members.  *See Campion v. Old Republic*

13   *Home Prot. Co.*, 272 F.R.D. 517, 536 (S.D. Cal. 2011) ("[T]he fact remains the proposed class

14   members may have seen some, all or none of these statements prior to the purchase of their home

15   warranty plans due to the varying ways in which they acquired their plans.").

16          As discussed above, the evidence shows that class members' exposure to information about

17   Veterinary Formula foods differed over time, place, by content, and by consumer.  No uniform

18   representation about a "prescription requirement" was made to class members.  Each class member

19   was instead exposed to representations that varied based on his or her conversations with his or her

20   veterinarian and the retail location in which he or she purchased the food.  *See supra* Part I.A.1.

21   Because the representations to class members were not uniform, it is impossible to answer the

22   question of the materiality of the varied representations made to class members "in one stroke."

23   *Dukes*, 564 U.S. at 350.

24

25

26

27

28

---

[5] Plaintiff also repeats her misstatement that the Reed-Arthurs survey supports her "materiality"
argument with respect to Mars Petcare.  Mot. 15.

1

2

### 3. Individual issues predominate when the purchase process involves individual clinical judgments and unique health needs and conditions.

Courts uniformly deny class certification in circumstances that are closely analogous to this case. For example, in *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 123 (2009), plaintiffs alleged that they were misled into paying more for Vioxx because Merck misrepresented that it was "better than a generic NSAID." *Id.* at 123. Describing plaintiff's argument as a "vast oversimplification of the matter," *id.* at 133, the court affirmed the denial of class certification because the claim "is dependent on each individual's specific medical needs and history." *Id.* at 126. "The process by which a physician decides whether and what to prescribe . . . requires an individualized approach that applies a physician's clinical judgment to each patient's unique situation." *Id.* at 125; *see also id.* at 133-34 (discussing the individualized issues); *Lewallen v. Medtronic USA, Inc.*, 2002 WL 31300899, at *4 (N.D. Cal. Aug. 28, 2002) ("While there are undoubtedly some common questions of fact, the court is not persuaded that those common questions predominate. … Each patient's medical history is different, as are each patient's risk factors. Each treating physician's determination is different. What each doctor told each patient, the risks assumed by each patient, and the anticipated course of treatment for each patient are all highly individualized inquiries.").

The language in these cases mirrors the testimony of Plaintiff, who said that her decisions for buying Barkley's dog food were personal, individualized decisions based on her dealings with her veterinarian and her particular dog, relating to Barkley's individual medical conditions and needs. Pl.'s Ex. 5 at 68:17–69:3. And it echoes the testimony of Dr. Hill, a veterinarian who testified that his recommendations "var[y] based on the individual case and the diagnosis as to whether -- I mean, vary vastly as to whether it was GI disease, liver disease, pancreatic disease, kidney or bladder disease." Pl.'s Ex. 13 at 20:19-25. Class certification should be denied because, "the issue of materiality or reliance is a matter that would vary from consumer to consumer." *In re Vioxx Class Cases*, 180 Cal. App. 4th at 129.

### C. Plaintiff Cannot Show That Evidence of Causation Is Common.

"[T]he CLRA requires each class member to have an actual injury caused by the unlawful practice." *Stearns*, 655 F.3d at 1022. Plaintiff offers no classwide proof of causation. Mot. 14-15;

Ex. B 110:12-19 (no opinion on "reliance by consumers on any conduct by Hill's or Mars Petcare"). Instead, she argues that classwide causation can be presumed because the representations and omissions are material.  Mot. 14-15.  The evidence shows that this presumption does not apply.  As demonstrated above, Plaintiff fails to establish that representations about the "prescription requirement" are material.

"[T]he Ninth Circuit has held that if a misrepresentation is not material as to all class members, the issue of reliance varies from consumer to consumer, and no classwide inference arises."  *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 982 (C.D. Cal. 2015) (quotes omitted). Here, Plaintiff presents no evidence whatsoever that any alleged misrepresentation was material as to all class members.

The evidence shows that individualized questions of reliance predominate over common questions.  As discussed above, class members were not exposed to uniform representations.  Even Reed-Arthurs' unreliable survey—which did not analyze any IAMS products, Ex. B 81:5-13— found that only a minority of consumers believed "prescription only" food contained a drug or medicine.  *See* Pl.'s Ex. 8 at ¶ 22 ("approximately *15%* of respondents provided unprompted open-ended responses that indicated that they believed the difference between a prescription-only and an over-the-counter pet food product was that the prescription-only product contained a drug, medicine, regulated or controlled substance, or similar"); Ex. I (Butler Decl.) at ¶ 14.  That finding precludes any possibility that "all" class members relied on a "prescription requirement."  Plaintiff's materiality expert "can't speculate" on "the factors that play into a pet owner's decision to buy pet food."  Ex. A 129:6-12.  "They certainly would be varied depending on the pet and the pet's conditions."  *Id.*

The evidence shows that causation "is a matter that would vary from consumer to consumer, [and] the issue is not subject to common proof."  *In re Vioxx Class Cases*, 180 Cal. App. 4th at 129. Accordingly, "the action is properly not certified as a class action."  *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II. THE COURT SHOULD DENY CLASS CERTIFICATION BECAUSE PLAINTIFF FAILS TO OFFER ANY KIND OF DAMAGES MODEL APPLICABLE TO THE CLASS.

