1
2
3
4          IN THE UNITED STATES DISTRICT COURT
5          FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7    TAMARA MOORE, et al.,                    Case No.  16-cv-07001-MMC
8                Plaintiffs,
                                              **ORDER DENYING MOTIONS FOR
9          v.                                 CLASS CERTIFICATION**
10   MARS PETCARE US, INC., et al.,           Re: Doc. Nos. 261, 262, 264
11               Defendants.
12
13         Before the Court are three motions, filed May 17, 2023: (1) plaintiff Greta L. Ervin's

14   ("Ervin") "Motion for Class Certification" as to claims against defendant Royal Canin

15   U.S.A., Inc. ("Royal Canin") (see Doc. No. 261), (2) plaintiffs Tamara Moore ("Moore"),

16   Nichols Smith ("Smith"), and Cynthia Welton's ("Welton") "Motion for Class Certification"

17   as to claims against defendant Hill's Pet Nutrition, Inc.'s ("Hill's") (see Doc. No. 262), and

18   (3) plaintiff Renee Edgren's ("Edgren") "Motion for Class Certification" as to claims

19   against defendant Mars Petcare US, Inc. ("Mars") (see Doc. No. 264).  Each motion has

20   been fully briefed.  Having read and considered the papers filed in support of and in

21   opposition to the motions, the Court rules as follows.

22                                  **BACKGROUND**

23         In the operative complaint, the Second Amended Class Action Complaint ("SAC"),

24   plaintiffs allege Royal Canin, Hill's, and Mars "created and enforced upon retailers and

25   consumers the mandatory use of a prescription, issued by a veterinarian, as a condition

26   precedent to the purchase of certain cat and dog foods" (hereinafter, "the prescription

27   requirement"). (See Doc. No. 116 ("SAC") ¶ 1.)  Specifically, plaintiffs allege, Royal Canin

28   manufactures and markets a line of pet food in packaging labeled "Veterinary Diet"

United States District Court
Northern District of California

("VD"), Hill's manufactures and markets a line of pet food in packaging labeled "Prescription Diet" ("PD"), and Mars manufactures and markets a line of pet food in packaging labeled "Veterinary Formula" ("VF").  (See SAC ¶ 87a, b, d, Exhibit A.) According to plaintiffs, by creating and enforcing the prescription requirement as to PD, VD, and VF, defendants are leading reasonable consumers to believe, incorrectly, that said pet food "is approved by the FDA, has been subject to government inspection and testing, and has medicinal and drug properties that legally require a prescription for sale." (See SAC ¶ 11.)  As a result, plaintiffs allege, consumers "expect to and do pay a premium" for those products.  (See SAC ¶ 36.)

Based on the above allegations, plaintiffs assert, individually and on behalf of three putative classes, the following state law  causes of action: "Violation of California's Unfair Competition Law ('CA UCL') (Bus. & Prof. Code § 17200, et seq.)"; "Violation of California's False Advertising Law ('CA FAL') (Bus. & Prof. Code § 17500 et seq.)"; and "Violation of California's Consumer Legal Remedies Act ('CA CLRA') (Civil Code § 1750)."  (See SAC at 70:19-21, 72:1-3, 73:9-11.)

## LEGAL STANDARD

A plaintiff, to be entitled to an order certifying a class, "must establish the four prerequisites of [Rule] 23(a)" of the Federal Rules of Civil Procedure, see Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996), which are as follows: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class," see Fed. R. Civ. P. 23(a).  In addition, the plaintiff must establish "at least one of the alternative requirements of [Rule] 23(b)."  See Valentino, 97 F.3d at 1234.  Rule 23(b) provides for certification of a class where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

2

controversy."  See Fed. R. Civ. P. 23(b)(3).

"The party seeking certification . . . bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met."  See Nghiem v. Dick's Sporting Goods, Inc., 318 F.R.D. 375, 379 (C.D. Cal. Dec. 1, 2016); see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 665 (9th Cir. 2022) (holding plaintiff "must . . . carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence").  "If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class."  See Hadley v. Kellogg Sales Co., 324 F. Supp. 3d 1084, 1093 (N.D. Cal. 2018) (citing Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001)).

**DISCUSSION**

### A.  Royal Canin

Ervin alleges she "has a dog named Teddy," and that "[w]hen Teddy became ill with giardia," she "received a prescription from Teddy's primary-care veterinarian, located in California, for, and purchased, Royal Canin Veterinary Diet Gastrointestinal Puppy dry and wet dog food," and "also received a prescription from Teddy's specialty veterinarian, located in California, for, and purchased, Royal Canin Veterinary Diet Selected Protein Adult PV dry and wet dog food."  (See SAC ¶ 103.)  Ervin alleges she "was told by her veterinarian that these pet foods required a prescription to purchase" (see id.) and, at her deposition, confirmed that allegation (see Doc. No. 320-1 ("Ervin Dep.") at 15:22-24 (testifying that "[she] know[s] it's called prescription dog food when discussed with the vet" and that "[i]t was referred to as prescription dog food")).

Ervin seeks to represent a class of "all California residents who purchased Royal Canin's Veterinary Diet pet foods from any retailer in California" within the relevant class period, specifically, from December 7, 2012, to the present for the UCL claim and from December 7, 2013, to the present for the CLRA and FAL claims.  (See Doc. No. 261-1 ("Mot. re: Royal Canin") at 8:15-18.)

The Court first addresses Ervin's showing under Rule 23(a), which Royal Canin does not challenge.

### 1. Rule 23(a)(1): Numerosity

"[C]ourts . . . have concluded that the numerosity requirement is usually satisfied where the class comprises 40 or more members." Zeiger v. WellPet LLC, 526 F. Supp. 3d 652, 690 (N.D. Cal. 2021) (internal quotation and citation omitted).

Here, Ervin has provided evidence, specifically, "sales data," demonstrating "there were thousands of VD purchasers throughout California during the class period." (See Doc. No. 320-27, Exhibit 27 to Mot. re: Royal Canin)

Given such showing, the Court finds the numerosity requirement is satisfied.