Certification should be denied for the independent reason that Plaintiff has failed to "establish[] that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. To satisfy the Rule 23(b)(3) predominance requirement, plaintiffs must "develop a method for calculating damages on a class-wide basis that is reasonably administrable and 'consistent with its liability case.'" *Castillo v. Johnson*, 853 F. App'x 125, 126 (9th Cir. 2021) (quoting *Comcast*, 569 U.S. at 35); *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017). Here, Plaintiff admits that she has not presented any class-wide damages model, let alone a model that is capable of satisfying the *Comcast* requirements. Mot. at 15. Accordingly, Plaintiff cannot satisfy the predominance requirement and class certification should be denied. *See Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016). Plaintiff's argument that she is not required to present a viable class-wide damages model misconstrues Ninth Circuit precedent. *See* Mot. at 15. As the Ninth Circuit explained in *Doyle*:

> In interpreting Comcast, we have stated, "***[A] methodology for calculation of damages that [can] not produce a class-wide result [i]s not sufficient to support certification.***"… Although [Plaintiff] is correct that our court has emphasized that "the need for individualized findings as to the amount of damages does not defeat class certification," it has applied this understanding in cases ***where there existed a common methodology for calculating damages***. In those cases, damages could feasibly and efficiently be calculated once the common liability questions are adjudicated.

663 F. App'x at 579 (citations omitted) (emphasis added); *see also Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) ("Uncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages."). For example, in *Leyva v. Medline Indus. Inc.*, the court found that the defendant's "computerized payroll and time-keeping database would enable the court to accurately calculate damages related penalties for each claim." 716 F.3d 510, 513 (9th Cir. 2013). Plaintiff has offered no similar "common methodology for calculating damages" here. *Doyle*, 663 F. App'x at 579.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**III.    THE COURT SHOULD DENY CLASS CERTIFICATION BECAUSE PLAINTIFF'S CLAIMS ARE NOT TYPICAL OF THE CLAIMS OF THE CLASS.**

In order for a class to be certified, Plaintiff must establish that her "claims or defenses … are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. at 225 (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)).

Plaintiff suggests that a class should be certified, in part, because of language on the labels of IAMS Veterinary Formula foods. *See* Mot. 2-4, 13, 21. However, as discussed above, Ms. Edgren did not read the label before purchasing IAMS Veterinary Formula. Pl.'s Ex. 5 at 106:6-9. Therefore, Ms. Edgren could not have been deceived by or relied on any statement on the product label. *See, e.g.*, *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1112 (S.D. Cal. 2011) (plaintiffs who did not visit defendant's website could not have relied on statements on the website in making their purchasing decision). Accordingly, Ms. Edgren's claims are not typical of the claims of class members who allegedly were deceived by and relied on the product label, and class certification should be denied. *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *5 (C.D. Cal. June 23, 2016) ("[T]o the extent 'a named plaintiff did not read Defendants' statements on the product packaging of products purchased or explicitly testified that [he] did not rely on packaging statements, such an individual is *not* typical of the class [he] seeks to represent.'") (quoting *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 662 (C.D. Cal. 2014) (emphasis in original)); *see also Dunn v. Costco Wholesale Corp.*, 2021 WL 4205620, at *5 (C.D. Cal. July 30, 2021) ("these questions are not common to or typical of the claims of the entire proposed class because the proposed class includes members who did not see or rely on the '100% Arabica Coffee' representation on the packaging in deciding to purchase the Product").

**IV.    NO "ISSUES" CLASS SHOULD BE CERTIFIED UNDER RULE 23(c)(4).**

Plaintiff cannot rely on Rule 23(c)(4) as a fallback where she falls short of the 23(b)(3) requirements. *See* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §

1790 (3d ed. 2023 Update) ("[Rule 23(c)(4)] should not be invoked merely to postpone confronting difficult certification questions. … 'A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met.'" (quoting Committee Note)). Plaintiff must provide an independent justification as to why Rule 23(c)(4) issue classes would be appropriate. *See* William B. Rubenstein, 2 *Newberg and Rubenstein on Class Actions* § 4:92 (6th ed. 2023) ("issue classes (1) must meet the basic class certification requirements, as applied to the issue proposed for certification; (2) they also must meet Rule 23(c)(4)'s requirement that they be 'appropriate'").