### 2. Rule 23(a)(2): Commonality

The commonality requirement of Rule 23(a)(2) is satisfied where "plaintiffs . . . show that their claims 'depend upon a common contention' that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." See A. B. v. Hawaii State Dep't of Educ., 30 F.4th 828, 839 (9th Cir. 2022) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011)). "[F]or purposes of Rule 23(a)(2) even a single common question will do." See Wal-Mart, 564 U.S. at 359 (internal quotation, citation, and alterations omitted).

Here, Ervin contends "[c]ommon questions, the answers to which will resolve issues that are central to the validity of [her] (and the [c]lass') claims, include:"

> (1) Whether Royal Canin engaged in deceptive or fraudulent conduct under the UCL, CLRA, and/or FAL by marketing and selling "Veterinary Diet" labeled products pursuant to its prescription requirement and without disclosing that the products are not legally required to be sold by prescription and do not contain medicine[;]
> (2) Whether Royal Canin's representations and omissions regarding VD products are literally false and/or likely to deceive a reasonable consumer;
> (3) Whether Royal Canin's representations and omissions regarding VD products are material to a reasonable consumer; and
> (4) Whether the amount of damages or restitution due to the [c]lass as a result of Royal Canin's deceptive conduct can be measured on a classwide basis.

United States District Court
Northern District of California

1   (See Mot. re: Royal Canin at 9:16-23.)

2        Courts in this district have found such questions sufficient for purposes of

3   satisfying the commonality requirement.  See Fitzhenry-Russell v. Dr. Pepper Snapple

4   Grp., Inc., 326 F.R.D. 592, 607 (N.D. Cal. 2018) (finding question whether allegedly

5   deceptive label was "likely to deceive reasonable consumers" was question common to

6   class) (collecting cases); Zeiger, 526 F. Supp. 3d at 691 (finding "whether reasonable

7   consumers would be misled by" allegedly "misleading marketing claims" was question

8   common to class); Kumar v. Salov N. Am. Corp., 2016 WL 3844334, at *5 (N.D. Cal. July

9   15, 2016) (holding "[w]hether the label statement violates [various] laws, and therefore

10  establishes a predicate for a UCL, FAL or CLRA claim, is a common question, both

11  factually and legally").

12       In light of the above, the Court finds the commonality requirement is satisfied.

13       **3.  Rule 23(a)(3): Typicality**

14       "The test of typicality is whether other members have the same or similar injury,

15  whether the action is based on conduct which is not unique to the named plaintiffs, and

16  whether other class members have been injured by the same course of conduct."  See

17  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation and

18  citation omitted).

19       Here, Ervin asserts that "[she] and the Class have suffered the same injury,"

20  namely, "overpa[yment] for VD products based on Royal Canin's deceptive conduct,"

21  (see Mot. re: Royal Canin at 9:13-14), that her claims and the proposed class members'

22  claims are based on the same conduct, namely, "Royal Canin's business practice of

23  requiring a veterinary 'prescription' as a mandatory prerequisite to purchase any VD

24  product, which Royal Canin imposes on all VD resellers and enforces" (see id. at 10:14-

25  16 (emphasis omitted)), and that "[p]urchasers of all VD products suffered a substantially

26  similar harm" from said business practice (see id. at 10:19-20).

27       In light of the above, the Court finds the typicality requirement is satisfied.

28

United States District Court
Northern District of California

### 4.  Rule 23(a)(4): Adequacy

"To determine adequacy of representation under Rule 23(a)(4), the Court must consider: '(1) whether the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) [whether] the representative plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.'" See Kumar, 2016 WL 3844334, at *2 (quoting Staton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003)) (alteration omitted).

Ervin contends "[t]here are no conflicting or antagonistic interests" where, as here, "the representative [plaintiffs] seek damages under the same California statutes" (see Mot. re: Royal Canin at 11:3-4), and that she, "as a conscientious representative, fully participated in discovery" and is "represented by local and national counsel with experience in consumer class actions and complex litigation" (see id. at 11:5-7).

In light of such circumstances, the Court finds the adequacy requirement is satisfied.

### 5.  Rule 23(b)(3): Predominance

As noted, Rule 23(b)(3) requires, in addition to the prerequisites of Rule 23(a), a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." See Fed. R. Civ. P. 23(b)(3).  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." See Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016) (internal quotation and citation omitted).  "In order for the plaintiffs to carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." See Olean, 31 F.4th at 665.

Here, Ervin argues, common questions as to the likelihood of deception, materiality, and damages predominate over individual questions.  (See Mot. re: Royal

United States District Court
Northern District of California

1  Canin at 1:19-23.)

2  ### a. Likelihood of Deception

3  Ervin contends "[c]ommon questions regarding whether Royal Canin's

4  representations and omissions regarding VD products are literally false, and/or likely to

5  mislead reasonable consumers are central to [her] UCL, FAL, and CLRA claims."  (See

6  Mot. re: Royal Canin at 12:18-20.)

7  The UCL, FAL, and CLRA "prohibit not only advertising which is false, but also

8  advertising which, although true, is either actually misleading or which has a capacity,

9  likelihood or tendency to deceive or confuse the public."  See Moore v. Mars Petcare US,

10  Inc., 966 F.3d 1007, 1017 (9th Cir. 2020) (emphasis in original) (internal quotation,

11  citation, and alteration omitted).  Claims under those three "California statutes are

12  governed by the reasonable consumer test," see Williams v. Gerber Prod. Co., 552 F.3d

13  934, 938 (9th Cir. 2008) (internal quotation and citation omitted), which requires a plaintiff

14  to "show that members of the public are likely to be deceived," see id. (internal quotation

15  and citation omitted), specifically, "that a significant portion of the general consuming

16  public or of targeted consumers, acting reasonably in the circumstances, could be

17  misled," see Moore, 966 F.3d at 1017 (internal quotation and citation omitted).  Ordinarily,

18  "[t]his objective test renders claims under the UCL, FAL, and CLRA ideal for class

19  certification because they will not require the court to investigate class members'

20  individual interaction with the product."  See Tait v. BSH Home Appliances Corp., 289

21  F.R.D. 466, 480 (C.D. Cal. 2012) (internal quotation and citation omitted). "[T]he question

22  of likely deception," however, "does not automatically translate into a class-wide

23  question." See Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1068 (9th Cir. 2014)

24  (affirming denial of class certification where customers' experiences as to challenged

25  contract terms varied).