The Ninth Circuit requires that "[c]ertification of an *issues* class must materially advance resolution of the *entire* case." *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017) (emphasis in original).   Accordingly, "certification … under Rule 23(c)(4) is appropriate only if it materially advances the disposition of the litigation as a whole." *Id.* (internal quotation marks and citation omitted).  Reliance on Rule 23(c)(4) is especially inappropriate where, as in this case, the proposed issue classes would merely chop up and restate the distinct elements of the entire cause of action. *See Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 639 (N.D. Cal. 2015) ("Plaintiffs appear to be stretching [Rule 23(c)(4)] beyond its intended application. That is, Plaintiffs are basically asking the Court to have every element of a claim for fraudulent inducement and/or breach of express warranty subject to class treatment—i.e., in effect, the entire action."). "Plaintiffs cite no precedent in which a court has allowed a comprehensive division of multiple issues for certification under Rule 23(c)(4) where the aggregation of those issues would otherwise not be certifiable under Rule 23(b)(3)." *Id.*  Yet that is precisely what Plaintiff seeks here, i.e., separate classes "as to the issues of deception and/or materiality."  Mot. 17.

Plaintiff's argument that predominance is not required for a Rule 23(c)(4) issues class, Mot. 17, is misleading.  Predominance remains a roadblock to certifying any Rule 23(c)(4) issue class. While Plaintiff need not establish that common questions predominate with regard to the *entire action*, she must still prove that common questions predominate *within* the issue class.  *See* 2 *Newberg and Rubenstein* § 4:92 ("[A]n issue class can be certified if the Rule 23(a) requirements are met and if the class proponent demonstrates that *common questions will predominate in the*

*adjudication of the proposed issue* (emphasis added)).  As detailed above, individual questions predominate the inquiries into each of Plaintiff's proposed issue classes—deception, materiality, and damages or restitution.

## V.  NO CLASS SHOULD BE CERTIFIED UNDER RULE 23(b)(2).

Certification under Rule 23(b)(2) should be denied.  Plaintiff lacks standing to pursue injunctive relief because (i) she has no desire to buy a Veterinary Formula again, and (ii) Mars Petcare no longer sells Veterinary Formula and has no plans to resume sales.  As a result, there is no evidence that she faces any "certainly impending" threatened injury.  *See* Docs. 256 & 269 (Mars Petcare's Supplemental Memorandum in Support of Motion for Summary Judgment on Plaintiff's Claims for Injunctive Relief, and Reply).

Additionally, Rule 23(b)(2) applies only where "the party opposing the class has acted or refused to act on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).  As discussed above, nothing about the process for buying Veterinary Formula applies generally to the class.  Pet owners receive information about the Veterinary Formula from their veterinarians.  Those conversations vary to a significant degree depending on the pet owner, the pet's unique medical needs, and the veterinarian's clinical judgment and individually-tailored recommendations.  Thus, the pet owners' exposure to information about Veterinary Formula differed over time, by place, by content, and by consumer.  Under these circumstances, certification under Rule 23(b)(2) would be inappropriate.  *See, e.g.*, *Willis v. City of Seattle*, 943 F.3d 882, 885-86 (9th Cir. 2019) (affirming denial of injunctive relief because "[a]ppellants notably do not point to a specific practice that applies uniformly to all proposed class members" and "there is no evidence that every Appellant has experienced the same challenged practice or suffered the same injury"); *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 481 (N.D. Cal. 2014) (denying Rule 23(b)(2) class where "diverse, individualized transactions" vary "depending on the specific facts giving rise to the individual customer's claim"); *McKinnon v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 4537957, *12 (N.D. Cal. July 27, 2015) (same).

**CONCLUSION**

For the reasons explained above, this Court should deny Plaintiff's motion for class certification.

Dated:  June 28, 2023

By:  */s/ Stephen D. Raber*
Stephen D. Raber (State Bar No. 121958)
Joseph S. Bushur (*pro hac vice*)
Campbell E. Curry-Ledbetter (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, D.C. 20024
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
E-mail:  sraber@wc.com
E-mail:  jbushur@wc.com
E-mail:  ccurry-ledbetter@wc.com

Jeffrey E. Faucette (State Bar No. 193066)
SKAGGS FAUCETTE LLP
Four Embarcadero Center, Suite 1400 PMB #72
San Francisco, CA 94111
Telephone:  (415) 295-1197
Facsimile:   (888) 980-6547
E-mail:  jeff@skaggsfaucette.com

*Attorneys for Defendant Mars Petcare US, Inc.*

**LOCAL RULE 5-1(h)(3) ATTESTATION**

I, Jeffrey E. Faucette, hereby attest in accordance with Local Rule 5-1(h)(3) that each signatory has concurred in the filing of the document.

Dated:  June 28, 2023

By:  */s/ Jeffrey E. Faucette*
Jeffrey E. Faucette

*Attorney for Defendant Mars Petcare US, Inc.*