26  Here, Royal Canin contends Ervin's proposed class should not be certified

27  because there were "no uniform 'prescription' representations [made] to class members."

28  (See Doc. No. 285 ("Opp'n re: Royal Canin") at 12:7.)   In particular, Royal Canin argues,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    inter alia, "pet owners encounter a variety of circumstances when it comes time to buy

2    [VD]" (see id. at 14:3).  As set forth below, the Court finds Royal Canin's argument

3    persuasive.

4                                          **(i) Exposure**

5         Although Ervin asserts the prescription requirement is "the core, uniform

6    deception, which universally applies to all VD purchasers" (see Doc. No. 301 ("Reply re:

7    Royal Canin") at 4:19-20; see also SAC ¶ 1), Ervin has not shown all purchasers are

8    exposed to this requirement nor that those who are exposed have uniform experiences.

9    While Ervin has provided evidence that "every VD product and purchase is subject to

10   Royal Canin's universal [p]rescription [r]equirement" (see Reply re: Royal Canin at 9:7-8;

11   see also Doc. No. 320-8 ("Royal Canin VD Distribution Statement") ("Our [c]ompany's

12   distribution policy ensures that [VD] products are sold only by licensed veterinarians or

13   pursuant to prescriptions written by licensed veterinarians"); Doc. No. 261-7 (Royal Canin

14   Marketing Director Dep.) at 17:17-20 (testifying VD pet foods "have to be prescribed by

15   [a] vet before the pet parent can purchase them")), the fact that a product is universally

16   subject to a requirement does not mean the purchasers of such product are made aware

17   of the requirement or, for those who do learn of it, that they do so in a uniform manner.

18        Here, defendants have submitted evidence that pet owners can purchase

19   prescription pet foods without ever learning a prescription is required. In particular, pet

20   owners can only obtain Royal Canin VD after first having an appointment with a

21   veterinarian, and veterinarians are not required, either by Royal Canin or otherwise, to

22   use any uniform script or materials when discussing the food with pet owners. (See Doc.

23   No. 261-11 ("Royal Canin Direct Buy Agreement") at ¶ 4.D (stating veterinarians at

24   partner animal clinics need only "provide accurate, prompt and competent technical

25   advice" regarding Royal Canin products)). Indeed, based upon a survey of veterinarians,

26   defendants' expert Sarah Butler ("Butler") found "the majority of veterinarians [who sell

27   prescription pet food in their clinics] do not provide a written prescription and thus most

28   consumers will not experience this gating mechanism." (See Doc. No. 280-7 ("Butler

Rep.") ¶¶ 101 n.108, 196.) In other words, pet owners may visit a veterinarian, discuss the recommendation that their pet be put on a prescription pet food diet, and buy the prescription pet food directly from the veterinarian's clinic without ever hearing about a prescription requirement or seeing a written prescription.

Moreover, even when purchasing prescription food from an outside provider, purchasers may not be alerted to the existence of the prescription requirement. Defendants require prescription pet food retailers to confirm pet owners have a veterinarian's prescription, but, for purposes of such confirmation, some retailers only ask a customer to provide his or her veterinarian's contact information and never alert the customer to the prescription requirement during the purchasing process. (See e.g., Doc. No. 261-6 ("Chewy Prescription Approval Process Flow Chart") (showing customer must "provide vet information at checkout," after which Chewy confirms veterinarian approval directly with veterinarian and "prescription [is] created and recorded in backoffice").)

As Royal Canin points out, the Ninth Circuit has found class certification inappropriate where not all putative class members were exposed to the deceptive practice. See Berger, 741 F.3d at 1069 (finding common questions did not predominate where plaintiff "ha[d] not alleged that all of the members of his proposed class were exposed to [defendant]'s alleged deceptive practices"); see also Mazza v. Am. Honda Motor Co., 666 F.3d 581, 596 (9th Cir. 2012) overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651 (9th Cir. 2022) (vacating class certification where "it [was] likely that many class members were never exposed to the allegedly misleading advertisements").

In response, Ervin, citing In re Tobacco II Cases ("Tobacco II"), 46 Cal. 4th 298 (2009), argues reliance, and impliedly exposure, can be presumed. In Tobacco II, however, "evidence was admitted to prove the decades-long campaign of the tobacco industry to conceal the health risks of its product while minimizing the growing consensus regarding the link between cigarette smoking and lung cancer and, simultaneously, engaging in saturation advertising targeting adolescents, the age group from which new

smokers must come." <u>Tobacco II</u>, 46 Cal. 4th at 327 (internal quotation and citation omitted).

Here, by contrast, Ervin points to no evidence of marketing materials aimed at consumers beyond a "consumer-facing video" by the "Pet Food Institute, a trade group that counts RC as a member of its Board of Directors," in which a veterinarian states "[y]our veterinarian may prescribe a therapeutic pet food" (<u>see</u> Pls.' Supp. Brief re: Royal Canin at 3:1-5 (quoting Exhibit 81 thereto)), a "Royal Canin[] consumer-facing website" which included the statement "Royal Canin veterinary diets are available by prescription only" (<u>see id.</u> at 3:7-8 (quoting Exhibit 128 thereto)), and a 2001 "Royal Canin Cat Encyclopedia" that discussed "Prescription Foods" (<u>see id.</u> at 3:24-4:4 (quoting Exhibit 8 thereto)). Such evidence falls far short of the widescale advertisement campaign in <u>Tobacco II</u>, and, consequently, does not support a finding of classwide exposure. <u>See, e.g.</u>, <u>Todd v. Tempur-Sealy Int'l, Inc.</u>, 2016 WL 5746364, at *10 (N.D. Cal. Sept. 30, 2016) (holding 300 million pages of direct mail advertisement and 25 million website views "failed to demonstrate the marketing at issue was sufficiently extensive such that one can infer exposure on a class-wide basis").

In further response, Ervin proposes the use of "a claim form or questionnaire" for purposes of self-identifying those individuals who were exposed. (<u>See</u> Doc. No. 407 ("Supp. Sur-reply re: Royal Canin") at 3:9-13.) The use of a claims form, however, is not appropriate where the form seeks to elicit recall of events prone to "subjective memory problems." <u>See</u> <u>In re Hulu Priv. Litig.</u>, No. C 11-03764 LB, 2014 WL 2758598, at *16 (N.D. Cal. June 17, 2014) (holding self-reporting by affidavit inappropriate when form asked questions about customers' web-browser use and settings). Here, Ervin proposes asking putative class members to recall specific details of how they learned of the prescription requirement from conversations or other events that occurred almost twelve years ago. (<u>See</u> Mot. re: Royal Canin (defining class period as encompassing December 2012 to present); Supp. Sur-reply re: Royal Canin at 3:10-13 (setting forth proposed questions)); <u>see also</u> <u>Mobile Emergency Hous. Corp. v. HP, Inc.</u>, 2023 WL 9550942, at

1   *13 (N.D. Cal. Dec. 8, 2023) (holding self-identification of putative class members through

2   use of affidavits inappropriate where "affidavit would require a putative class member to

3   attest to not seeing one of several potential disclosures more than two years ago").

4          Accordingly, as to the likelihood of deception, given the above discussed failure to

5   show classwide exposure, Ervin has not met her burden of showing common questions

6   predominate, and, consequently, class certification is not appropriate. Moreover, as set

7   forth below, even for those purchasers who were exposed to the prescription

8   requirement, Ervin has not shown common questions as to the likelihood of deception

9   predominate.

**(ii)   Circumstances of Exposure**

11          Even where pet owners are apprised of the prescription requirement, Royal Canin

12   has provided evidence that their experiences can vary markedly, thereby causing those

13   class members' understanding of the prescription requirement, i.e. whether a class

14   member is likely to be deceived, to vary as well.

15          As noted, every pet owner, in order to obtain prescription pet food, must meet with

16   a veterinarian. In that regard, defendants' expert Butler, based on her survey, found

17   veterinarians "communicate an array of information to pet [owners]" and "what vets say is

18   a function of their individual practices, experience, and the questions consumers ask."

19   (See Butler Rep. at 109-10, tbls.7 & 8.) Plaintiffs' experts are in accord. Plaintiffs' expert

20   Rebecca Reed-Arthurs, PhD ("Dr. Reed-Arthurs") acknowledged that "a consumer's

21   exposure to information about prescription pet foods differs over time, place, [and] by

22   content" (see Doc. No. 285-2 ("Reed-Arthurs Dep.") at 191:25–192:7), and plaintiffs'

23   expert Thomas Maronick, DBA ("Dr. Maronick") agreed that "the vet," "the pet," "the pet's

24   condition," and "what's . . . available" are "all factors that will come into discussion" (see

25   Doc. No. 285-3 ("Maronick Dep.") at 96:16-24). Consistent therewith, Steven Hill, DMV

26   ("Dr. Hill"), Ervin's veterinarian, testified that the information he conveys to pet owners

27   "var[ies] based on the individual case and the diagnosis" (see Doc. No. 261-24 ("Hill

28   Dep.") at 20:21-22); he also testified that he has "never indicated to a client that there

11

was a medication in food" and that he has "never had a client indicate to [him] that they thought there was a medication in the food." (See id. Hill Dep. at 23:25-24:3.). In sum, what one veterinarian conveys to a pet owner who buys prescription pet food may be markedly different from what is conveyed to another, and given such variation, the Court, as discussed below, finds Ervin has failed to meet her burden to show common questions as to the likelihood of deception predominate.

At the outset, the Court notes that Ervin is not relying on the product's label as the means by which the prescription requirement is communicated. (See Doc. No. 368 ("Class Cert. Tr.") at 62:22-63:2 (responding "no" when asked if "plaintiffs [are] bringing a freestanding mislabeling case").) Indeed, the VD label bears the phrase "veterinary diet," and Ervin concedes that nothing in the packaging or label says the pet food is a "prescription product" or "prescription medication." (See Doc. No. 261-3 ("Ervin Dep.") at 123:19-124:1, 126:4-10.) Consequently, Ervin is, in essence, relying on verbal communications from a variety of sources, resulting in contexts that, as noted, can vary markedly even if the requirement is conveyed in the course thereof. See Fairbanks v. Superior Ct., 197 Cal. App. 4th 544, 556, 561-64 (2011) (affirming denial of class certification where plaintiffs did not rely solely on challenged policy language but, rather, on the "*combination* of [death benefit] illustration, policy design, annual statements[,] agent training, and marketing materials") (emphasis in original) (internal quotation and citation omitted). Even where purchasers have been exposed to uniform written materials, courts have found predominance is not satisfied where putative class members' experiences varied. See Kaldenbach v. Mut. of Omaha Life Ins. Co., 178 Cal. App. 4th 830, 841-42, 847 (2009) (affirming denial of class certification where plaintiff "primarily relied upon uniformity in [defendant]'s sales materials, training, and illustrations," but "there was no evidence that uniform training or sales materials were used with each putative class member"; finding "individualized issues predominated"); see also id. at 845 (citing In re LifeUSA Holding Inc., 242 F.3d 136, 145-148 (3d Cir. 2001) (distinguishing case "involve[ing] uniform, scripted, and standardized sales

presentations")).

Accordingly, Ervin has failed to show common questions predominate as to the central issue, likelihood of deception.

### b. Materiality and Damages

The UCL, FAL, and CLRA all "allow[] plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material."  See Fitzhenry-Russell, 326 F.R.D. at 612. In the absence of a uniform representation having been conveyed to the putative class, however, the question of materiality will depend, as here, on the circumstances particular to the individual consumer, thus precluding a finding of predominance as to materiality.

Lastly, in light of the Court's finding that Ervin has failed to meet her burden of showing predominance as to the likelihood of deception and materiality, the Court does not address herein the question of predominance as to damages, other than to note that the same reasons why likelihood of deception and materiality are not susceptible to class certification are equally appliable to the issue of damages as well.

### 6. Conclusion: Royal Canin

Ervin having failed to show common questions of fact predominate, Ervin's motion for class certification will be denied.

### B. Hill's

Welton alleges she "has a dog named Kodiak," and that when "Kodiak became ill with a kidney problem, [she] received a Prescription from Kodiak's veterinarian, located in Menlo Park, [California,] for, and purchased, Hill's Prescription Diet k/d wet and dry dog food."  (See SAC ¶ 106.)  Welton further alleges "[t]he veterinarian told her that a prescription was required before she could purchase the product, which she purchased from the veterinarian."  (See id.; see also Doc. No. 322-1 ("Welton Dep.") at 62:24-25 (testifying, regarding PD k/d, "it was a prescription like any other prescription that we get there").)  "From August 2014 through at least November 16, [Welton] purchased [PD k/d] . . . believ[ing] that the Hill's 'Prescription' [k/d] food had medicinal qualities not available

United States District Court
Northern District of California

1   in non-prescription dog food." (See Doc. No. 322-2 ("Welton's Resp. to Hill's First Set of

2   Interrogs.") at Resp. 6(f).)

3          Smith alleges he "has a cat named Mimi, and . . . also had a cat named Neichi,"

4   and that "[w]hen Mimi and Neichi became overweight, [he] received a prescription from

5   the cats' veterinarian, located in Sonoma County, [California,] for, and purchased Hill's

6   Prescription Diet Glucose/Weight Management m/d cat food from the veterinarian's

7   clinic." (See SAC ¶ 104.) Smith further alleges he "was told by the veterinarian that a

8   prescription was required for [said] cat food." (See id.; see also Doc. No. 322-3 at 80:6-8

9   ("Smith Dep.") (testifying that "when [vet] said it was a prescription diet, [he] just assumed

10  that there was medication").) Smith "is without knowledge of the date of each purchase"

11  but states under oath that he purchased PD m/d "believ[ing] that he was receiving a

12  product that could, by law, only be obtained by prescription and that had medicinal

13  qualities not found in non-prescription foods." (See Doc. No. 322-5 ("Smith's Am. and

14  Restated Resp. to Hill's First Set of Interrogs.") at Resp. 6.)

15         Moore alleges she "has a dog named Pugalicious," and that "[w]hen Pugalicious

16  had to undergo surgery to remove kidney stones, [she] received a prescription from

17  Pugalicious's veterinarian, located in Santa Clara County, [California,] for Hill's

18  Prescription Diet u/d dog food, which she purchased first from a VCA Animal Hospital

19  and subsequently from PetSmart." (See SAC ¶ 101.) Moore further alleges that she

20  "was told by her veterinarian that a prescription was required before she could purchase

21  the product" (see id.; see also Doc. No. 322-7 ("Moore Dep.") at 241:12-14 (testifying that

22  she "was given a prescription on a prescription pad when [she] was first prescribed this

23  [product]")) and that "[s]he tried to purchase the product at another VCA Animal Hospital,

24  but was refused because she failed to present a prescription" (see SAC ¶ 101). Given

25  such circumstances, Moore avers, she "purchased [PD u/d] from approximately 2011 to

26  approximately 2017, . . . believ[ing] that she was receiving a product that could only be

27  obtained by prescription and that had medicinal qualities not found in non-prescription

28  foods." (See Doc. No. 322-8 ("Moore's Resp. to Hill's First Set of Interrogs.") at Resp.

14

6(a), (i); see also Moore Dep. at 92:25-93:5 (testifying that "a prescription in [her] opinion is generally what is used when you have a condition that requires some sort of medicine or something that is going to make that condition better").)

Welton, Smith, and Moore (collectively, "Hill's Plaintiffs") seek to represent a class of "all California residents who purchased Hill's Prescription Diet pet foods from any retailer in California." (See Doc. No. 262-1 ("Mot. re: Hill's") at 14:1-3.)

The Court first addresses the Hill's Plaintiffs' showing under Rule 23(a)(1) and (a)(2), which Hill's does not challenge.

### 1. Rule 23(a)(1): Numerosity; Rule 23(a)(2): Commonality

As to numerosity, the Hill's Plaintiffs provide evidence that "Vetsource's sales data, which reflects sales by just one of many PD retailers, demonstrates that there were thousands of PD purchasers throughout California during the class period." (See Mot. re: Hill's at 14:11-13.) As to commonality, the Hill's Plaintiffs contend that "[c]ommon questions, the answers to which will resolve issues that are central to the validity of [p]laintiffs'(and the [c]lass') claims, include":

(1) Whether Hill's engaged in deceptive or fraudulent conduct under the UCL, CLRA, and/or FAL by marketing and selling "Prescription Diet" labeled products pursuant to the prescription requirement and without disclosing that the products are not legally required to be sold by prescription and do not contain medicine;
(2) Whether Hill's representations and omissions regarding PD products are literally false and/or likely to deceive a reasonable consumer;
(3) Whether Hill's representations and omissions regarding PD products are material to a reasonable consumer; and
(4) Whether the amount of damages or restitution due to the Class as a result of Hill's deceptive conduct can be measured on a classwide basis.

(See id. at 15:2-11.)

For the same reasons as discussed above with respect to Ervin's motion, the Court finds the numerosity and commonality requirements are satisfied.

### 2. Rule 23(a)(3): Typicality; Rule 23(a)(4): Adequacy

The Hill's Plaintiffs argue their claims are typical, in that "[p]urchasers of all PD

United States District Court
Northern District of California

United States District Court
Northern District of California

1   products suffered a substantially similar harm" resulting from "Hill's business practice of

2   requiring a veterinary 'prescription' as a mandatory prerequisite to purchase any PD

3   product" (see Mot. re: Hill's at 16:1-6), and that there is adequacy of representation, in

4   that they have "no conflicting or antagonistic interests" and "have demonstrated

5   knowledge of the claims" (see id. at 16:19-20.) In response, Hill's contends "[p]laintiffs are

6   atypical and inadequate representatives of the proposed class." (See Doc. No. 276

7   ("Opp'n re: Hills") at 3:19-20.)

8       First, Hill's argues, Smith "lacks standing" to bring his claims "because [those]

9   claims belong to his bankruptcy estate." (See Opp'n re: Hill's at 24:11-12.)  Specifically,

10  Hill's asserts, "Smith filed for Chapter 7 bankruptcy in 2018 and received an order of

11  discharge later that year, yet never disclosed his interest in this litigation (in which he has

12  been a plaintiff since 2016)." (See id. at 24:16-17.) In response, the Hill's Plaintiffs note

13  that Smith subsequently "re-opened his bankruptcy case, properly scheduled (i.e.,

14  disclosed) his cause of action here as an asset, and that asset was not otherwise

15  administered prior to the re-closing of the bankruptcy case," with the result that,

16  according to the Hill's Plaintiffs, "Smith is, again, the rightful owner of his claim here."

17  (See Doc. No. 396 ("Pls' Mot. for Leave to File Order of Discharge") at 4:19-22.)

18      "In the Ninth Circuit, when an individual files bankruptcy, all causes of action that

19  accrued before the filing generally become the property of the bankruptcy estate."

20  Alakozai, 2014 WL 5660697, at *12 (internal quotation and citation omitted); see also

21  Kingsbury v. U.S. Greenfiber, LLC, 2014 WL 12567838, at *2 (C.D. Cal. Aug. 5, 2014)

22  (noting "[w]here . . . a debtor fails properly to schedule an asset, including a cause of

23  action, that asset continues to belong to the bankruptcy estate and does not revert to the

24  debtor" (internal quotation, citation, and alterations omitted)).  "As a result, the individual

25  lacks standing to bring an action based on the claim because the claim has become the

26  property of the bankruptcy estate."  See Alakozai, 2014 WL 5660697, at *12.

27      The subsequent abandonment of such interest, however, "may constitute the

28  estate's ratification of the debtor's actions, permitting the debtor to cure the standing

1    problem so long as the debtor had made an 'understandable mistake' by proceeding in

2    his own name, as opposed to some sort of strategic manipulation. See Cullen v. Bank

3    One Corp., 145 F. App'x 192, 193 (9th Cir. 2005).

4        Here, Smith reopened his bankruptcy case and amended his schedules to

5    disclose his causes of action in the instant case, which interest was not administered by

6    the trustee prior to the re-closing of the bankruptcy case (see Doc. No. 396; see also

7    Doc. No. 397-9 (Decl. of Hannah Chanoine Ex. H (Debtors' Ex Parte Motion to Reopen

8    Bankruptcy Case) at 1-4); Doc. No. 397-2 (Decl. of Hannah Chanoine Ex. A (In re Smith,

9    No. 9:18-bk-10495-RC (C.D. Cal.) Docket) at 3)), and, consequently, has been

10   "abandoned to the debtor" (see 11 U.S.C. § 554(c)).

11       Next, the Court must determine whether Smith made an "understandable mistake"

12   by initially proceeding here in his own name. In that regard, Smith plausibly has explained

13   that he did not disclose his interest in the instant case to the bankruptcy court because,

14   as of the date he filed his bankruptcy petition, the case had been dismissed, and,

15   although on appeal, he did not consider it an asset. (See Doc. No. 397-9 (Decl. of

16   Hannah Chanoine, Ex. H (Smith Decl.) at 5).)

17       Accordingly, as to Smith, the Court finds the typicality and adequacy requirements

18   are satisfied.

19       As to Welton and Moore, Hill's, citing Faulk v. Sears Roebuck & Co., 2013 WL

20   1703378 (N.D. Cal. Apr. 19, 2013), argues they "cannot represent the proposed class

21   because they continued to buy therapeutic foods after becoming aware that PD

22   contained no medicine and is not legally required to be sold by prescription." (See Hill's

23   Opp'n at 24:22-25); see also Faulk, 2013 WL 1703378 at *9 (holding named plaintiff who

24   "continued to purchase" product "even after he became aware" of alleged deception

25   "show[ed] . . . materiality may not be susceptible to proof by objective criteria").

26       In that regard, Hill's argues, "Welton's husband is a physician, and she understood

27   from the outset that PD was not medicine but a 'therapeutic formulation'" (see Opp'n re:

28   Hill's at 10:20-21 (citing Welton Dep. at 68:3-6 (testifying "[i]t was a therapeutic

United States District Court
Northern District of California

1   formulation [Kodiak] was given for his medical issue is my understanding"))), apparently

2   implying Welton's husband must have known PD contained no medicine and passed on

3   that information to his spouse.  The Court finds Hills' double speculation, first as to

4   Welton's husband's knowledge and then as to what he conveyed, insufficient to support a

5   finding of inadequacy.

6       As to Moore, the Hill's Plaintiffs provide evidence that she first purchased PD

7   believing "it would have some sort of medicinal content" (see Moore Dep. at 94:14-15)

8   and that it "mattered to [her]" that "[i]t was a prescription" (see id. at 302:9-12). Although

9   the Hill's Plaintiffs concede "Moore bought PD a few times after she filed suit," they point

10  to evidence that she stopped buying it once she felt she was able to do so without

11  jeopardizing her pet's health. (See Doc No. 302 ("Reply re: Hill's") at 15:4-7 (citing Moore

12  Dep. at 84:18-21 ("It took [Pugalicious] probably a good three weeks maybe, maybe four,

13  before he was able to fully transition without getting sick or having diarrhea").)

14      Accordingly, as to Moore and Welton, the Court finds the typicality and adequacy

15  requirements are satisfied.

16          **3.  Rule 23(b)(3): Predominance**

17      The Hill's Plaintiffs, like Ervin, contend common questions as to the likelihood of

18  deception, materiality, and damages predominate over individual questions.  (See Mot.

19  re: Hill's at 6:20-23.)  In that regard, they make essentially the same arguments as made

20  in Ervin's motion for class certification, with some differences as to evidentiary support,

21  which differences the Court addresses below.

22          **a.  Likelihood of Deception**

23      As to likelihood of deception, the Hill's Plaintiffs, much like Ervin, argue "[c]ommon

24  questions regarding whether Hill's representations and omissions regarding PD products

25  are literally false, and/or likely to mislead reasonable consumers central to [Hill's]

26  Plaintiffs' UCL, FAL, and CLRA claims."  (See Mot. re: Hills at 18:8-10.)

27          **(ii) Exposure**

28      Although the Hill's Plaintiffs' argument varies from Ervin's as to the evidence they

United States District Court
Northern District of California

cite to support the contention that reliance, and impliedly exposure, can be presumed, their argument likewise is unavailing. In particular, they cite a "2011 book for pet parents" that "discusses 'veterinary prescription diets'" (see Pls.' Supp. Brief re: Hill's at 3:26-27 (citing Exhibit 3 thereto)), "a 2017 email to millions of PetSmart customers marketing 'veterinary diets' as requiring a prescription" (see id. at 4:4-6 (citing Exhibit 15 thereto) (emphasis added)), and a reference to a Hill's YouTube channel that "includes commercials such as [a] 2023 spot featuring pet parents discussing the 'prescription diet food'" (see id. at 7:24-8:2.) As discussed above, such evidence continues to fall far short of the widescale advertisement campaign in Tobacco II. See, e.g., Todd v. Tempur-Sealy Int'l, Inc., 2016 WL 5746364, at *10 (N.D. Cal. Sept. 30, 2016). Moreover, the first of the above three citations is a critical evaluation of prescription pet foods in which the author questions the efficacy of such formulations, describes how and why they are being marketed, and makes clear they differ from other pet foods as to their nutrient content, not by the addition of drugs. (See, e.g., Pls.' Supp. Brief re: Hills, Ex. 3 at 5 (concluding "these foods . . . . are likely to do less harm than prescription drugs"; observing, "the ingredient list . . . looked much like that of any other premium pet food.")

Accordingly, for the same reasons as discussed above as to Royal Canin, the Hill's Plaintiffs have failed to show classwide exposure to the challenged requirement, and, consequently, class certification is not appropriate. Moreover, as set forth below, even for those purchasers who were exposed to the prescription requirement, the Hill's Plaintiffs have not shown common questions as to the likelihood of deception predominate.

### (ii) Circumstances of Exposure

As noted earlier herein, Hill's, unlike Royal Canin, uses the word "prescription" on its PD pet food labels. As further noted, however, the Hill's Plaintiffs are not bringing a freestanding labeling case. (See Class Cert. Tr. at 62:22-63:2.) As alleged in the SAC, the label comprises only part of the purported deceptive conduct (see e.g., SAC ¶¶ 137, 148 (alleging each defendant violated UCL and CLRA by making

"misrepresent[ations] through the Prescription [Requirement], its advertising and marketing statements, and its failure to include any adequate disclaimer on Prescription Pet Food labels")), and, as the majority of consumers' first knowledge of and decision to purchase this type of pet food is at the time it is recommended by their veterinarian, they are unlikely to see the packaging until after that decision is made. Consequently, the difference in labeling has little bearing on the Court's analysis. Rather, for the reasons discussed above, the prescription requirement is not conveyed to all pet owners, and those who do learn of it do so in varying ways. Thus, the same reasons why likelihood of deception is not susceptible to class certification as to Royal Canin are equally appliable to Hill's.

### b. Materiality and Damages

In light of the Court's finding that the Hill's Plaintiffs have failed to meet their burden of showing predominance as to the likelihood of deception, the Court does not address again herein the question of predominance as to materiality and damages, other than to note again that the same reasons why likelihood of deception is not susceptible to class certification are appliable to these two issues as well.

### 4. Conclusion: Hill's

The Hill's Plaintiffs having failed to show common questions of fact predominate, the Hill's Plaintiffs' motion for class certification will be denied.

### C. Mars

Edgren alleges she "has a dog named Barkley," and that "[w]hen Barkley experienced skin and coat problems, [she] received a prescription from Barkley's veterinarian, located in San Mateo County, [California,] for, and purchased, Iams Veterinary Skin & Coat Plus Response KO dog food." (See SAC ¶ 105.) Edgren further alleges she "understood from her veterinarian that a prescription was required in order to purchase" said pet food (see id.) and, at deposition, testified that "the way that [she] bought this food, which was through a prescription," and the name "veterinary formula," signified it contained "drugs" (see Doc. No. 319-5 ("Edgren Dep.") at 115:22-25).

Edgren seeks to represent a class of "all California residents who purchased Mars' Veterinary Formula pet foods from any retailer in California" within the relevant class period, specifically, from December 7, 2012, to the present for the UCL claim and from December 7, 2013, to the present for the CLRA and FAL claims.  (See Doc. No. 264-1 ("Mot. re: Mars") at 7:13-16.)

### 1. Rule 23(a)(1): Numerosity; Rule 23(a)(2): Commonality; Rule 23(a)(4): Adequacy

Mars does not challenge Edgren's showing as to numerosity or adequacy, each of which is essentially the same as that made by Ervin, and for the reasons discussed above, the Court finds those requirements of Rule 23(a) are satisfied.  As to commonality, Mars appears to reserve its arguments for its challenge to predominance, which issue will be addressed later herein. The Court thus turns to Mars's arguments with regard to typicality.

### 2. Rule 23(a)(3): Typicality

Mars, asserting "Edgren did not read the label before purchasing IAMS Veterinary Formula," argues "Edgren's claims are not typical of the claims of class members who allegedly were deceived by and relied on the product label."  (See Doc. No 283 ("Opp'n. re: Mars") at 20:11-16 (citing Doc. No. 319-5 ("Edgren Dep.") at 106:6-9).)  As Edgren points out, however, "Mars' business practice of requiring a veterinary 'prescription' as a mandatory prerequisite to purchase any VF product, which Mars imposed and enforced as to all VF resellers, is at the heart of [her] UCL, CLRA, and FAL claims" (see Mot. re: Mars at 9:19-21 (emphasis omitted)), and, as noted, she testified the "way" she purchased the food, signified to her that it contained "drugs" (see Edgren Dep. at 115:22-25).  Additionally, Edgren provides evidence that Mars, like Royal Canin and Hill's, imposed the prescription requirement as to every purchase of VF.  (See, e.g., Doc. No. 319-4 (Mars Veterinary Director, stating "IAMS® Veterinary Formula products are restricted for resale to consumers only through licensed veterinarians and veterinary clinics").)

United States District Court
Northern District of California

In light of the above, the Court finds the typicality requirement is satisfied.

### 3.  Rule 23(b)(3): Predominance

#### a.  Likelihood of Deception

Much like Royal Canin's challenge to Ervin's showing as to predominance, Mars challenges Edgren's showing on the ground that there were "[n]o uniform 'prescription' representations [made] to class members" (see Opp'n re: Mars at 11:21), specifically, that "there is no evidence that class members were uniformly exposed to a deceptive label" (see id. at 12:9-10), that the prescription requirement "is communicated to pet owners by their veterinarians" and "[t]he pet owner's understanding of the prescription requirement thus depends on what is said" (see id. at 13:7-8 (internal quotation and citation omitted)), and that "pet owners encounter a variety of circumstances when it comes time to buy the food" (see id. at 14:3). In sum, as discussed above, the prescription requirement is not conveyed to all pet owners, and those who do learn of it, do so in varying ways.

#### (i) Exposure

In support of her argument that reliance, and impliedly exposure, can be presumed, Edgren cites to evidence that Mars spent large sums of money on educating veterinarians, a 2016 "pet food blog[,] 'Dogs Naturally[,]'" which "posted about 'Prescription Diet Pet Food,'" the "language 'prescribed and sold only by veterinarians'" on VF packaging, and a sign referencing "veterinary prescription diets" at the office of Edgren's veterinarian. (See Pls.' Supp Brief re: Mars at 4:3-11). Such evidence, as with that submitted by Ervin and the Hill's Plaintiffs, falls far short of the widescale advertisement campaign in Tobacco II. See, e.g., Todd v. Tempur-Sealy Int'l, Inc., 2016 WL 5746364, at *10 (N.D. Cal. Sept. 30, 2016).

Accordingly, for the same reasons as discussed above as to Royal Canin and Hill's, Edgren has failed to show classwide exposure to the challenged requirement, and, consequently, class certification is not appropriate. Moreover, as set forth below, even for those purchasers who were exposed to the prescription requirement, Edgren has not

1    shown common questions as to the likelihood of deception and materiality predominate.

**(ii) Circumstances of Exposure**

3    While Edgren points out the "label of every VF product states: "dog [or cat] food
*prescribed* and sold only by veterinarians" (Underline Mot. re: Mars at 21:15-16 (emphasis
added by Edgren)), a label's inclusion of the word "prescription," or a variation thereof,
has only limited significance here, as no plaintiff is bringing a freestanding mislabeling
claim. Additionally, as discussed above, the prescription requirement is not conveyed to
all pet owners, and those who do learn of it, do so in varying ways. Consequently, the
same reasons why likelihood of deception and materiality are not susceptible to class
certification as to Royal Canin and Hill's, are equally appliable to Mars.

**b.  Damages**

12    Mars argues Edgren's class should not be certified for the independent reason that
"she has not presented any method—much less a valid method—for calculating damages
for the class of IAMS Veterinary Formula purchasers she seeks to certify." (Underline Doc. No.
374 ("Defs' Supp. Brief re: Mars Damages") at 1:13-15.) Edgren concedes she "ha[s] not
presented a classwide damages model for Mars' VF sales to the Class" (underline Mot for
Class Cert: re Mars at 15:15-16) but argues "there is no need for a damages model to
obtain certification of a Fed. R. Civ. P. 23(c)(4) issues class as to liability only."  (Underline
Doc. No. 385 ("Pls' Supp. Brief re: Mars Damages") at 1:5-6.) Issue certification does not
solve Edgren's predominance problem, however, because a Rule 23(c)(4) liability-only
class still requires a showing of predominance as to questions of liability, which, for the
reasons stated above, Edgren has failed to meet her burden of showing.

**4.  Conclusion: Mars**

24    Edgren having failed to show common questions of fact predominate, Edgren's
motion for class certification will be denied.

**CONCLUSION**

27    For the reasons discussed herein:

28    1.  Ervin's motion for class certification is hereby DENIED;

United States District Court
Northern District of California

2. Moore, Smith, and Welton's motion for class certification is hereby DENIED;

3. Edgren's motion for class certification is hereby DENIED.


**IT IS SO ORDERED.**


Dated: September 27, 2024

MAXINE M. CHESNEY
United States District Judge